UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


MARITZA REYES,

     Plaintiff,

v.                                   CASE NO.:

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

     Defendant.

_____

## COMPLAINT AND DEMAND FOR A JURY TRIAL AND PERMANENT INJUNCTIVE RELIEF REQUESTED

Plaintiff ("Plaintiff" or "Professor Reyes") hereby complains against the Board of Trustees of Florida Agricultural & Mechanical University ("Defendant" or "FAMU") as follows:

### I.    NATURE OF THE CLAIMS

1. This suit is brought by a Hispanic/Latina law professor who has been subjected to race, color, national origin, and sex discrimination and retaliation by Defendant in violation of: Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq.* ("Title VII"); 42 U.S.C. § 1983, as

amended ("§1983") for violating her rights under the Equal Protection Clause of the United States Constitution; and Florida Civil Rights Act of 1992, as amended and codified at Fla. Stat. § 760.01, *et seq.* ("FCRA").

2.  The unlawful discrimination, harassment, ongoing hostile work environment, and retaliation because of race, color, national origin, and sex have taken many forms, including a phenomenon termed by experts as "workplace mobbing."

3.  Plaintiff seeks all available remedies including damages, attorneys' fees, costs, interest, compensatory damages, and punitive damages.

## II.   PARTIES

4.  Plaintiff is a Hispanic/Latina, a woman of Hispanic, Latino origin, who resides in the State of Florida, Orange County, and is and was employed by Defendant at all times relevant to the allegations in this Complaint.

5.  Defendant is a public historically black college university ("HBCU") within the State University System of Florida ("SUS"). Defendant's main campus is located in Tallahassee Florida. Defendant's law school campus, Florida A&M University College of Law ("FAMU College of Law"), is located in Orlando, Florida, Orange County.[1]

---

[1] In 2000, through bipartisan efforts, the Florida Legislature re-established FAMU College of Law. To comply with the location requirements of the legislation, FAMU College of Law was located in Orlando, Florida.

6.  At all times relevant to this Complaint Defendant was an employer pursuant to the pertinent laws and received federal and state financial assistance.

7.  Defendant acted through its agents, representatives, and/or employees at all times material hereto.

### III.   JURISDICTION AND VENUE

8.  This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.  Plaintiff has complied with the administrative prerequisites by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Notice of Right to Sue from the EEOC and filed this Complaint within ninety (90) days of the Notice of Right to Sue.

10.  Plaintiff has fulfilled the conditions precedent prior to filing this Complaint.

11. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b).

## IV.   GENERAL ALLEGATIONS

12. Professor Maritza Reyes ("Professor Reyes") earned the "traditional" credentials to become a law professor before joining the faculty of FAMU College as a full-time tenure track assistant professor.

13.  Professor Reyes earned a Juris Doctor (J.D.) *summa cum laude* from Nova Southeastern University Shepard Broad College of Law ("Nova Law") in 2000 (graduating in the top 1% of her class of over 400 students). Professor Reyes attended Nova Law on a full-tuition, merit Goodwin academic scholarship. She earned Dean's List all semesters and book awards for highest grade in several courses. Professor Reyes served as Articles Editor of the *Nova Law Review* and earned membership in the Moot Court Honor Society. She also volunteered as Editor of the Florida Bar Foundation's Children First Project Legislative Bill-Tracking Publication, contributing writer in *Broadly Speaking*, Nova Law's Student Newspaper, and law student advisor.

14. During her J.D. studies at Nova Law, Professor Reyes earned several awards, including:  Best Brief in the Moot Court Freshmen Appellate Writing Competition, Student Bar Association Academic Achievement Award, Public Interest Bronze Pro Bono Award, Gold Circle Women's Club Scholarship, Young Lawyers Division of The Florida Bar Scholarship, the National Association of

Women Lawyers Award – Outstanding Law Student (2000), and Who's Who: American Law Students (20th ed.).

15.  During her J.D. studies at Nova Law, Professor Reyes gained practical legal experience as a summer associate with an international law firm and as a certified legal intern in the U.S. Attorney's Office Appellate Division.

16.  After earning her J.D., Professor Reyes's legal experience included working for private law firms as an associate and serving as a federal court law clerk at the district court level.

17.  In preparation to begin full-time law teaching, Professor Reyes attended the Harvard Law School ("Harvard Law") where she earned a Master of Laws (LL.M.) in 2008. Admission to the Harvard Law LL.M. program is highly competitive nationally and internationally. Only about one to two percent of students (a handful) admitted each year hold J.D. degrees from law schools in the United States and Puerto Rico.

18.  While at Harvard Law, Professor Reyes served as General Editor of the *Harvard Latino Law Review* and Coordinator of External Affairs of La Alianza, a student-run organization. She also participated in the Spring Pro Bono Program in the Florida Immigrant Advocacy Center. She was awarded a Congressional Hispanic Caucus Institute Graduate Scholarship and, upon graduation, a Harvard

Law Post-Graduate Research Fellowship. She published articles in the *Harvard Latino Law Revie*w, *The Harvard Law Record*, and *The Harvard Crimson*.

19. The re-established FAMU College of Law opened its doors in August 2002. It received provisional accreditation in August 2004. The Florida Legislature gave the FAMU College of Law a period of five years from the graduation of its first class to achieve full accreditation. Fla. Stat. § 240.7105(5) (2000). The FAMU College of Law graduated its first class in April 2005.

20. According to the FAMU College of Law 2008 Self Study, "[t]he founding dean of the law school, Percy Luney, was dismissed in June 2005 after allegations of financial improprieties. James Douglas was appointed interim dean and his tenure at the law school ended abruptly when he left the law school during the 2006 winter break. His associate dean, Ruth Witherspoon, became interim dean in January 2007 and held that position during an extensive dean search which culminated in the appointment of" "LeRoy Pernell, in late 2007."

21. Professor Reyes was recruited as the FAMU College of Law was seeking full approval by the American Bar Association (ABA)'s Council of the Section of Legal Education and Admissions to the Bar. Professor Reyes was identified by the 2008-2009 FAMU College of Law Faculty Recruitment Committee ("Recruitment Committee") in fall 2008 as a result of a national search through the Association of American Law Schools ("AALS") Faculty Recruitment Conference. Professor

6

Reyes became the first FAMU College of Law entry-level faculty member identified and hired through the AALS Faculty Recruitment Conference.

22. Professor Reyes was initially interviewed by Dean Pernell and faculty members of the Recruitment Committee at the AALS Faculty Recruitment Conference in Washington, D.C.  Subsequently, she was invited for a visit to the FAMU College of Law where she was interviewed by additional members of the faculty. Although there were many women on the faculty (Black women), the dinner with the faculty consisted of two White men, one of them picked up Professor Reyes from the airport. In hindsight, maybe that meant something, but Professor Reyes did not think much about it. As part of the on-campus visit Professor Reyes made a "job talk" presentation to faculty members. Thereafter, the faculty of the FAMU College of Law and Dean Pernell recommended to Dr. Cynthia Hughes Harris, the then Provost and Vice President for Academic Affairs, that she be hired as a full-time, tenure-earning, assistant professor of law.

23. On March 30, 2009, then FAMU University Provost Cynthia Hughes Harris made Professor Reyes an offer of employment as an assistant professor of law in a tenure-earning position. As part of the hiring negotiations, Professor Reyes requested the rules and standards for promotion and tenure. She received the rules for promotion and tenure that would apply to her according to the FAMU College of Law Faculty Handbook in existence at that time and a Memo prepared

by then Associate Dean for Research and Faculty Development and Professor of Law Kenneth B. Nunn (the "Nunn Memo").

24.  On April 7, 2009, Professor Reyes accepted the offer of employment as a full-time, tenure-earning/tenure-track faculty member of the FAMU College of Law in a position of assistant professor of law.

25.  The FAMU College of Law received full ABA accreditation  in July 2009.

26.  Under the terms agreed upon hiring, Professor Reyes was required to apply for tenure no later than the beginning of the 2014-2015 academic year, which was the beginning of her sixth tenure-earning year. The College of Law Faculty Handbook ("CoL Faculty Handbook")[2] stated: "Submission of materials by the candidate in support of his/her application for promotion and/or tenure must coincide with the University's Schedule for Promotion and Tenure as generated annually from the Provost's Office."[3] The "2014/2015 Tenure and Promotion Schedule" ("University Tenure Schedule") generated by the University stated that the deadline for applications for tenure and promotion was September 12, 2014.

27. The FAMU College of Law Retention, Promotion and Tenure (RPT) Committee is a Committee constituted pursuant to the rules of the CoL Faculty Handbook. When Professor Reyes joined the faculty, the RPT Committee

---

[2] The CoL Faculty Handbook that applied to Professor Reyes in the review of her applications for tenure and promotion was the CoL Faculty Handbook in existence when she was hired.

[3] CoL Faculty Handbook, § I.E.7.

consisted only of the tenured, full professors. At the urging of a group of Black female law professors who were not yet full professors, after they made their complaints to the ABA accreditation site teams, the CoL Faculty Handbook was amended to include all tenured associate and full professors in the RPT Committee.

28.  During the 2014-2015 academic year the RPT Committee consisted of the following tenured associate and full professors (the tenured faculty):  Randall S. Abate (a White man), Robert H. Abrams (a White man), Deleso A. Alford (a Black woman), Nicola ("Nicky") A. Boothe-Perry (a Black woman), Patricia ("Pat") Broussard (a Black woman), Jeffrey M. Brown (a Black man), Joan R.M. Bullock (a Black woman), Ann Marie B. Cavazos (a Black woman), Markita D. Cooper (a Black woman), John Duncan (a Black man), Jonathan W. Fineman (a White man), Joseph Grant (a Black man), Ronald C. Griffin (a Black man), William ("Bill") D. Henslee (a White man), Darryll K. Jones (a Black man), Lundy R. Langston (a Black woman), Shiv Persaud (an Asian/West Indian man), Rhonda M. Reaves (a Black woman), Omar Saleem (a Black man), Jennifer M. Smith (a Black woman), and Phyllis C. Taite (a Black woman).[4]

29. Aggregated by race, the members of the RPT Committee that reviewed Professor Reyes's application for tenure were as follows: ten (10) Black women, six (6) Black men, four (4) White men, and one (1) Asian/West Indian man. All the

---

[4] Professor Jeremy Levitt was on leave.

female members of the RPT Committee were Black women. There was no Latina/o (man or woman). Professor Reyes was the first Latina/o hired in the tenure track and the first to apply for tenure.

30. Dean LeRoy Pernell appointed Professor John Duncan as Chair of the 2014-2015 RPT Committee. Professor Duncan was supposed to guide Professor Reyes through the tenure process. However, he turned the process into an adversarial process even before she applied. He did not provide information and told Professor Reyes that she should contact Professor Phyllis Taite with questions. When Professor Reyes contacted Professor Taite with questions, she responded that she would forward her questions to Professor Duncan. Professor Taite treated Professor Reyes very rudely on August 20, 2014 during what was supposed to be a presentation when Professor Taite was going to provide information about the tenure process. Rather than answer Professor Reyes's questions, Professor Taite instructed her to submit her questions in writing. Therefore, Professor Reyes followed up via email. Unbeknown to Professor Reyes, Professor Taite sent a memorandum to Dean Pernell alleging that Professor Reyes was harassing her by asking her questions about the tenure process; this was before Professor Reyes applied for tenure. Professor Taite never informed Professor Reyes about this memorandum and she did not recuse herself from participation in Professor

Reyes's tenure process. Instead, she participated in the ploys to deny Professor Reyes tenure.

31. On September 12, 2014, Professor Reyes submitted her application and portfolio materials in full compliance with the deadline set forth in the University Tenure Schedule. She delivered her application and portfolio materials in accordance with instructions given to her by Professor John Duncan. Professor Reyes put together a very strong application by all objective standards. She fulfilled and exceeded the standards that were provided to her upon hiring. Dean Pernell had rated her performance as excellent in all categories of her annual evaluations. The annual RPT Committee reviews had all rated her performance in teaching, scholarship, and service to be very good to excellent. She had received class peer observations rating her teaching from very good to excellent. Students had consistently rated her as an effective, highly competent teacher. The overwhelming majority of comments in student evaluations were extremely positive about her teaching. A few students complained about Professor Reyes's rigorous teaching style, but no one ever raised concerns about this during her annual evaluations.

32. Pursuant to the University Tenure Schedule, the deadline for the RPT Committee to submit its recommendation to Dean Pernell was October 10, 2014. In mid-October 2014, Professor Reyes became concerned because she had not

heard anything about the status of her application. She also noticed that members of the RPT Committee were avoiding her. She reached out to Dean Pernell via email to request the status of her application and he responded that they should meet. On October 29, 2014, Professor Reyes met with Dean Pernell, in his office, and he informed her that he was unable to begin his review of her application because the RPT Committee had not sent him her application and portfolio materials or its letter of recommendation. The deadline for Dean Pernell to submit his recommendation was November 14, 2014.

33. Dean Pernell told Professor Reyes that he could not review her application and materials if the RPT Committee did not first fulfill its duty to engage in the initial review process and provide a letter of recommendation to him. Therefore, the failure of the RPT Committee to perform its duty to (a) process Professor Reyes's application and supporting materials, including arranging for external and internal reviews of her scholarship, and (b) prepare a letter of recommendation by the stated deadline derailed Professor Reyes's entire tenure process. Moreover, if the RPT Committee did not process her application, there would be no review by the College of Law Dean, University Tenure and Promotion ("T&P") Committee, Provost, President, and Board of Trustees. The failure of the RPT Committee to fulfill its duty to process Professor Reyes's application and issue a recommendation would foreclose a review of Professor Reyes's application for

12

tenure altogether. The University Faculty Handbook stated: "By the end of six years of continuous full-time, or equivalent part-time service in a tenure-earning position in the University, a Faculty employee shall be nominated for tenure or given notice that further employment will not be offered, in the affected position with reason(s) why the employee was not nominated for tenure."[5]

34. The majority clique that hijacked Professor Reyes's tenure process was driven by unlawfully discriminatory animus against Professor Reyes. They recruited allies and followers. They silenced the dissenters, who were also prohibited from communicating with Professor Reyes about what was happening in the secret, closed RPT Committee meetings, including about the decisions that were being made to derail her tenure process and reach a recommendation that tenure should be denied.

35. In their efforts to deny Professor Reyes tenure, the majority clique repeatedly violated the regulations that governed the tenure review process. They also violated the regulations that set forth the standards that should be applied when reviewing an application for tenure. They also violated the ethical standards

---

[5] University Faculty Handbook, § II.J.(5)(a).

of the legal profession,[6] including by denying Professor Reyes fairness and due process. They engaged in many ploys, including the following:

a. Making a five-minute false allegation of violation of a non-deadline that turned Professor Reyes's tenure process into an adversarial, controversial, and difficult process, which served to discredit Professor Reyes at the RPT Committee level and higher levels of review.

b. Stopping Professor Reyes's tenure process in violation of the rules and ignoring Professor Reyes's repeated assertion that she delivered her materials by 5:00 PM. The actual deadline for submission was an entire day (until 11:59 PM). The RPT Committee refused to tell Professor Reyes what the allegation was (the 5:05 PM time) and what evidence they alleged, despite her repeated requests for this crucial information.

c. Denying Professor Reyes the opportunity to refute their unsubstantiated allegation. They made it extremely difficult to set up a meeting and then, once a date and place were finally agreed upon (September 29, 2014) with Chair John Duncan, Professor Lundy Langston, and Professor Joseph ("Joe") Grant, they cancelled the meeting at the last minute without any explanation to Professor Reyes as to the reason for the cancellation. Subsequently, they misrepresented to the other members of the RPT Committee, the FAMU Division of Audit and Compliance ("DAC") investigator, the Dean, the Interim Provost, the President, the General Counsel, and/or other University officials that Professor Reyes did not want to clarify, without telling them that they were the ones who canceled the meeting and continued to keep Professor Reyes in the dark about what was happening in her tenure process.

d. Keeping Professor Reyes isolated and marginalized during the entire tenure process (over two semesters when the process was only supposed to be one semester). Chair John Duncan refused to provide Professor Reyes with the information she was entitled to receive. He also instructed other Committee members not to speak with her; thereby silencing them and alienating Professor Reyes from colleagues who would vote on her tenure.

e. Arguing for "confidentiality" of the process to keep everything secret while they violated the claimed "confidentiality" by going outside the process (to

---

[6] CoL Faculty Handbook, § III.V.(c) ("*In addition to their assigned duties, faculty members have responsibilities arising from the nature of the educational process. Such responsibilities include, but are not limited to, observing and upholding the ethical standards of their discipline.*").

all decision-makers at the University level) with their unsubstantiated allegation that Professor Reyes was lying about the time of delivery of her materials and also falsely claiming that she refused to clarify. In their statements, they never sated the alleged time (5:05 PM); they just kept saying that she submitted late or after the deadline. They also spread the falsehood to Black law professors beyond the FAMU College of Law.

f. Disenfranchising two White men from voting on Professor Reyes's tenure application: Professors Randall ("Randy") Abate and Robert ("Rob") Abrams.

g. Causing Professor Reyes to be subjected to a DAC investigation that she only learned about when she received notice of her interview, three days before the interview, at a time when she was busy teaching an extra heavy course load. Upon information and belief, a Black female faculty member who was a member of the RPT Committee submitted her tenure application materials late in a prior year but she was not accused and investigated as Professor Reyes was.

36. Three members of the RPT Committee were interviewed during the DAC investigation: John Duncan, Joe Grant, and Phyllis Taite. Their interviews were audio recorded. In those interviews, they attempted to corroborate the alleged late submission; however, none of them were present when Professor Reyes submitted her application. Then Associate Dean, Professor, and RPT Committee member Joan Bullock, the one who made the initial false allegation, did not submit herself to an interview. Instead, she provided a self-serving written statement in which she claimed that she stopped by Professor Reyes's office, early in the afternoon on the day when she was supposed to submit her materials, and Professor Reyes was still working on her application. In her written statement, Associate Dean Bullock

gratuitously and falsely alleged that Professor Reyes "grunted" at her. Although Associate Dean Bullock was present in the law school building, she did not receive Professor Reyes's materials. Instead, she assigned the most junior program assistant, someone under her supervision, to receive Professor Reyes's application and supporting materials (3 large binders and 25 small binders as required).

37. Associate Dean Bullock and Professor Duncan manipulated the program assistant who received the materials into going along with their allegation of late submission. They got her to say that Professor Reyes submitted her materials five (5) minutes after 5:00 PM (not the published deadline). They also tried to get Professor Reyes's program assistant, Celia Westbrook (formerly DeAlmeida), who was also present when Professor Reyes submitted her application, to go along with their ploy. However, she refused and told the truth during the DAC investigation. Thereafter, Associate Dean Bullock, her supervisor, retaliated against her with the lowest evaluation Ms. Westbrook had ever received.

38. Ms. Westbrook complained to the DAC that she was subjected to retaliation after she was promised that she would suffer no retaliation if she told the truth. Eventually, the DAC conducted an investigation and reviewed the evaluations provided by three of the faculty members whom Ms. Westbrook assisted. All three (Professor Randy Abate, Professor Pat Broussard, and Professor Reyes) provided individual evaluations with very high scores; therefore, Associate

Dean Bullock had no basis to give Ms. Westbrook the low scores she assigned. According to records of the DAC investigation of Ms. Westbrook's complaint of retaliation, Professor Pat Broussard stated that she gave Ms. Westbrook high scores in her evaluation; however, she wanted to give her lower scores but was afraid that Ms. Westbrook may file a complaint against her. The DAC found that the Ms. Westbrook's complaint of retaliation by Associate Dean Bullock was corroborated by the evidence.

39. Ms. Westbrook resigned from the FAMU College of Law a couple of weeks before the current academic year (2022-2023) began. Ms. Westbrook worked in the FAMU College of Law for twelve (12) years and witnessed the ongoing discrimination, harassment, hostilities, and workplace mobbing that Professor Reyes has endured. Ms. Westbrook was targeted when she refused to participate in ploys to harm Professor Reyes. It was all part of the hostile work environment.

40. Three (3) professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant) rushed to review Professor Reyes's evidence and professional responsibility classes right at the beginning of fall 2014; they knew, by that point, that there was a late submission ploy underway to stop processing Professor Reyes's application for tenure. Stopping the tenure process meant that the four (4) evaluations by these three (3) professors were the only peer teaching evaluations available for Professor

Reyes's fall 2014 classes. RPT Committee Chair John Duncan refused to give Professor Reyes the four (4) peer teaching evaluations from Professors Broussard, Cavazos, and Grant. This was another violation of the process. Professor Reyes was left in the dark about the false and negative comments those three (3) professors stated in those four (4) evaluations; therefore, she did not have a chance to refute what they stated.

41. The individual professors (Broussard, Cavazos, and Grant), the teaching subcommittee, and the RPT Committee violated the mandate in the College of Law Faculty Handbook that required that class observers meet with the professor to provide feedback. None of the three (3) professors (Broussard, Cavazos, and Grant) met with Professor Reyes. The RPT Committee considered and gave credit to allegations made by Professor Pat Broussard during the RPT Committee meeting and in her peer teaching evaluation about what students allegedly told her. Professor Broussard did not disclose to the RPT Committee that she told students to complain about Professor Reyes to then Associate Dean Darryll Jones, who then instructed them to file written complaints against Professor Reyes.

42. Professor Patricia Broussard, a member of the RPT Committee and the College of Law representative in the University-wide T&P Committee, approached students in Professor Reyes's evidence course (at the beginning of fall 2014), in violation of the peer evaluation process, to elicit negative gossip about Professor

Reyes and her class. She was supposed to conduct a peer evaluation (class observation) of Professor Reyes's teaching, not student evaluations of her teaching. Student evaluations were due to be administered at the end of the semester and faculty members are not supposed to be involved in student evaluations. Professor Broussard approached students and asked them about Professor Reyes and her class right at the beginning of the semester (at the beginning of Professor Reyes's tenure process) as Professor Reyes was just beginning to establish a rapport with second year students who had not taken any of her courses until then because she generally does not teach first year courses.

43. In a repeated and ongoing pattern of discriminatory and hostile conduct toward Professor Reyes, Professor Pat Broussard negatively interfered with Professor Reyes's relationships with students and empowered students to question Professor Reyes's teaching methodology and disrespect her. She informed students that Professor Reyes was applying for tenure, something that Professor Reyes had not shared with students. Professor Broussard also told students to submit complaints against Professor Reyes.

44. After Professor Pat Broussard sent students to complain to then Associate Dean Darryll Jones about Professor Reyes, four (4) students, out of seventy-four (74) students in her evidence course, submitted written complaints, at the beginning of fall 2014. Neither Professor Broussard nor Associate Dean Jones ever

discussed the alleged student issues with Professor Reyes. As with the false allegation of five-minute late submission, the RPT Committee denied Professor Reyes an opportunity to respond to the ploy to use the four (4) student complaints in her tenure process. Professor Reyes learned about this ploy after a student warned her, on February 11, 2015, the date when the teaching subcommittee disclosed the four (4) complaints to the entire RPT Committee. According to the student, the ringleader of the four (4) complaints was encouraging students to complain about Professor Reyes and telling them that there was a meeting that day "to get her fired." The student said that the ringleader was openly saying this in Professor Broussard's class. Professor Reyes did not know when the RPT Committee was meeting but students knew.

45. The teaching subcommittee, under the leadership of Professor Nicola ("Nicky") Boothe-Perry, a member of the majority clique, presented information about the four (4) student complaints to the RPT Committee at the last minute. The members of the RPT Committee who were blindsided with this new material did not have a meaningful opportunity to argue the issue, including whether it was a violation of the process to consider this type of student complaints and what due process should be provided to Professor Reyes. Professor Boothe-Perry did not notify Professor Reyes that the student complaints would be added to her tenure file. When Professor Reyes learned of the ploy, she urged the RPT Committee to

consider the potential repercussions for the four (4) law students whose frivolous complaints and allegations were going to become part of the record. The RPT Committee did not attach and did not consider in its deliberations a memorandum Professor Reyes provided to the RPT Committee on February 24, 2015 (with Exhibits), in response to the four (4) student complaints. The negative comments in those four (4) complaints were highlighted in the teaching assessment of Professor Reyes's tenure report. However, the majority clique refused a suggestion by some Committee members that, if those four (4) complaints were going to be added and considered, the total student evaluations from fall 2014 should be added and considered. Those evaluations were not yet available when Professor Reyes applied in fall 2014 but were available in spring 2015 by the point the four (4) complaints were being added to her tenure file (in violation of the rules).

46. RPT Committee Chair John Duncan selected the members and chairs of three (3) subcommittees to review Professor Reyes's teaching, scholarship, and service. On repeated occasions Professor Reyes requested information about the composition of the subcommittees, but Chair Duncan refused to provide this information, just like he refused to provide Professor Reyes the information she was entitled to receive immediately before and during the tenure process. She finally received the list of RPT subcommittees after the DAC concluded its investigation and Professor Reyes sought and received the records.

47. None of the chairs of the subcommittees ever requested to meet with Professor Reyes. Chair Duncan selected chairs and members of subcommittees who went along with the ploys (by action or inaction). Upon information and belief, the following full professors were excluded from Professor Reyes's tenure subcommittees: Professor Randall Abate, Professor Robert Abrams, Professor Ron Griffin, Professor Rhonda Reaves, and Professor Omar Saleem. However, they were still members of the entire RPT Committee. The subcommittees wrote the teaching, scholarship, and service sections of the RPT Report.

48. Professor Nicky Boothe-Perry, the chair of the teaching subcommittee, was supposed to visit Professor Reyes's Professional Responsibility class in fall 2014, but she never did. She also never responded to Professor Reyes's email in which she asked her if she was going to visit her class in fall 2014. Professor Boothe-Perry did not visit Professor Reyes's class in spring 2015.

49. Professor Boothe-Perry did not give Professor Reyes copies of the class observation forms that were provided to her during the tenure process (fall 2014 and spring 2015). Professor Boothe-Perry never communicated with Professor Reyes to give her feedback about her peer teaching evaluations during the tenure process. The teaching subcommittee waited until the last minute (February 11, 2015) to slip in the information about the four (4) student complaints in its report; at a point when other committee members felt they could not do much to refute

them and Professor Reyes could not receive due process. At that point, the RPT Committee was told that a vote had to be taken on February 25, 2015 and the final report had to be assembled and provided to Dean Pernell by February 27, 2015.

50. The scholarship subcommittee was chaired by Professor William ("Bill") Henslee. Upon information and belief, Professor Henslee wrote (or guided) the scholarship report that dismissed the merit of two of Professor Reyes's law review articles and totally ignored one of her other articles in clear violation of the rules, which required that all articles Professor Reyes submitted should be considered in the scholarship assessment. Professor Henslee never went through a tenure process in a law school. Professor Henslee received tenure and promotion to associate professor upon being hired as a founding faculty member of the re-established FAMU College of Law. Professor Henslee knew Dean Percy Luney, the dean who hired the founding faculty.

51. Upon information and belief, Professor Henslee was denied promotion to full professor in the FAMU College of Law on a couple of occasions due to alleged deficiencies with his scholarship. Some years before Professor Reyes applied for tenure, Professor Henslee told Professor Reyes that he was denied promotion because he is a White man. However, during Professor Reyes's tenure process, Professor Henslee gained insider status by participating in the ploys against Professor Reyes with the Black majority clique.

52.  In yet another violation of the tenure process, Professor Lundy Langston, the same person who silenced Professor Ronald Griffin (by filing a complaint against him) when he tried to argue for fairness in Professor Reyes's tenure process in fall 2014, was the person who took charge of the outside reviewer selection process with her co-chair, Professor Deleso Alford. After Professor Reyes received excellent external reviews of her scholarship from law professors in top-ranked law schools, Professor Langston, at the last minute, slipped in a negative external review by a Black female law professor whose area of expertise is critical race theory. That external reviewer professor was not vetted through the Outside Reviewer Selection Subcommittee process. She provided the only negative external review of Professor Reyes's scholarship.

53.  The clique that took control of the tenure process, inappropriately placed great emphasis on the highly critical external review by the critical race scholar, someone who did not disclose in her external review that she and her friend, a self-described Afro-Latina law professor, both attacked Professor Reyes personally when they were all participants in the *Defining Multiracialism and its Impact on the Law* panel during the 2014 Southeastern Association of Law Schools Annual Conference. This was during the summer before Professor Reyes applied for tenure. The two professors mocked Professor Reyes for proposing that Hispanic/Latino has become a race and should be considered for inclusion in the

racial categories of the next U.S. Census (the 2020 Census). Immediately after the panel, Professor Reyes approached the critical race theory scholar to introduce herself; the professor responded in a rude and dismissive manner. She told Professor Reyes, in what Professor Reyes perceived as a threatening tone, "you should tell LeRoy Pernell, your dean, that I said hello. He and I go a long way back." During the tenure process, Professor Reyes did not know that this professor had become part of the ugly ploys.

54. There were additional ploys as part of Professor Reyes's tenure process. The ploys stated in this complaint are only a representative sample of the ongoing, severe and pervasive hostilities and indignities Professor Reyes has faced for years. On April 24, 2015, Professor Reyes submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to FAMU's Office of Equal Opportunity Programs ("EOP") against members of the 2014-2015 RPT Committee who discriminated against her, harassed her, and made the tenure process as hostile as possible.

55. The majority clique did not want a non-Black Latina from Hispanic origin to join the group of tenured professors.

56. Professor Reyes's Charge was investigated by Carrie M. Gavin, EOP Director. Ms. Gavin did a sham investigation and dismissed the Charge.

57. Professor Reyes documented the flaws in Ms. Gavin's investigation in a memorandum dated September 8, 2015, which Professor Reyes submitted to then President Elmira Mangum requesting review of the decision.

58. On September 14, 2014, the then General Counsel, Avery McKnight, responded that there was no appellate procedure to review the sham EOP investigation.

59. At the end of the RPT Committee review, the majority clique recommended denial of tenure to Professor Reyes.

60. Dean LeRoy Pernell, after conducting an independent evaluation of the application, recommended that Professor Reyes be granted tenure. He concluded that the majority in the RPT Committee did not provide a rational basis for its conclusion (recommendation). He also found that the RPT Report and Recommendation issued by the RPT Committee did not set forth a rationale that supported the conclusion (recommendation).

61. The University T&P Committee (with Professor Broussard as the representative of the College of Law) followed the lead of the RPT Committee.

62. Provost Marcella David, an experienced, accomplished law professor who had recently joined FAMU as provost, knew how to review an application for tenure by a law professor and did an independent review of Professor Reyes's application.

63. Provost David and President Elmira Mangum recommended that Professor Reyes receive tenure.

64.  Professor Reyes's tenure was approved on June 10, 2015.

### On the Basis of Race, Color, National Origin, and Sex

65. The factual findings section of the 2008 ABA Site Visit Report documented a workplace riddled with divisions and tension within the faculty. Specifically, the report described "pervasive, persistent and destructive tensions between the senior and junior faculty." The report stated: "The faculty continues to suffer from a negative dynamic that is extraordinary." The report suggested that the law school should recruit new faculty to improve the faculty relationships and environment especially because there was a "race against the clock" to satisfy the requirements for full accreditation.

66. It is against this backdrop that Professor Reyes joined the faculty of the FAMU College of Law as the first Hispanic/Latina/o in the tenure track. Professor Reyes did not have access to the site visit report until years after she joined the faculty when she was searching for answers as to why she was experiencing horrific circumstances. Eventually, Professor Reyes came to understand that she cured the senior and junior faculty divisions by her mere presence. The senior and junior Black faculty found a common interest in discriminating against, harassing, and making the work environment hostile for Professor Reyes.

27

67. Comments about race, color, and national origin have been prevalent in Professor Reyes's experiences at FAMU. There has also been a gender aspect to the ongoing discrimination. A former Latina executive assistant who worked in the Dean's Suite, Wanda Aviles, went through similar discrimination and hostile work environment. She no longer works in the FAMU College of Law. Ms. Aviles described how a group of Black women targeted her when she was the only non-Black woman in the Dean's Suite. She also described how another Latina staff member adopted a Black identity and was accepted by the majority clique. Ms. Aviles also described how, once Associate Dean Darryll Jones and Associate Dean Reginald Green realized that the Black women did not like Ms. Aviles, they also joined in efforts to sabotage her to gain favor with the Black women. Associate Dean Jones even raised his voice at Ms. Aviles in what she considered an abusive tone. Associate Dean Jones has also been abusive toward Professor Reyes for years. By targeting Professor Reyes he has bonded with the Black women who harass her because she is Latina and not Black.

68. After Professor Reyes accepted the offer to join the FAMU Law faculty, during a visit to look for housing she stopped by the law school and was introduced by a staff member to Professor Rhoda Cato, a more senior faculty member, a Black woman. Professor Cato's first comment to Professor Reyes was: "So you are the wise, Latina diva they hired." Professor Reyes was hired around the time of Justice

Sonia Sotomayor's confirmation hearing, when she was attacked and chastised for her comment that a wise Latina judge may reach a different result than a wise judge of a different background and experience.

69. Professor John Duncan's first comment to Professor Reyes when she joined the faculty was: "We are going to have fun with you."  Professor Reyes found the comment odd at the time but did not say anything.

70. Professor Patricia Broussard, during Professor Reyes's first weeks on the job, kept referring to Professor Reyes's Latina identity as the basis for her hiring. Professor Reyes finally responded that she was qualified for the job beyond her Latina identity.

71. Professor Lundy Langston once told Professor Reyes that the reason why the African-American women professors were hostile toward her was because of her hair. She explained that her straight hair and light complexion means she is White. Professor Langston also told Professor Reyes that she identifies with her Dominican (someone from the Dominican Republic) hairdresser because they have the same hair texture and, as such, they share a racial connection. Professor Reyes does not have the same hair texture as Professor Langston and had no idea that her hair and skin color would be scrutinized.

72. The comments about race, color, and national origin distinctions continue year after year. The scrutiny of Professor Reyes's hair, skin color, and race self-

identification are also replicated within the student body and often serve to divide. It has taken Professor Reyes years working at FAMU to understand how "code language" is used by some Black faculty members. For example, some Black professors, primarily some of the ones who constantly target Professor Reyes, often responded to Professor Reyes's suggestions during faculty meetings with the phrase "this is a Black school." Eventually, Professor Reyes realized that this comment was meant to silence her and to signal to other faculty members that Professor Reyes should not comment because she is not Black.

73. There were also comments about a caste system depending on the national origin of immigrants. Black immigrants and immigrants from countries that are deemed Black are preferred. There is also a preference for dark skin color if someone is not Black. Related to this, Professor Reyes also learned that some Black faculty members divide Latinas/os between "Black Latino" and "White Latino." Some Latina/o students shared with Professor Reyes that Professor Jeremy Levitt, during class, shamed Latina/o students into picking between Black and White after they initially responded that they are Latina/o. Latina/o students also shared with Professor Reyes that this feeds racial conflict within the student body.

74. About two years ago, HALSA Board members met with Dean Keller to raise some of the issues they face because they are Latinas/os and told her that they

want Professor Reyes to be treated the same as other tenured professors. Dean Keller has not spoken with the HALSA Board after that and she has not spoken with Professor Reyes about the issues. Recently, Professor Reyes reminded Dean Keller that, if she presents data on Black students and Bar passage, she should also present data for Hispanic/Latino students because they are also statistically at high risk of not passing the Bar. The fact that Professor Reyes speaks on behalf of Latina/o students and HALSA, as HALSA's advisor, has made her a target of additional conflict, including when she raised the issue of HALSA being left out of a domestic violence and breast cancer event, organized by students in Professor Langston's domestic violence workshop, during the Covid pandemic.

75. Black tenured professors (men and women) have attacked Professor Reyes throughout the years with impunity, including when the entire faculty and even students have been present. They have sent a message to Professor Reyes that she, a non-Black Latina, should not be a tenured law professor in the FAMU College of Law.

76. A year after Professor Reyes was hired as a tenure-track assistant professor, the professors who have targeted Professor Reyes with racial animosity for years, pushed for a legal writing instructor, a Latina who self-identified as Black, to be hired in the tenure-track. Some professors and students reported that they did not know that the professor was Latina. She had changed her name and was primarily

31

using the African name she adopted. When Professor N.N. applied to become a tenure track faculty member, she distributed documents to the faculty explaining that she changed her name to denote her African ancestry and moved from College Park to Pine Hills to be in a Black neighborhood. She emphasized her Black racial identity during the hiring process. Professor Reyes tried to approach her a couple of times but, the first time, Professor Levitt interrupted and physically got between Professor Reyes and Professor N.N. The second time, they spoke briefly and, after that, Professor Reyes perceived that Professor N.N. felt she had to stay away from Professor Reyes in order to gain favor with the Black faculty members who target Professor Reyes. This is how some faculty members divide Latinas/os. Professor N.N. is no longer in the FAMU College of Law. She and Professor Reyes may have been able to make a great team if they had not been divided.

77. After Professor N.N. was hired in a tenure track position, during a faculty meeting, Professor Jeremy Levitt made it a point to correct the FAMU 2012 Self-Study, which the faculty was preparing to present to the ABA, to describe Professor N.N. as "Black Latina" and not as "Latina." Professor N.N. was present at the meeting but said nothing. At the time, Professor Reyes asked whether the ABA had a separate category for "Black Latino." Professor Darryll Jones looked at Professor Reyes with disdain and asked her what kind of Latina she is. Professor Reyes responded that she self-identifies just as Latina, but Professor Jones asked

her again what kind. Professor Reyes responded that she would need some type of DNA test to tell him more. Years later, Professor Jeremy Levitt, in an email to the entire faculty on October 23, 2019, falsely accused Professor Reyes of rejecting N.N.'s "self-designation as Black and Latina." He characterized Professor Reyes as a "White Latina" with "white privilege," and attempted to once against pit her against Professor N.N., a "Black Latina" who was no longer working in the law school. Apparently, Professor Levitt and perhaps other Black faculty members had been spreading the falsehood about Professor Reyes and she had no idea.

78. Professor Reyes has been subjected to the constant message that some of the Black professors who discriminate against her perceive her as a White Latina and want her to accept said label. During the DAC investigation, then Associate Dean and Professor Joan Bullock said that Professor Reyes is "White appearing." On April 8, 2020, Professor Jennifer Smith called Professor Reyes a "White Latina" after a presentation during which Professor Reyes once again stressed that she self-identifies as Latina without any additional qualifier.

79. Some years before that incident, Professor Smith made a comment during a forum when Professor Smith was a panelist, as she saw Professor Reyes enter with students, that "Asians and Latinos are unintended beneficiaries of the Civil Rights Movement." Professor Reyes responded to the comment by briefly explaining that Latinos participated in the Civil Rights Movement, even if they were not in the

South, and Chinese fought against the Chinese Exclusion Acts and racist treatment. Another constant message Professor Reyes gets is that Black ancestry is superior, that Blacks have a superior right to life in the United States than Latinos, and that she is supposed to accept inferior status, including by accepting the discrimination, disparate treatment, and hostilities without complaining.

80. The racial hostility became evident in the closed RPT Committee meetings when the Committee was reviewing Professor Reyes's application for tenure. On October 1, 2014, Professor Lundy Langston sent an e-mail to then Dean Pernell with copies to his executive assistant, Pamela Leonard, and then Associate Dean Jones complaining about "reprehensible conduct" allegedly exhibited by an African American male professor, Ronald Griffin, against her during an RPT Committee meeting on October 1, 2014. This was around the time when the majority clique was insisting that Professor Reyes's process should not proceed.

81.     On October 24, 2014, Professor Langston sent another e-mail that she characterized as "an official complaint" against Professor Griffin "for his [alleged] conduct referring to [her] and other [Black] female colleagues . . . as being malicious, evil, racist, and vile" during an RPT Committee meeting on October 23, 2014. She stated that Professor Griffin made his statements "while addressing the viewpoints expressed by African American women committee members." Professor Langston sent her complaint to Dean Pernell and copied the University

34

President, the Interim Provost, the Board of Trustees' attorney, the University EEO Officers, the General Counsel, Chair Duncan, Associate Dean Jones, and Pamela Leonard (Ms. Leonard was one of the Black women who was hostile to Wanda Aviles when they worked together in the Dean's Suite and she was also hostile to Professor Reyes since the hiring process when she delayed processing Professor Reyes's moving paperwork).

82.    In her complaint, Professor Langston described, with much verbosity, a scenario of "African American women committee members" breaking down and "sobbing, loudly" after Professor Griffin allegedly made his comments. "Two other African American women" allegedly "walked out of the meeting." Professor Langston claimed that the words that he allegedly used were "actionable as slanderous." She went on to define each term and seemed to conclude that Black women cannot be racist because of the racism they themselves experience.

83.    Professor Langston tainted Professor Reyes's tenure process by potentially creating additional animus against her when she submitted her complaint about what she alleged happened in the tenure process to decision-makers that were supposed to review and make recommendations on Professor Reyes's application for tenure at subsequent levels of review. Rather than limit herself to submitting her complaint to the University Equal Opportunity Programs Officer, which is the procedure specifically prescribed in the University

Regulation, she sent her complaint to Dean Pernell, an African-American man, and copied the President, an African-American woman, the Interim Provost, an African-American man, the Board's attorney, another African-American woman, the Associate Dean for Academic Affairs, an African-American man; the Chair of the RPT Committee, an African-American man, and Dean Pernell's executive assistant, an African-American woman. By including Ms. Leonard, Professor Langston riled up even the staff, the majority of whom are Black women.

84.     Professor Langston did not stop there. She and some of the other Black female faculty members complained behind the scenes about Professor Reyes and claimed that they were afraid of her. There were email exchanges with EOP Director Carrie Gavin and Human Resources liaison Adrienne Snyder raising all kinds of rumors about Professor Reyes being "dangerous." Professor Jennifer Smith told a staff member about a dream she had about Professor Reyes and the staff member allegedly had some type of anxiety attack. Professor Reyes did not know this was happening. She found out when she obtained the records of the investigations. Those records show the deep racial hatred against Professor Reyes and how turning Professor Reyes into a "dangerous White Latina" conjures up ancestral fears that cause group frenzy like workplace mobbing.

85.     FAMU's General Counsel Denise Wallace, a Black woman, has also misrepresented Professor Reyes's conduct, including by claiming that Professor

Reyes contacted the Office of the General Counsel in another university to ask about open meetings when it was not Professor Reyes. Professor Reyes has been blamed and become the scapegoat for situations that she does not even know about.

86.    In addition to dealing with hostilities from Black women, Professor Reyes has also been subjected to abusive conduct from Black men. For example, Professor Reyes only communicates with Professor Levitt in group emails and she is only around him during faculty meetings because he was highly abusive toward her since she joined the faculty in 2009. Around that time, Professor Barbara Bernier and Professor Jennifer Smith filed complaints against Professor Levitt. Professor Reyes did not know that a Hispanic/Latino student had also filed a race and national origin complaint against Professor Levitt. When Professor Reyes spoke about his abusive conduct with Associate Dean Markita Cooper, she told Professor Reyes that she was also dealing with his harassment but, if Professor Reyes told anyone, she would deny it. Basically, Associate Dean Cooper said that she would lie. Therefore, Professor Reyes realized that she could not count on her to help. Professor Reyes had to fend for herself in an abusive workplace where she was more vulnerable than most.

87.    In May 2019, Professor Levitt sent an individual email to Professor Reyes. This was soon after he ridiculed Professor Reyes at a faculty meeting on

May 8, 2019 when, upon Professor Reyes's request for credit for her professional contributions, Professor Levitt responded that he was going to give her "a star and smelly sticker or happy face." Professor Levitt's subsequent email was apparently an excuse to start conflict with Professor Reyes, claim offense, accuse her of racism, and insult her because of her race. In that email exchange, he called Professor Reyes a "white Latin or Hispanic," and termed her response to his attack "[her] defensive and white privileged victim-based response." On May 13, 2019, Professor Reyes demanded that Professor Levitt stop sending her emails. She stated in pertinent part:

> Jeremy,
>
> You have crossed the line into harassment. I am copying attorney Shira Thomas, FAMU's Interim Vice President and General Counsel, so she can add this record to all the records in the Office of the General Counsel about FAMU Law and what happens here. I **am not** filing a Regulation 10.103 complaint because I have no confidence in the FAMU Office of Equal Opportunity Programs. They and the FAMU Office of the General Counsel have been aware of the hostile work environment in the law school for years. Unfortunately, like the avoidance of dealing with the hazing problem until it became public, the institution has, thus far, ignored the workplace environment problem in the law school. I hope that the selection of a new dean serves to address this cancer that has been killing the law school and harming human beings who find ourselves in a position of vulnerability.

88. On May 14, 2022, Professor Reyes also put Provost Maurice Edington on notice of Professor Levitt's latest attack. She also notified then Interim Dean Nicky Boothe-Perry, Interim Associate Dean Phyllis Taite, and Associate Dean Reginald

Green (Professor Levitt's friend since they were 1L students in law school). Professor Reyes reminded the three of them that they were present when Professor Levitt ridiculed her during the faculty meeting and they, as administrators, said nothing. In her email to Provost Edington and Interim General Counsel Thomas, Professor Reyes stated:

> The e-mail below from Jeremy Levitt confirms the latest setup. Jeremy Levitt bullied me at the faculty meeting (on 5/8/19) when we met to discuss the finalists for the dean position. Then, he followed up by e-mailing me. He escalated the situation and, after I defended myself and copied attorney Shira Thomas, he leveled a heinous and false accusation against me by stating that I am "attacking [him] and others on the basis of race and or gender." This is a blatant lie. It is also hypocritical and self-serving, especially after Jeremy Levitt called me a "white Latin or Hispanic" with "white privilege." This is how he and others view me in this workplace.
>
> Professor Levitt is accusing me to silence me. I will not remain silent.
>
> ***
>
> The fact that this situation is happening in an HBCU law school with a publicized mission of social justice is troubling and demoralizing. How would people outside judge what is happening here? This is beyond embarrassing. It is abusive. The University should hire a reputable law firm to conduct an independent investigation of the workplace environment and propose a plan of action to address the mayhem.

89. On May 15, 2022, Carrie Gavin, FAMU's EOP Director, sent an email to Professor Reyes asking her if she wanted to file a harassment complaint. Professor Reyes responded in pertinent part:

> With all due respect, I am not going to spend yet another summer, without pay, dealing with another non-productive, non-objective, sham internal investigation. FAMU is on notice of the hostile work environment and the actions against me.

If additional circumstances arise, I may re-assess the need to file a complaint after consultation with legal counsel. In such case, the goal will be to get objective and independent review of my claims.

I understand that the only assistance you are offering is documenting that you told me to file a Regulation 10.103 complaint. I suggest that you go beyond that and finally advise the Provost and the President to hire a reputable law firm to conduct an independent, credible investigation of the hostile work environment in the law school.

90. After Professor Reyes demanded that Professor Levitt stop sending her emails, he joined in a group email to the faculty wherein Professor Phyllis Taite dismissed Professor Reyes's comment and said that the "majority" was in agreement. Professor Reyes has heard the same "majority" comment for years and has come to understand that it is meant to constantly remind her that she is not part of the majority. In response to Professor Taite, Professor Reyes acknowledged her minority status. Professor Levitt then took this opportunity to reply to all faculty attacking Professor Reyes and questioning her race and gender identity. In summary, Professor Levitt, in his e-mail correspondence dated October 23, 2019, 2:56 PM:

  a) began by insulting Professor Reyes and self-servingly claiming that there were no "EO concerns" raised by his harassment, which Professor Reyes qualified as abusive conduct;
  b) applied some type of litmus test to question Professor Reyes's racial identity;
  c) used a reference to former colleague N.[N.], a self-described Black Latina who was pitted against Professor Reyes, to set up a false race-based accusation against Professor Reyes;
  d) ascribed to Professor the thinking of a Spanish conquistador who was a torturer and mass murderer of indigenous people;

e) falsely alleged that Professor Reyes admitted not understanding the diversity of Black people;

f) determined that Professor Reyes does not have the knowledge and experience Professor Reyes claims about "race, ethnicity, color, gender and religion in the US" because, according to Professor Levitt, Professor Reyes's experience is not morally equivalent to his;

g) labeled Professor Reyes a descendant of the "enslavers" of "[his] people;" and

h) criticized the definition of Latino that Professor Reyes used in an article in 2008 in the Harvard Law School student newspaper.

91. Professor Reyes waited three weeks to see if any faculty member or administrator who was copied in Professor Levitt's email responded in her defense or at least ask her how she was feeling after such a vicious and public attack. No one reached out to her. Professor Reyes determined that she must respond; otherwise, her silence may be deemed an admission of Professor Levitt's false allegations.

92. Professor Reyes prepared a memorandum, dated November 13, 2019, which she submitted to the following: College of Law Faculty, President Larry Robinson, Provost Maurice Edington, General Counsel D. Denise Wallace, and EOP Director Carrie Gavin. In said memorandum, before responding to each of Professor Levitt's vicious racialized attacks, Professor Reyes stated:

> I must respond to Levitt's dangerous and abusive allegations (See Composite Exhibit "A"). He made unsupported accusations and broad misrepresentations about me and what I have stated with the clear intent of harassing me, damaging my reputation, and promoting additional racial animus against me. Therefore, I cannot afford to leave his false allegations unchallenged. This is by no means an academic exchange. This is my response/defense to Levitt's discrimination and

harassment, which institutional actors have been aware of. Again, I became his target as soon as I began working here.

\*\*\*

The e-mail exchange that led to this memorandum response is a perfect example of how I have yet again been attacked by a member of this law school's faculty, and need to defend myself because, otherwise, the false allegations may be deemed admissions. The lies are spread all over the law school and beyond. This has happened before; therefore, I must respond, preferably in e-mails to all faculty, to try to avoid misrepresentations of what I said or did.

\*\*\*

Can you imagine what would happen if I (a Latina) wrote to Levitt (a Black man) the hateful things he writes to me? To put Levitt's attacks against me in context, in his "*Fuck your Breath*" law review article, Levitt stated that hate "means to intensely dislike, harbor extreme hostility, or antipathy toward [another] 'usually deriving from fear, anger, or sense of injury.'" To me, Levitt's e-mails are full of this hate. What is even more dangerous is that Levitt is using this institution to spread hate and a hate-filled rhetoric against people whom he perceives as not being "the same [as] or even similar" to him – people he places "on different sides of the enslavement and slavery index" [Levitt's words].

93. There was infighting present in the FAMU College of Law before Professor Reyes arrived. In fact, an outside consultant identified all kinds of dysfunctional dynamics within the faculty, including malicious gossip. Professor Reyes had no idea how bad it was or how extra vulnerable to attacks she would be.

94. When Professor Reyes was recruited and hired, she also did not know that, upon information and belief, Carmenelisa Perez-Kudzma, a former College of Law non-tenure track legal research and writing instructor, complained that she was being discriminated for being Latina. Professor Perez-Kudzma was no longer

teaching at the FAMU College of Law by the time Professor Reyes joined the faculty.

95. Professor Levitt has not attacked any other faculty member with the racist attacks he has directed at Professor Reyes in plain view of many people, including deans and associate deans. President Robinson and Provost Edington have been on notice. Professor Levitt has also attacked Professor Reyes in combination of woman and "White Latina." Professor Darryll Jones has also joined in attacking Professor Reyes in emails and in meetings. And, Associate Dean Reginald Green has also participated behind the scenes in ploys to sabotage Professor Reyes.

96. Black female faculty members who themselves complained that they suffered gender discrimination from Black men on the faculty, including Professor Joan Bullock, Professor Lundy Langston, Professor Jennifer Smith, Professor Patricia Broussard, Professor Ann Marie Cavazos, Professor Nicky Boothe-Perry, and Professor Phyllis Taite joined with Black men in attacking Professor Reyes for years. In this way, attacking Professor Reyes has become a source of Black racial solidarity. Other faculty and staff members follow the lead of the majority clique. That is how workplace mobbing works.

97. A Black female tenure-track faculty member who did not follow the lead of the majority clique had her Black identity questioned by Professor Jennifer Smith during a pre-planning workshop when then Dean Felecia Epps was dean. Professor

Reyes was seated at the same table with Professor Smith. She saw and heard what happened. Dean Epps placed rushed to get in between the two of them when it looked like the situation may escalate. Rumors started that the junior faculty member was "friendly" with Professor Reyes. She joined the faculty when Professor Reyes was going through the horrific tenure process. Dean Epps knew that Professor Smith was sending abusive emails to the junior faculty member; however, upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith like she did to Professor Reyes over malicious and frivolous allegations by Professors Broussard and Cavazos. The junior faculty member eventually resigned and called the FAMU College of Law a "hellish" work environment.

98. The race issues have also permeated to the student body. Professor Reyes has heard stories of Hispanic/Latina/o students who have felt racially discriminated but do not want to complain because they are afraid. Professor Reyes has also heard similar stories from White students, primarily White female students who have felt racially targeted primarily by some Black female students who have told them that "this is a Black school" and they are taking the place of Black people. Professor Reyes has also heard about Caribbean students who are made to feel that they have to prove their "Blackness," including by distancing themselves from non-Black students.

99. For years, Professor Reyes has advanced that racial hostility causes divisions that should not happen in a law school with the noble mission of the FAMU College of Law. It is harmful for the law school, students, the clients alumni will serve, the legal profession, and society in general. Even as she has been racially, color, national origin, and gender attacked, Professor Reyes has worked to bring students of all race, ethnic, and cultural backgrounds together for a common purpose of serving as catalysts for positive change. The diverse students in the law school are the reason why Professor Reyes has remained. She has helped many students and alumni. In turn, many students and alumni of diverse gender, race, ethnic, and cultural groups have sought her mentoring and showed appreciation for her teaching and service. Some Black female students have been the most supportive, including because they share Professor Reyes's Christian faith. Many students and alumni have provided moral support and prayers along the years when Professor Reyes has been dealing with the ongoing discrimination, harassment, and hostile work environment, including workplace mobbing.

**The Discrimination, Harassment, Hostile Work Environment and Retaliation Continued After Professor Reyes Received the Tenure She Earned**

100.     EOP Director Carrie Gavin's sham investigation of Professor Reyes's EOP Charge during the tenure process, including Director Gavin just taking members of the majority clique at their word (even with one-sentence denials), emboldened them in their ploys against Professor Reyes.

101.    For example, in her EOP Charge, Professor Reyes detailed several violations by Professor Broussard. Professor Broussard's response to the Charge consisted of one sentence: "I categorically deny all allegations of Ms. Reyes's Complaint." This was sufficient for EOP Director Gavin to conclude that Professor Reyes's Charge as to Professor Broussard's conduct was unsubstantiated.

102.    The retaliation against Professor Reyes continued even when she was visiting at the University of Florida Levin College of Law ("UF Law") in fall 2015.

103.    When Professor Reyes accepted the invitation to visit UF Law for one semester (right after her tenure ordeal), she remained in the FAMU payroll system. FAMU negotiated with UF Law for a rate they charged to cover Professor Reyes's FAMU salary and benefits. The rate they charged UF Law was higher than what they paid Professor Reyes. Therefore, FAMU received a windfall which became a line item in the FAMU College of Law's budget. For all intents and purposes, Professor Reyes remained a FAMU employee.

104.    In fall 2015, Professor Darryll Jones, who was then Interim Dean, invited the new UF Law Dean to meet with the FAMU Law faculty in Orlando. However, he did not invite Professor Reyes. Professor Reyes learned about the invitation when the UF Law Dean told her. To Professor Reyes's recollection this was the only time a dean from another law school in Florida was invited to visit with the faculty of the FAMU College of Law.

105.     Upon information and belief, that same semester (fall 2015), FAMU College of Law's Black Law Students Association (BLSA) hosted UF Law's BLSA. A BLSA member told Professor Reyes that some FAMU College of Law BLSA members were gossiping with UF Law BLSA members about Professor Reyes. Upon information and belief, Professor Jennifer Smith was the faculty advisor of FAMU College of Law BLSA.

106.     Professor Reyes has been serving as faculty advisor of the Hispanic American Law Student Association ("HALSA") for many years. Professor Reyes planned to continue to advise HALSA during fall 2015. She reviewed the Student Handbook rules and confirmed that she could remain as faculty advisor, including because she was still a full-time employee in the FAMU system. UF Law arranged her class schedule such that she could travel to Orlando to attend HALSA functions. She paid for parking at FAMU College of Law because she planned to attend HALSA events. Professor Reyes worked with HALSA's president to re-certify the organization through FAMU's bureaucratic process. She fulfilled all her duties as faculty advisor for the semester, including attending activities for Hispanic Heritage Month. She put a lot of time and effort into driving from Gainesville to Orlando to attend orientation for HALSA and all major events. She also spent lots of time communicating by phone and email with HALSA's

president. UF Law arranged video conferencing so Professor Reyes could meet with HALSA's Board.

107.    Toward the end of the fall 2015 semester, Associate Dean Reginald Green, with the approval of Interim Dean Darryll Jones, instructed members of the HALSA Board to remove Professor Reyes as faculty advisor. Upon information and belief, then Associate Dean Joan Bullock was also involved in the ploy.

108.    The hostile removal was effected in violation of the University Student Handbook, which required consultation with the faculty advisor prior to removal.

109.    Associate Dean Reginald Green, Interim Dean Darryll Jones, and Associate Dean Joan Bullock did not contact Professor Reyes.

110.    The president of HALSA reported to Professor Reyes that she was threatened with HALSA losing funding if Professor Reyes was not replaced.

111.    Associate Dean Green instructed FAMU College of Law Student Affairs Director Fritzlaine Powell not to respond to Professor Reyes's request for information.

112.    One of Professor Reyes's ongoing harassers, Professor Patricia Broussard, replaced Professor Reyes as HALSA's faculty advisor without even contacting Professor Reyes.

113.     The hostile way in which the hostile removal was orchestrated was meant to humiliate Professor Reyes and ostracize her from students.

114.     The institutional actors who participated in the hostile removal caused chaos, confusion, and division within HALSA and nearly decimated the organization.

115.      HALSA members reached out to Professor Reyes to find out what was happening. They reported that they were being called into a meeting to elect Professor Broussard as faculty advisor. However, the meeting and vote were being scheduled and conducted in violation of the provisions in the HALSA Constitution.

116.     Professor Reyes felt she had a duty to inform HALSA members to be careful and not violate HALSA's internal documents.

117.      She sent a couple of emails to HALSA members explaining what she knew about the situation and advising them not to violate HALSA's Constitution.

118.      Everything Professor Reyes stated in her emails to HALSA was true and stated in good faith for the benefit and protection of HALSA and its members.

119.      For the sake of HALSA, to avoid having the organization be further targeted in efforts to harm Professor Reyes, Professor Reyes did not fight the removal as HALSA's faculty advisor.

120.      In further retaliation against Professor Reyes, on November 25, 2015, the day before Thanksgiving, Professor Broussard submitted a false, malicious, and frivolous EOP Charge against Professor Reyes.

121.      Professor Broussard alleged retaliation and Title IX stalking. She used the email Professor Reyes sent to HALSA as the basis for her Charge.

122.      Professor Broussard also referenced a video of a faculty meeting and falsely alleged that Professor Reyes "attempted to push her way into [her] space." She also claimed that Associate Dean Green "was so upset by [the video.]"

123.      Associate Dean Green denied that he said what Professor Broussard alleged and stated that he did not watch the video.

124.      The video actually showed Professor Broussard blocking Professor Reyes from participation in the counting of votes during a meeting when a White male candidate was being considered for a clinic position.

125.      The video also showed that two Black female law professors were much closer to Professor Broussard than Professor Reyes and even made physical contact with Professor Broussard. Professor Broussard did not accuse them of attempting to push their way into her space. The video also showed Professor Cavazos questioning why Professor Reyes was counting the votes. Professor Reyes had to remind these faculty members that she also had a right to participate in the counting like Black female professors.

126.     Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith sent emails with copy to all faculty insulting Professor Broussard.

127.     Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith called her a "snake" and a "weasel" in emails that were filed in Professor Smith's federal case against FAMU.

128.     In addition to slanderous accusations against Professor Reyes, Professor Broussard claimed that she was afraid of Professor Reyes and tried to stay away from her. This was patently false.

129.     Professor Reyes responded to Professor Broussard's EOP Charge line by line. Professor Reyes noted that Professor Broussard's own actions belied her claims of fear and staying away from Professor Reyes. Professor Broussard participated voluntarily in the hostile replacement as HALSA's faculty advisor. She was not afraid. She has constantly looked for ways to harm Professor Reyes including via student situations and student organizations.

130.     Professor Reyes's comprehensive response to Professor Broussard's Charge demonstrated the falsity of Professor Broussard's conclusory and defamatory allegations.

131.     In her response to Professor Broussard's EOP Charge, Professor Reyes requested that the EOP recommend that Professor Broussard be disciplined in accordance with FAMU Regulation 10.103(6)(d) for knowingly filing a false complaint of retaliation and Title IX stalking and for providing false testimony in the form of false facts alleged in her Charge.

132.     Professor Broussard was not disciplined and this further emboldened her to continue to harass Professor Reyes and make false allegations against her.

## The Hostilities Became Physical

133.     The hostilities against Professor Reyes have even become physical.

134.     In spring 2015, as Professor Reyes was being tortured in the tenure process, a member of the staff, Erica Polite, who had been bringing lunch to Professor Broussard in her office that semester, bumped Professor Reyes on her shoulder as Professor Reyes was walking by her. Ms. Polite had the space available to move to her right and avoid the physical contact. Professor Reyes was literally against a wall and did her best to get against the wall to avoid Ms. Polite. About a year or two before that, Ms. Polite screamed at Professor Reyes on the phone, about an IT issue. Professor Reyes reported that incident to Ms. Polite's supervisor and avoided Ms. Polite since then. Professor Reyes could not avoid the bump.

135.     Professor Reyes reported the bump incident to IT/Security Director Shashi Persaud whose office door was open, right by where the incident happened.

He claimed he did not see anything; however, he had a video of the incident because it was recorded in the surveillance camera. The matter was reported to Associate Dean Reginald Green and Dean LeRoy Pernell; neither of them ever followed up with Professor Reyes. Instead, they escalated the situation by referring it to the FAMU Police in Tallahassee without even consulting with Professor Reyes. This was leaked all over the building and turned against Professor Reyes.

136.    Professor Phyllis Taite, Professor Rhoda Cato, and Professor Pat Broussard made a point of exaggerating their efforts to stay far from Professor Reyes as they passed each other in a hallway. The rumor was that Professor Reyes was going to accuse them with the FAMU Police. However, Professor Reyes has never accused anyone with the police despite all that has been done to her.

137.    There was also an incident with something that looked like blood smeared on the doorframe of Professor Reyes's office. Professor Reyes discovered it when she was walking back to her office with a student. Professor Reyes's program assistant, Celia Westbrook, and Professor Rhonda Reaves also saw it. Professor Reaves, as she often did when Professor Reyes was targeted, dismissed it as if nothing happened. The cleaning crew later notified Professor Reyes that they had to report it to their supervisor because it appeared to be blood when they cleaned it. Professor Reyes informed Dean Pernell about it but she never heard anything more.

138.      At the beginning of fall 2018, Professor Broussard bumped Professor Reyes from behind as Professor Reyes was walking back from taking the group faculty pictures. Professor Broussard acted as if it was by accident and Professor Reyes did not say anything. Professor Reyes knew that Professor Broussard wanted a reaction from Professor Reyes.

139.      On May 6, 2019, Professor Broussard ran to one of the two elevators in the first floor of the FAMU College of Law lobby when she saw that Professor Reyes had just gotten in the elevator. Professor Broussard was accompanied by Professor Ann Marie Cavazos, as she often is. Rather than take the empty elevator right next to the one Professor Reyes had just entered, Professor Broussard ran to push the button so she could stop Professor Reyes from going up alone in the elevator.

140.      When Professor Broussard and Professor Cavazos entered the elevator, Professor Reyes rushed out. She then went to the library elevator.

141.      When Professor Reyes exited the library elevator in the third floor, by the faculty suites, Professor Broussard and Professor Cavazos were standing by the door of that elevator with a Black female staff member, Claudine Beale, who has also engaged in hostile actions against Professor Reyes. The law school surveillance cameras recorded the incident. The video showed that Professor Broussard and Professor Cavazos enjoy harassing Professor Reyes.

142.     In spring 2022, Professor Broussard once again found a way to be in the same space as Professor Reyes, when Professor Reyes had gone out of her way to check and confirm that Professor Broussard would not serve as moderator of a diversity and inclusion student panel organized by the Women's Law Caucus ("WLC") with several organizations, including HALSA.

143.     Professor Broussard is the faculty advisor of the WLC. Therefore, Professor Reyes requested the identity of the panelists and moderator. The president of the WLC, a Black female student who had been hostile to Professor Reyes, finally provided the information Professor Reyes requested. She provided it the Friday before the Monday panel. She provided the itinerary and questions for the panel. She also provided the name of the moderator and it was not Professor Broussard.

144.     Contrary to the information Professor Reyes sought and received about the identity of the moderator and the start time of the panel, she was shocked when she entered the room and saw Professor Broussard already moderating the panel. Professor Broussard started the panel earlier than the time in the itinerary that was provided to Professor Reyes. Professor Broussard made a comment about Professor Reyes being late. Professor Reyes explained, by reference to the printout of the email she received, that she was actually early.

145.     During the panel, Professor Broussard stood over Professor Reyes, said she was going to deviate from the questions that had been agreed upon, poked Professor Reyes on her shoulder with her finger and glasses, and mocked Professor Reyes about wearing a mask and not wanting to be videotaped. She also questioned why Professor Reyes was going to be in the group picture if she did not want to be on video. Professor Reyes had to explain the obvious, that video is not the same as a picture. Professor Reyes had to do her best to maneuver the situation with alumni and students present. A few of those alumni and students had been disrespectful to Professor Reyes in her evidence course. This has been a consistent circumstance for years; some students who are close to Professor Broussard are rude and disrespectful toward Professor Reyes.

## The Review for Promotion to Full Professor Became a Continuation of the Discriminatory Review for Tenure

146.     The effective date of Professor Reyes's promotion to associate professor was August 6, 2012. Her tenure was approved on June 10, 2015. Professor Reyes planned to submit her application for promotion to full professor as soon as she qualified under the University rule, which required that she serve five (5) years in rank as associate professor. That meant that she would have been qualified to apply in 2017, the year when FAMU adopted the Interfolio electronic

application system which required that the Office of the Provost provide the information to access the system.

147.     Professor Rhonda Reaves was chair of the RPT Committee during the 2017-2018 academic year.

148.     Professor Reyes asked Professor Reaves for the Interfolio access information on several occasions and Professor Reaves responded that she did not receive it.

149.     Professor Reyes once again began asking for the Interfolio information the next year, in summer 2018. That year, Professor Rob Abrams was appointed chair of the RPT Committee.

150.     Professor Reyes finally received the Interfolio case access information at the last minute in fall 2018 and applied by the published deadline. She became the first professor from the College of Law to apply for promotion via the new online Interfolio platform. She had to figure out the system on her own.

151.     All ten (10) tenured, full professors who participated in the review of Professor Reyes's application for promotion to full professor were also members of the RPT Committee when Professor Reyes submitted her application for tenure in fall 2014. They were Rob Abrams, Nicky Boothe-Perry, Pat Broussard, Ann Marie Cavazos, Ron Griffin, Bill Henslee, Darryll Jones, Rhonda Reaves, Jennifer Smith, and Phyllis Taite. They were all involved, in one way or another, in the

discriminatory, harassing, and retaliatory tenure process Professor Reyes endured during the 2014-2015 academic year. Three (3) of the ten (10) members of the RPT Committee (Professors Rob Abrams, Ron Griffin, and to a lesser extent Rhonda Reaves) became targets of hostility when they were deemed supportive of Professor Reyes's application for tenure. During the review of Professor Reyes's application for promotion to full professor they went along to get along with the discrimination and retaliation. That is how workplace mobbing works.

152.    The RPT Committee applied a quantitative standard for scholarship that did not appear anywhere in the CoL Faculty Handbook or in the interpretive memorandum provided to Professor Reyes (the "Nunn Memo") when she was hired.[7] The Committee's application of a standard that did not exist in the CoL Faculty Handbook or the University Faculty Handbook was basically the same tactic as when the RPT Committee invented and used incorrect standards to evaluate Professor Reyes's application for tenure and conclude that she did not meet the standards.

153.    The RPT Committee's discriminatory actions tainted the entire process at all levels with discriminatory animus. The RPT Committee members carried the discrimination from the tenure process into the promotion process by

---

[7] The FAMU College of Law represented to the ABA accrediting body that the Nunn Memo clarified how the scholarship standards should apply.

refusing to conduct a new review according to the standards in the CoL Faculty Handbook and the Nunn Memo. They built on the same unlawfully discriminatory animus that drove violations of the rules and misapplication of the standards during Professor Reyes's tenure process. In this way, they turned her promotion review into the same review as the tenure process. The two became a continuous process.

154.     The RPT Committee attached reports from Professor Reyes's prior application for promotion to associate professor (in Fall 2011) and for tenure (in Fall 2014). However, in violation of the express provision in the Faculty Handbook,[8] they did not attach any of the external reviews of her scholarship conducted during those evaluations. This is how they set up their recommendation that she be denied promotion.

155.     All actors at higher levels of review, namely Interim Dean LeRoy Pernell, the T&P Committee led by Dr. Michael Abazinge (same as during the tenure process), Provost Maurice Edington and President Larry Robinson went along with the misapplication of the scholarship standard and decision of the RPT Committee. They did not conduct independent reviews. They allowed and perpetuated the discrimination, retaliation, and hostile work environment.

---

[8] The Faculty Handbook requires that external reviews be attached to the RPT Committee reports.

**<u>Provost Edington and President Robinson Participate in the Hostilities</u>**

156.     According to the Provost's published schedule, the President was supposed to provide the decision to Professor Reyes in June 2019.

157.     When Professor Reyes had not received the decision by the beginning of July, she requested it.

158.     On July 17, 2019, Provost Edington responded to one of Professor Reyes's e-mails and stated: "You will be provided notification of the outcome of your application for promotion within the next week."

159.     A week after that email, Professor Reyes followed up because no decision was provided within a week of Provost Edington's response.

160.     On August 5, 2019, Professor Reyes once again requested the decision from President Robinson and Provost Edington; this time, she copied Trustee Belvin Perry in the e-mail.

161.     That same day, August 5, 2019, Provost Edington responded and alleged that a letter was sent to Professor Reyes via regular mail on July 25, 2019. However, he never even bothered to confirm whether Professor Reyes received the letter and did not provide the letter to Professor Reyes via e-mail despite her several e-mails asking for the decision. This is a tactic in the hostile work environment.

162.    Provost Edington falsely claimed that the letter was sent to Professor Reyes's mailing address, which FAMU has had on file since Professor Reyes began working at FAMU in 2009. However, the letter was sent to a wrong address in Tallahassee and it was returned by the U.S. Postal Service to FAMU "Return to Sender – Not Deliverable as Addressed."

163.    Professor Reyes sent Provost Edington an e-mail on July 23, 2019, once again requesting the decision; however, Provost Edington did not respond until she followed up again on August 5, 2019. The letter from Provost Edington was dated July 24, 2019, but it was not provided to Professor Reyes until August 5, 2019 via email. They waited to provide the letter until the first day of the semester; this was an additional act of hostility. They gave Professor Reyes the negative decision on the first day of classes rather than during the summer when she was not teaching. They waited until Professor Reyes was starting to teach the heaviest teaching load of any professor in the law school (two large, required, first-year and second-year courses for a total of seven (7) credits).

164.    After that, President Robinson and Provost Edington made it impossible for Professor Reyes to appeal the denial of promotion. They involved Associate Provost Genyne Boston (a Black woman) and General Counsel Denise Wallace (a Black woman), who engaged Professor Reyes in a back-and-forth of e-

mails about the information, only to finally deny her the information and sabotage her appeal.

165.    President Robinson has gone along with the hostilities against Professor Reyes since he was Provost. Professor Reyes tried to meet with him in 2013 as Professor Reyes was being subjected to blatant discrimination and escalating hostilities. She offered to drive to Tallahassee to meet with him; however, he and his administrative assistant, Ora Mukes,  sabotaged the meeting in August 2013 and made it seem as if Professor Reyes did not show up for the appointment when they never informed her of the appointment.

166.    More recently, Provost Edington ostracized Professor Reyes in front of the faculty during a faculty meeting in the law school on January 22, 2020. Provost Edington disagreed with Professor Reyes's reiteration of something he said and turned to the faculty and asked them whether they sided with his version or Professor Reyes's. No one responded because no one was going to take Professor Reyes's side against the Provost. It was one more hostile way to send a message to the faculty that such types of hostility should be directed at Professor Reyes. He undermined her in front of faculty and staff. After the incident, Provost Edington told Professor Reyes that it was not "personal." She responded that it felt very personal to her, including because he has great institutional power as the provost and as a Black man in an HBCU. However, Professor Reyes offered an

olive branch and asked Provost Edington if he would finally agree to meet with her to come up with a plan to address the discrimination and hostilities, including the denial of her promotion. Provost Edington responded by asking Professor Reyes if she would agree to meet and she responded, "Of course, this is what I have been asking for, to try to resolve matters amicably and put an end to the hostilities."

167.    Professor Reyes followed up via email that same day asking Provost Edington when he was available and offering to audio- and even video-record the meeting to avoid "that's not what I said" issues. To date, Provost Edington has not responded to Professor Reyes's request to schedule a meeting. Professor Reyes realized that it was one more sham tactic.

168.    The denial of promotion meant that Professor Reyes did not get a long, overdue 15% raise. She also did not get other benefits, such as an office with a window. Professor Reyes must work harder than most full professors, including because she must deal with ongoing hostilities, including denial of information and resources she needs to do her job. In addition to the duties associated with being an excellent law professor, Professor Reyes must spend precious time defending against the constant attacks, writing memoranda about incidents, and documenting what she says and does in order to be able to defend against potential allegations. Upon information and belief, Professor Reyes has been the target of more investigations than any other employee in the law school. It is a testament to

Professor Reyes's ethics, professionalism, and competence that she has been able to respond over and over again to the malicious prosecution to which she has been subjected.

### New Deans but Same Old Systemic Discrimination, Harassment, Hostile Work Environment and Retaliation Against Professor Reyes

169.     As new deans (interim and permanent) have been appointed by President Robinson and Provost Edington, they have joined in the discrimination, harassment, hostile work environment and retaliation against Professor Reyes. President Robinson and Provost Edington have apparently endorsed the hostile work environment against Professor Reyes. They have received notice for years of what a majority clique have done to Professor Reyes. Again, the phenomenon of workplace mobbing explains why so many people have participated in the harm against Professor Reyes, individually and collectively.

170.     Angela Felecia Epps was recruited and hired when Professor Reyes was visiting at UF Law. Professor Epps started her tenure as dean at the same time Professor Reyes returned from UF Law in spring 2016. Professor Reyes reached out to Dean Epps via email to welcome her to the law school. She also invited her to meet for coffee or lunch, a professional courtesy in many law schools when a new dean joins the faculty. However, Dean Epps responded that she would only meet in the law school building. There is no cafeteria in the law school; therefore, sharing a meal was not an option.

171.     When Dean Epps showed up in Professor Reyes's office, Professor Reyes decided to ask for her help. She tried to tell her about what had just happened in her tenure process and the recent frivolous charge by Professor Broussard. Dean Epps responded that she did not want to hear history and that Professor Broussard had a right to file a charge. Dean Epps did not even try to empathize with Professor Reyes. She told her, "you got tenure and that's that."

172.     The way Dean Epps acted toward Professor Reyes upon meeting her, led Professor Reyes to think that she had been talking to some of the faculty members who target Professor Reyes – the majority clique. Dean Epps sided with the Black women who targeted Professor Reyes. She showed them gender/racial solidarity by going after Professor Reyes.

173.     Dean Epps refused to help Professor Reyes. Instead, based on false complaints by Professor Pat Broussard and Professor Ann Marie Cavazos, Dean Epps issued a letter of "counseling" to Professor Reyes without due process. By terming it a letter of "counseling" and not a letter of "reprimand," she avoided giving Professor Reyes the due process required in the FAMU Regulations. However, in violation of said regulations, she placed the letter in Professor Reyes's file.

174.     When Professor Reyes submitted a complaint about the letter of "counseling" to President Robinson, he refused to process it in clear violation of

the FAMU Regulations. When Professor Reyes reported the refusal to abide by FAMU's Regulation to the Division of Audit and Compliance, they also refused to investigate. Dean Epps continued to retaliate against Professor Reyes. Thankfully, she only lasted as dean for about sixteen (16) months and is no longer employed in the FAMU College of Law.

175.     Then, when Nicky Boothe-Perry became Interim Dean and named her friend Phyllis Taite as Interim Associate Dean they also retaliated and escalated the hostilities against Professor Reyes. The two of them, individually and as part of the majority clique, had participated in ploys to deny Professor Reyes tenure.

176.     Once Professor Boothe-Perry and Professor Taite became interim administrators, they targeted two students (a Latina and an Indian woman) whose independent research Professor Reyes supervised. They refused to process Professor Reyes's upper-level writing certification of the students' independent research papers, which the students needed to graduate. Interim Dean Boothe-Perry and Interim Associate Dean Taite falsely accused Professor Reyes, in a meeting when faculty and students were present, of not doing her job in reference to the certification. They also told the students not to communicate with Professor Reyes thereby marginalizing her. The students were afraid that they would not be able to graduate.

177.     Professor Reyes documented to Provost Edington that Interim Dean Boothe-Perry and Interim Associate Dean Taite were violating the Student Handbook provision that applied to the students and falsely accusing her. However, the damage was done. Since then, Professor Reyes has not volunteered to supervise additional independent writing projects to avoid students getting harmed when Professor Reyes is targeted. Professor Boothe-Perry and Professor Taite have been visiting at other law schools and Professor Reyes does not know if they will come back to the FAMU College of Law.

178.     On January 29, 2020, Interim Dean Boothe-Perry and Interim Associate Dean Taite accused Professor Reyes of not doing her job.

179.     On May 13, 2020, Interim Associate Dean Taite falsely accused Professor Reyes of withholding grades and threatened to put a memo in Professor Reyes's evaluation file.

180.     On May 15, 2020, Professor Reyes reached out to Provost Edington about the false accusations, but she is still waiting to hear from him.

181.      Professor Reyes actively participated in the dean search process of the current dean, Deidré Keller. She also encouraged Professor Markita Cooper to serve as Associate Dean of Academic Affairs once again. She suggested to Dean Keller that Associate Dean Cooper was the most qualified faculty member to become associate dean because she already knew the job and would support her.

Unfortunately, Dean Keller and Associate Dean Cooper also joined in the retaliation, hostile work environment, and workplace mobbing against Professor Reyes. Once again, Professor Reyes became the litmus test to show racial solidarity with the Black faculty members who target Professor Reyes.

182.    Even before Dean Keller officially started working in the FAMU College of Law, she joined with then Interim Dean Nicky Boothe-Perry in an op-ed in the *Orlando Sentinel* where they both proclaimed their shared identity as Black women and mothers of Black boys.

183.    Dean Keller scheduled phone calls with faculty and, after those phone calls, she distanced herself from Professor Reyes. She also closed the faculty meetings, which is something that the majority clique always wanted to do. This way, they hide their wrongdoing, including unlawful discrimination, behind group decisions when other stakeholders, like students, are not present. Dean Keller has also whitewashed the minutes. In this way, the law school has gone backward instead of forward.

184.    Dean Keller and Associate Dean Markita Cooper have also retaliated against Professor Reyes after she filed her EEOC charge. When Professor Reyes has tried to address the discrimination and retaliation, they both become upset. They do not provide information that Professor Reyes should receive like where she is in the wait list for faculty office with a window. Professor Reyes has been

asking them for over a year. It is a pattern of conduct meant to humiliate, marginalize, and distress Professor Reyes.

185.    On February 24, 2021, Dean Keller and Associate Dean Cooper held a Zoom meeting with students and permitted two Black students to make disparaging comments about Professor Reyes when the students were arguing that they wanted a Black female visiting law professor to remain in the law school beyond the agreed upon term of her visit. The students wanted to know why she was not scheduled to teach the evening evidence course that Professor Reyes was teaching. The students who complained were not students who were taking the evidence course. There were about 80 participants in said Zoom meeting. Professor Reyes could not believe that Dean Keller and Associate Dean Cooper did nothing to address the disparaging comments the two students made about Professor Reyes.

186.    Immediately after the first Zoom meeting ended, Professor Reyes posted in the chat of the next Zoom meeting (a town hall), when some of the same students were still present, that law students should not engage in such conduct. Professor Reyes also posted that she may need to deal with the disparaging comments in due time as in making them a teaching moment about professionalism. Dean Keller posted in the chat that she would discuss the situation with Professor Reyes. Thereafter, she asked to meet with Professor Reyes via

Zoom but did not tell Professor Reyes that Associate Dean Cooper would also be present in the meeting.

187.     When the three met, Dean Keller proceeded to "counsel" Professor Reyes that some students could consider what Professor Reyes wrote as a "threat." However, Dean Keller did not receive any complaints from students about Professor Reyes. In fact, two Black female students emailed Dean Keller, with copy to Professor Reyes, complaining about Dean Keller's conduct of permitting the disparaging comments against Professor Reyes.

188.     After Professor Reyes met with Dean Keller, someone submitted an anonymous complaint to the Division of Audit and Compliance (DAC) against Professor Reyes with vicious, false allegations and referenced the "threat" that Dean Keller referenced. The DAC forwarded the complaint to the EOP and Sylvia Barge sent the one-page anonymous complaint to Professor Reyes. Professor Reyes prepared a 15-page memo and 62 exhibits to respond to the malicious and false allegations.

189.     On May 13, 2021, Ms. Barge notified Professor Reyes via email, with copy to EOP Director Carrie Gavin, that the anonymous complaint was closed. However, there was now a written report of the investigation stating that Dean Keller met with Professor Reyes and "counseled" her. The report stated that Dean Keller acknowledged that no students complained to her. The DAC did not receive

any complaints from students. Dean Keller took it upon herself to view a threat where there was none thereby creating a reason to "counsel" Professor Reyes for no valid reason. During the meeting with Professor Reyes, Dean Keller made serious allegations about what Professor Reyes may do to students without any proof that Professor Reyes has ever done any such thing. In fact, because Professor Reyes is highly ethical and professional, she has been able to defend against all the malicious, false claims and complaints that have been made against her. Professor Reyes has learned to do her best to get ahead of the next ploy or at least be ready to respond with evidence.

190.     The anonymous complaint was one more instance when Professor Reyes was forced to document with evidence her innocence but the accuser(s) was not required to provide evidence in support of the accusations. The accuser did not even provide his/her/their name. The anonymous complaint, the processing of the complaint, the written report, and Dean Keller's reference to "counseling" all served to further soil Professor Reyes's professional/academic record.

191.     Dean Keller and Associate Dean Cooper never apologized for the part they played in permitting the disparaging comments against Professor Reyes and possible the anonymous complaint that followed.

192.      Dean Keller recently gave Professor Reyes the lowest annual evaluation she has ever received (average), including by not giving her credit for

her extensive service work, when the electronic faculty activities report that Dean Keller provided did not indicate that there were word count limits and more questions than appeared on the screen. When Professor Reyes was unable to include all the information in the spaces in the electronic form, she copied and pasted the questions into a Word document, answered them, and submitted them to Dean Keller in a PDF document (as she had submitted annual faculty activity reports to prior deans). Professor Reyes did not find out, until May 11, 2022, the day of her evaluation meeting, which Dean Keller insisted must be in person in the Dean's conference room (rather than via Zoom as Professor Reyes preferred), that there were more questions than the ones that appeared on the screen.

193.    During that hostile evaluation meeting, Dean Keller did not tell Professor Reyes until the end of the meeting that she would state in the evaluation form that she could not assess Professor Reyes's service because she did not provide the information. This was a two-year evaluation which is a violation of the one-year evaluation procedure stated in the University Faculty Handbook. It was arbitrary, petty, and capricious for Dean Keller to essentially punish Professor Reyes and not give her credit for the merit of her two-year service work. Professor Reyes requested that she provide the missing questions and allow her to submit the information. As of the date of filing of this complaint, Dean Keller and Associate Dean Cooper have not provided the additional questions to Professor Reyes.

194.     On May 13, 2022, Professor Reyes reached out to Provost Edington and requested that he intervene and instruct Dean Keller to provide the questions, allow Professor Reyes to provide the information, and re-assess her based on the merit of her work. Professor Reyes explained to Provost Edington that this was the first year that faculty received the electronic form, that there were glitches with the form (as documented in emails from the Dean's Suite), and that Professor Reyes's request was reasonable in light of the circumstances.

195.     On May 16, 2022, Provost Edington responded: "I will review this matter and follow up with you accordingly." On July 22, 2022, when Professor Reyes was still in unpaid status during the summer, she sent an email to Provost Edington following up on her request for assistance. On July 26, 2022, Provost Edington responded that he would follow up with her by the end of the week. On July 29, 2022, he responded that he discussed the matter with Dean Keller and decided that "[Dean Keller] is not obligated to conduct an additional evaluation of you. You are free to provide responses to the branch questions for inclusion in your file." On that same day, Professor Reyes replied to Provost Edington correcting several factual inaccuracies he stated about the electronic form and the process. Professor Reyes's last comment on the matter was: "Please let me know when Dean Keller will finally provide all the questions, so I can provide the responses I should have been permitted to provide." Nearly a month has passed since that

email and Professor Reyes has not received the courtesy of a response or the missing questions; therefore, she has been denied the opportunity to respond and at least include those responses in her file. These are the recurring hostilities and indignities that Professor Reyes, an attorney and law professor, must deal with.

196.    Dean Keller has made it unbearable for Professor Reyes to do her job. To start, right as she became dean, she appointed Professor Reyes Chair of the 2020-2021 Faculty Recruitment Committee, during the Covid pandemic, and then sabotaged the work Professor Reyes needed to do by not providing the information she needed. She also allowed Director Adrienne Snyder, someone who was supposed to perform the Human Resources function and has been involved behind the scenes in defamation and group hysteria about Professor Reyes (in emails). Ms. Snyder made getting information for the hiring process very difficult by not responding to emails, which is a tactic used against Professor Reyes. When Professor Reyes asked to meet with her via Zoom, Ms. Snyder refused and said they would have to wait until her supervisor, Associate Dean Green, could attend the meeting. Associate Dean Green did not make himself readily available. Professor Reyes needed to get the hiring process started and no one was providing the resources she needed to do so. To add insult to injury, Dean Keller told Professor Reyes that she should not meet with Associate Dean Green or Ms. Snyder, that all questions should be submitted to her. Dean Keller joined in

discriminating against Professor Reyes and furthering the hostile work environment. She also promoted Ms. Snyder to Chief of Staff.

197.    When Professor Reyes complained about not getting the information she needed to start the recruitment process, Dean Keller asked her if she wanted to quit as chair of the committee. Professor Reyes responded that she would not quit and did not appreciate that Dean Keller seemed to be setting her up for failure. Professor Reyes knew that this could be used against her in an evaluation, including a post-tenure review.

198.    Professor Reyes worked seven days a week to do all her assigned duties in addition to the work required to do the recruitment process without assistance she should have received from Director Snyder and Associate Dean Green. Professor Reyes structured a professional hiring and recruitment process from scratch. It was the most successful hiring process since Professor Reyes has been a member of the faculty (over a decade). Professor Reyes organized and led the recruitment efforts in 50 public Zoom meetings and nine public full-day Zoom interviews all in compliance with Florida's Sunshine Law. Three faculty members were hired: a Latina legal research and writing instructor (the first Latina alumni hired for a full-time teaching position); a doctrinal constitutional law professor (a Black man who immediately received majority status and joined in hostility against Professor Reyes); and a clinic director/professor (a White man who received tenure

upon appointment after Professor Reyes helped him to prepare materials sufficient to support approval of tenure).

### The Majority Clique Voted a Highly Qualified White Woman Unqualified – Similar to How They Voted to Deny Professor Reyes Tenure and Promotion

199.    During a faculty meeting on February 17, 2021, the majority clique managed to foreclose consideration of a White woman who was highly qualified for a doctrinal position. She was a tenured law professor with outstanding credentials and experience. Her resume showed that her interests and work, since she was in law school, aligned with the mission of the FAMU College of Law. She had the best scholarship record of the three finalists in addition to impressive work experience, including prestigious federal district court and appellate clerkships. As a tenured associate professor, she had a better scholarship record and credentials than most tenured full professors in the FAMU College of Law. She was eager to teach in an HBCU law school because of her commitment to social justice. The Faculty Recruitment Committee ranked her in the top two candidates with the Black male professor who was eventually hired.

200.    Professor Reyes, as Chair of the Faculty Recruitment Committee, presented the candidates to the faculty. For the doctrinal position, there were three finalists who were already tenured professors: a Black man, a White man, and the White woman. The Committee found them all to be highly qualified. Some faculty attended their full day interviews but some did not. Because all three were tenured,

only tenured faculty (the RPT Committee) could vote on the first question – whether they were qualified for the position.

201.    The White man did not even progress to a vote. Then, the majority clique was ready to vote on the White woman without even discussing her credentials. The following faculty members (all members of the RPT Committee) voted that the White woman was not qualified: Pat Broussard, Ann Marie Cavazos, Ron Griffin, Yolanda Jones, Lundy Langston, Jeremy Levitt, Jennifer Smith, and Phyllis Taite. The Black man received a unanimous vote as he should have because the Committee had already found him to be qualified for the position, same as the White woman. However, by finding the White woman not qualified for the position, the majority clique ensured that only the Black man was considered for hiring. Therefore, the faculty did not get to proceed to a vote on ranking the candidates because only one was found to be qualified by the majority clique. Dean Keller was present when this happened.

202.    The obvious racial aspect of the vote reminded Professor Reyes of her own tenure and promotion votes by the majority clique. After the vote, Professor Reyes, as Chair of the Faculty Recruitment Committee, had to call the White female candidate and tell her that she was no longer under consideration because she was not found to be qualified. This was humiliating for a candidate with her credentials. Professor Reyes remembered the ways in which the majority clique

diminished her qualifications in efforts to humiliate her and get rid of her like they got rid of the highly qualified White female candidate. The law professor cried when she heard the news and Professor Reyes empathized with her and also cried after she hung up the phone. It was one more racial traumatic experience at FAMU College of Law. Professor Reyes remains the only non-Black tenured woman in the FAMU College of Law.

203.    Something similar almost happened with the White male candidate for the clinic position. He was also highly qualified. However, he was not tenured and had never been in a tenure track position. The CoL Faculty Handbook permitted granting tenure upon appointment if the candidate met the standards. Chair Reyes worked with the candidate to put together a strong record for tenure upon appointment. He made it through the qualification question, but the next review happened in the closed RPT Committee meetings. There, the issue of "White man privilege" was raised by Black members of the RPT Committee. Professor Reyes responded that race should not become the issue; the issue was whether he met the standards and should be granted tenure upon appointment. A factor that helped him is that a Black female candidate withdrew from consideration and the other Black female candidate did not show much interest in the position.

204.    In 2021-2022, another White male candidate was being considered for tenure upon hire; he had tenure in another law school that was no longer in

existence. Black female faculty members in the RPT Committee argued that he should not be eligible for tenure because the law school where he got tenure was no longer in existence. However, these were the same faculty members who favored granting tenure to a Black female candidate the year before when the law school where she received tenure was no longer in existence. The White male candidate had a much stronger teaching, scholarship, and service record, including from years when he taught as a visiting professor in the FAMU College of Law. Professor Reyes once again had to defend her position that he was qualified for tenure upon appointment as a lateral hire and, for her, race was not a factor in the decision.

205.    After Professor Reyes filed her EEOC charge, the retaliation from President Robinson, Provost Edington, Dean Keller, Associate Dean Cooper and other faculty members has made Professor Reyes realize that the targeting is systemic. The emails about what seem like insignificant issues are many. It is the frequency, severity, humiliating, and recurring nature of what they do. They deny Professor Reyes an accommodation to teach from home during the pandemic when she provided a doctor's letter stating that she was the sole caretaker of her elderly mother and would put her at risk of contracting Covid if Professor Reyes were to teach in person. Dean Keller and Associate Dean Cooper had some discretion to decide which 50% of the faculty returned in person. They made Professor Reyes

teach in person. Then, Professor Reyes got sick and needed to be on bed rest with her leg up during the last week of the fall 2021 semester. She requested permission to teach those last three classes synchronously via Zoom. Dean Keller and Associate Dean Cooper said no, same as President Robinson and Provost Edington. What made their tactic more egregious is that they insisted that Professor Reyes apply for an ADA accommodation when she kept telling them that she was not disabled. Then, when she applied it was denied. It was all a waste of time and additional work and stress. Professor Reyes did not get to rest. She had more work as a result of all the back-and-forth of emails and the work she had to prepare to make up for class time instead of teach synchronously.

206.    It has become evident to Professor Reyes that the retaliation plan is to (1) keep her busy defending against ongoing hostilities and indignities, in addition to all the work, which reduces her time for scholarship; (2) make it as hostile as possible so she leaves "voluntarily" or gets sick and is unable to keep up with the job; (3) set her up for "good cause" dismissal, despite her tenure; and (4) ruin her chances of getting other jobs by soiling her professional record (including with false accusations, formal investigations and by "blacklisting" her). This means that Professor Reyes is even more vulnerable after tenure and after she filed the EEOC charge. The ongoing incidents are also meant to intimidate, ridicule, insult,

ostracize, marginalize, and drive Professor Reyes out of the FAMU College of Law, after ruining her academic career.

207.   Through the years Professor Reyes, through records requests, has obtained surveillance videos showing some of the hostilities. The FAMU email system has all the emails Professor Reyes has sent and received. Many of those emails are evidence of the hostilities, discrimination, harassment, hostile work environment and retaliation she has endured. Many of those emails also demonstrate the many times she has reached out to President Robinson and Provost Edington asking for help. She has even asked them to consider how what they have done and permitted to be done to her would look if it were being done to a Black woman in a predominantly white institution. They do not seem to care.

208.   Professor Reyes is a lawyer and law professor. However, Professor Reyes has never practiced in the areas of employment or civil rights law. As the 90-day deadline to file this lawsuit was approaching, Professor Reyes was still wrestling with the decision whether to sue FAMU. She did not make the final decision until the first week back to classes (August 15 – 19, 2022) after she was verbally attacked by Professor Jeffery Brown, a Black man, on August 18, 2022. Some years ago, Professor Brown referred to Professor Reyes as a "fucking thing," during a committee meeting when then Associate Dean Darryll Jones, Professor Cavazos, and Professor Reaves were present. No one came to Professor Reyes's

defense. In fact, Associate Dean Jones said Professor Brown's epithet was "inappropriate but understandable." Professor Brown also provided cover for Professor Jeremy Levitt when he attacked Professor Reyes during her first semester at the FAMU College of Law.

209.    On August 18, 2022, Professor Reyes provided notice of Professor Brown's verbal attack to Provost Edington, Dean Keller, Associate Dean Cooper and the faculty. As of the date of the filing of this complaint, no one has reached out to Professor Reyes about the matter. This was definitive confirmation that the discrimination, harassment, workplace mobbing, and hostile work environment will continue unabated during the 2022-2023 academic year. No one within FAMU will do anything to address the situation. After years of putting up with abuse in her workplace, Professor Reyes decided that she must file a lawsuit.

210.    Due to the time and circumstances when Professor Reyes made the final decision to file this lawsuit, Professor Reyes had to prepare and file this complaint on her own. Professor Reyes conducted a good faith investigation of the facts she alleges and the applicable laws before filing this complaint.

211.    Professor Reyes is not the first FAMU College of Law professor to represent herself in a lawsuit against FAMU. Professor Jennifer Smith, a Black woman, filed her second lawsuit against FAMU on July 30, 2018 in the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida. Professor

Smith asserted claims for gender discrimination in pay and retaliation. FAMU removed said action to the United States District Court for the Northern District of Florida, Tallahassee Division.

212.     Professor Reyes is not the first FAMU College of Law professor to litigate an action against FAMU in the United States District Court for the Middle District of Florida, Orlando Division. Ka'Juel Washington, a Black man, and Rhoda Cato, a Black woman, also litigated actions against FAMU in this Court. FAMU Law students also litigated actions against FAMU in this Court.

213.     Professor Reyes has been uplifted by students and alumni of diverse race, ethnic, and cultural backgrounds during the thirteen (13) years she has taught in the FAMU College of Law. Professor Reyes has remained in the FAMU College of Law because she cares about the law school and students. However, she can no longer tolerate the abuse. This is why she is filing this lawsuit and hopes that students and alumni will understand that it is her right, as a human being, to do what she can to protect herself from further harm.

214.     Through the years, Professor has learned of faculty who instigate students and alumni against her. Professor Reyes hopes that law students and alumni will not be easily manipulated into thinking that Professor Reyes's act of speaking out is not a positive way to deal with the situation. Sometimes litigation helps to finally bring light to a problem and move to resolution.

215.     Professor Reyes prays that the FAMU leadership will finally do something to address the foundational problems that have plagued the FAMU College of Law since it was re-established. The abusive work environment is not conducive to more productive endeavors like scholarship production for example. Professor Reyes has pulled some of her articles from publication and has not attended some conferences because she has been busy dealing with the many investigations, appeals, and workplace situations that she should not have been subjected to as a law professor. Now, she must deal with this lawsuit. It is certainly not what she envisioned when she decided to become a law professor in a SUS law school.

216.     The FAMU College of Law is the only SUS law school that is not yet a full member of the Association of American Law Schools. There is a reason for that and it is the institutional environment. Like Dr. King said, "Injustice anywhere is a threat to justice everywhere." "Our lives begin to end the day we become silent about things that matter."

**FIRST THROUGH SECOND CLAIMS FOR RELIEF**
**[Discrimination in the Terms and Conditions of Employment in Violation of: 1) Title VII and 2) § 1983]**

217.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

218.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions it made vis-á-vis Professor Reyes as outlined herein.

219.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

220.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race, color, national origin, and gender discrimination.

221.     Defendant treated Professor Reyes differently because of her race, color, national origin, and gender in the terms and conditions of her employment. Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

## THIRD THROUGH FOURTH CLAIMS FOR RELIEF
### [Failure to Promote in Violation of: 3) Title VII and 4) § 1983]

222.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

223.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

224.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

225.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race, color, national origin, and gender discrimination.

226.     Defendant discriminated against Professor Reyes based on her race, color, national origin, and gender by failing to promoter her to full professor when she applied in 2018.

227.     Professor Reyes is a member of a protected class.

228.     Professor Reyes was qualified for the position of full professor when she applied in 2018.

229.     Professor Reyes applied for full professor in 2018 and was denied the promotion.

230.     Non-members of the protected class were treated more favorably and were promoted to full professor.

231.     Professor Reyes suffered and has damages such as lost compensation and benefits and emotional distress.

## FIFTH THROUGH SIXTH CLAIMS FOR RELIEF
### [Pay Discrimination in Violation of: 5) Title VII and 6) § 1983]

232.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

233.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outline herein.

234.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

235.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race, color, national origin, and gender discrimination.

236.     Defendant denied a salary raise when it denied Professor Reyes's 2018 application for promotion.

237.     Professor Reyes believed it was futile to apply for promotion in 2019.

238.     Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional distress.

## SEVENTH THROUGH EIGHTH CLAIMS FOR RELIEF
### [Hostile Work Environment in Violation of 7) Title VII and 8) § 1983]

239.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

240.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Professor Reyes based on her race, color, national origin, and/or gender and/or in retaliation for her protected activities.

87

241.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

242.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race, color, national origin, gender and/or for retaliatory reasons.

243.     Professor Reyes was subjected to insulting, humiliating and/or discriminatory conduct related to her race, color, national origin, and gender. Such conduct was unwelcome

244.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Professor Reyes's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

245.     Professor Reyes perceived the environment to be abusive or hostile.

246.     A reasonable Latina in her circumstances would consider the environment to be abusive or hostile.

247.     Defendant is vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Professor Reyes.

248.     Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional distress.

## NINTH THROUGH TENTH CLAIMS FOR RELIEF
### [Retaliation in Violation of: 9) Title VII and 10) § 1983]

249.     Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

250.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

251.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

252.     Defendant acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse action.

253.     On April 27, 2015, Professor Reyes formally opposed and complained about unequal treatment, discrimination and bias when she submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to Defendant's Office of Equal Opportunity Programs (EOP). However, Professor Reyes had raised concerns informally before then and has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race, color, national origin, and/or gender.

254.    In response to raising these concerns, she has been subjected to a pattern of retaliatory conduct.

255.    Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

## ELEVENTH CLAIM FOR RELIEF
### [Discrimination in Violation of FCRA]

256.   Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

257.   The foregoing allegations establish a cause of action for discrimination against Professor Reyes on the basis of race, color, national origin, and sex.

258.   The disparate treatment and discrimination described herein was based on Professor Reyes's race, color, national origin, and sex, and negatively affected the terms, conditions, and privileges of her employment.

259.   Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

## TWELFTH CLAIM FOR RELIEF
### [Retaliation in Violation of FCRA]

260.    Professor Reyes realleges and incorporates by reference all paragraphs set forth above.

261.    The foregoing allegations establish a cause of action for retaliation against Professor Reyes in violation of the Florida Civil Rights on the basis of race, color, national origin, and sex.

262.    The disparate treatment and discrimination described herein was based on Professor Reyes's race, color, national origin, and sex, and negatively affected the terms, conditions, and privileges of her employment.

263.    Professor Reyes has suffered and has damages such as lost compensation and benefits and emotional harm.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following:

a.  Back pay, in amounts to be determined at trial;

b.  Compensatory and consequential damages;

c.  Front pay;

d.  Injunctive and/or declaratory relief;

e.  Prospective relief;

f.  Punitive damages;

g.  Pre-judgment and post-judgment interest at the highest lawful rate;

h.  Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

i.  Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 25th day of August, 2022.


/s/ Maritza Reyes

P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200