UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


MARITZA REYES,

      Plaintiff,

v.                          CASE NO.: 6:22-cv-1525-WWB-DCI

FLORIDA A&M
UNIVERSITY BOARD
OF TRUSTEES ("FAMU")

      Defendant.

_____


**SECOND AMENDED COMPLAINT, DEMAND FOR A JURY TRIAL, AND REQUEST FOR PERMANENT INJUNCTIVE RELIEF**

      Maritza Reyes ("Plaintiff" or "Professor Reyes") hereby complains against the Board of Trustees of Florida Agricultural & Mechanical University ("Defendant" or "FAMU") as follows:

**I.      NATURE OF THE CLAIMS**

      1.  This suit is brought by a Hispanic/Latina law professor who has been subjected to race, color, national origin, and sex discrimination and retaliation by Defendant in violation of: Title VII of the Civil Rights Act of 1964, as amended and codified at 42 U.S.C. § 2000e, *et seq.* ("Title VII").

      2.  The unlawful discrimination, harassment, ongoing hostile work environment, and retaliation because of race, color, national origin, and sex have taken many forms, including a phenomenon termed by experts as "workplace mobbing."

3.   Plaintiff seeks all available remedies including damages, attorneys' fees, costs, interest, and compensatory damages.

## II.      PARTIES

4.   Plaintiff is a Hispanic/Latina, a woman of Spanish-speaking, Latin American origin, who resides in the State of Florida, Orange County, and is and was employed by Defendant at all times relevant to the allegations in this Amended Complaint.

5.   Defendant is a public historically black college university ("HBCU") within the State University System of Florida ("SUS"). Defendant's main campus is located in Tallahassee Florida. Defendant's law school campus, Florida A&M University College of Law ("FAMU College of Law"), is located in Orlando, Florida, Orange County.

6.   At all times relevant to this Amended Complaint Defendant was an employer pursuant to the pertinent laws and received federal and state financial assistance.

7.   Defendant acted through its agents, representatives, and/or employees at all times material hereto.

## III.      JURISDICTION AND VENUE

8.   This Court has original jurisdiction under the provisions of 28 U.S.C. § 1331 with respect to Plaintiff's claims arising under federal law.

9.   Plaintiff has complied with the administrative prerequisites by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received a Notice of Right to Sue from the EEOC and filed this action within ninety (90) days of the Notice of Right to Sue.

10.   Plaintiff has fulfilled the conditions precedent prior to filing this Amended Complaint.

11. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b).

## IV.    FACTUAL BACKGROUND

**Professor Reyes's Credentials Prior to Joining the FAMU College of Law**

12. Professor Reyes earned the "traditional," excellent credentials to become a tenure track law professor before she joined academia in the faculty of FAMU College as a full-time tenure track assistant professor. Professor Reyes earned a Juris Doctor (J.D.) *summa cum laude* from Nova Southeastern University Shepard Broad College of Law ("Nova Law") in 2000 (graduating in the top 1% of her class of over 400 students). Professor Reyes attended Nova Law on a full-tuition, merit Goodwin academic scholarship. She earned Dean's List all semesters and book awards for highest grade in several courses. Professor Reyes served as Articles Editor of the *Nova Law Review* and earned membership in the Moot Court Honor Society. During her J.D. studies at Nova Law, Professor Reyes earned several awards.

13. During law school, Professor Reyes gained practical legal experience as a summer associate with an international law firm and as a certified legal intern in the U.S. Attorney's Office Appellate Division. After earning her J.D., Professor Reyes's legal experience included working for private law firms as an associate attorney and as a federal court law clerk at the district court level.

14. During her second year of law school, Professor Reyes worked as research assistant for two professors and developed an interest in a teaching career. One of those professors provided a list of the "traditional" credentials for a tenure track career and Professor Reyes fulfilled every credential on that list before going on the

competitive, national teaching market through the Association of American Law Schools ("AALS") Faculty Recruitment Conference ("AALS Conference").

15.   In final preparation to begin full-time law teaching, Professor Reyes attended the Harvard Law School ("Harvard Law") where she earned a Master of Laws (LL.M.) in 2008. While at Harvard Law, Professor Reyes served as General Editor of the *Harvard Latino Law Review* and Coordinator of External Affairs of La Alianza, a student-run organization. She also participated in the Spring Pro Bono Program in the Florida Immigrant Advocacy Center. She was awarded a Congressional Hispanic Caucus Institute Graduate Scholarship and, upon graduation, a Harvard Law Post-Graduate Research Fellowship. She published articles in the *Harvard Latino Law Review*, *The Harvard Law Record*, and *The Harvard Crimson*.

### The FAMU College of Law When Professor Reyes was Hired

16.   The FAMU College of Law was legislatively re-established in 2000 and opened its doors in August 2002. It received provisional accreditation by the American Bar Association (ABA)'s Council of the Section of Legal Education and Admissions to the Bar in August 2004. The FAMU College of Law graduated its first class in April 2005. Professor LeRoy Pernell was hired as Dean of FAMU College of Law in late 2007. The ABA Journal reported, after an interview with Dean Pernell, in an article titled "Saving the School," that Dean Pernell joined the law school after ABA site visits in 2005, 2006, and 2007 "reported numerous problems and FAMU Law's failure to adequately address them." According to the article, FAMU College of Law was also under a deadline to get full accreditation or be subject to potential closure as stated in the Florida statute that re-established it in 2000. There were reports of issues within the faculty, including

4

conflict between the "founding faculty" and junior faculty. Dean Pernell said "'I knew we had to infuse the faculty with new faces, bringing in new as well as experienced law faculty.'" Dean Pernell also said that his efforts would include "reach[ing] out to more diverse people, not only throughout the state of Florida but regionally and nationally."

### Professor Reyes's Recruitment Process

17.  Professor Reyes was recruited as the FAMU College of Law was seeking full accreditation. Professor Reyes was identified by the 2008-2009 FAMU College of Law Faculty Recruitment Committee ("Recruitment Committee") in fall 2008 as a result of a national search through the AALS Conference. Dean Pernell was part of the Recruitment Committee. Professor Lundy Langston, a Black woman and "founding faculty," served as Chair of the 2008-2009 Recruitment Committee. Professor Reyes was initially interviewed by Dean Pernell and some members of the Recruitment Committee at the AALS Conference in Washington, D.C. However, a couple of days prior to that initial interview, Professor Reyes had to reach out to Dean Pernell to get the information about where the interview would take place. Dean Pernell was surprised that Professor Reyes had not received the information and reached out to Professor Langston about it. Professor Reyes was not aware of who was supposed to send her the information; she received the information by phone from Dean Pernell.

18. After the initial interview at the AALS Conference, Professor Reyes was invited for a visit to FAMU College of Law where she was interviewed by additional members of the faculty. Although there were many women on the faculty (overwhelmingly Black women) and Black women in the Recruitment Committee, including Professor Langston as Chair, the dinner with the faculty consisted of two White men, Professors Robert

5

Abrams and Jonathan Fineman. Professor Fineman picked up Professor Reyes from the airport.

19. All interviews with faculty members, with the exception of the interview with Professor Patricia ("Pat") Broussard, a Black woman, included more than one faculty member. Professor Broussard met with Professor Reyes alone in Professor Broussard's office. During the interview, Professor Broussard was arranging paperwork on her desk, did not make eye contact with Professor Reyes, and asked her why she wanted to teach in the FAMU College of Law. Professor Reyes responded that she was thrilled by the prospect of joining the faculty in an HBCU state law school in her home state of Florida. She also explained that she sought to contribute to the mission of the law school, teach diverse students, and help with efforts to increase bar passage. Professor Broussard then asked "but why this law school?" Professor Reyes thought she had already answered the question but once again provided a similar response.

20. As part of the on-campus visit Professor Reyes made a "job talk" presentation to faculty members. Prior to the job talk presentation, Professor Reyes was supposed to get time to eat lunch, prepare for the job talk, and meet with IT staff to go over the computer setup for her Power Point presentation. None of this happened because Professor Lundy Langston spent too much time walking her through the law school building. During this walk, Professor Reyes asked for a bathroom break. Professor Langston was walking her to the bathroom on the first floor when a woman approached and started talking to Professor Langston. Professor Reyes stood next to Professor Langston waiting for Professor Langston to introduce her. As Professor Langston continued talking with the woman, Professor Reyes noticed the bathroom door and

hesitantly interrupted the conversation to briefly introduce and excuse herself, in order to go to the restroom. The woman was Professor Joan Bullock. After Professor Reyes exited the restroom, Professor Langston said bye to Professor Bullock and walked Professor Reyes to the faculty conference room in the fourth floor.

21. By the time Professor Reyes arrived in the conference room, faculty members were seated and Professor Reyes had to set up her Power Point presentation while she also addressed the faculty and began her job talk. Despite not getting time to eat or prepare before her job talk, Professor Reyes enjoyed the job talk presentation and her time with the faculty. Then Associate Dean Kenneth Nunn, a Black man, asked probing questions, which made for a good presentation. Professor Reyes viewed some of the odd situations (not getting materials prior to the interview, not having any women join the dinner, being questioned repeatedly by Professor Broussard about why she was interested in "this law school," not being introduced to Professor Bullock by Professor Langston, and not getting time to prepare before her job talk) through a positive lens and did not presume ill-intent. Professor Reyes liked the FAMU College of Law, the faculty, and the students she met during her visit.

22. Some years after Professor Reyes joined the faculty of FAMU College of Law, when she mentioned to a faculty member that she sensed that Professor Broussard was sabotaging her, she learned that, at the time of her recruitment and hiring process, Professor Broussard told faculty members that Professor Reyes would not accept an offer to join the faculty. Years later, once Professor Reyes learned to identify Professor Broussard's, Professor Bullock's, and Professor Langston's tactics, she realized that they had been sabotaging her since the beginning although initially not full frontal. They

7

kept escalating their attacks against Professor Reyes including behind the scenes which Professor Reyes did not even know. They made a full attack, in the closed retention, promotion, and tenure meetings of the tenured faculty, during Professor Reyes's tenure process.

**Professor Reyes Accepted the Offer to Join FAMU College of Law**

23. The full faculty of FAMU College of Law and Dean Pernell recommended to Dr. Cynthia Hughes Harris, the then Provost and Vice President for Academic Affairs, that Professor Reyes be hired as a full-time, tenure-earning, assistant professor of law. On March 30, 2009, then FAMU University Provost Cynthia Hughes Harris made Professor Reyes an offer of employment as an assistant professor of law in a tenure-earning position.

24. As part of the hiring negotiations, Professor Reyes requested the rules and standards for promotion and tenure. She received the rules for promotion and tenure that would apply to her according to the FAMU College of Law Faculty Handbook ("CoL Faculty Handbook") and a Memo prepared by then Associate Dean for Research and Faculty Development and Professor of Law Kenneth B. Nunn (the "Nunn Memo"). The Nunn Memo was appended to the Self Study that the FAMU College of Law presented to the ABA as part of the law school's application for full accreditation. The law school represented to the ABA that the Nunn Memo clarified the standards as requested by the ABA.

25. On April 7, 2009, Professor Reyes accepted the offer of employment as a full-time, tenure-earning/tenure-track faculty member of the FAMU College of Law in a position of assistant professor of law. Professor Reyes became the first FAMU College

of Law entry-level faculty member identified and hired through the AALS Conference. Professor Reyes also became the first Hispanic/Latina/o hired in a tenure-track position in the FAMU College of Law.

26. The FAMU College of Law received full ABA accreditation in July 2009.

### The "Majority Clique" & "Workplace Mobbing"

27. In this pleading, the term "majority clique" is defined as Black, tenured professors who have individually and collectively participated in the tangible decisions and ploys that have harmed Professor Reyes during her employment at FAMU.

28. At FAMU, Black persons receive the highest status for automatic inclusion within the "FAMUly."

29. Defendant delegated institutional power to the majority clique.

30.  The majority clique has led the workplace mobbing of Professor Reyes because she is not Black and she is Hispanic/Latina. Members of the majority clique have co-opted some Black FAMU non-faculty employees in their efforts to mob Professor Reyes. As further described in this complaint, they included Associate Dean Reginald Green, Director Mildred Graham, staff member Claudine Beale, program assistant Evett Collins, IT assistant Erica Polite, Director Adrienne Snyder, and others. A few non-Black FAMU employees have also followed the lead of the majority clique and participated in efforts to harm Professor Reyes.

31. Workplace mobbing includes organizational dynamics and involvement.

**The FAMU College of Law Retention, Promotion and Tenure Committee**

**("RPT Committee")**

32. The FAMU College of Law Retention, Promotion and Tenure (RPT) Committee is a Committee constituted pursuant to the rules of the CoL Faculty Handbook. When Professor Reyes joined the faculty, the RPT Committee consisted only of the tenured, full professors. At the urging of a group of Black female law professors who were not yet full professors, after they made their complaints to the ABA accreditation site teams, the CoL Faculty Handbook was amended to include all tenured associate and full professors in the RPT Committee.

**The RPT Committee during Professor Reyes's Tenure Process**

33. Under the terms agreed upon hiring, Professor Reyes was required to apply for tenure no later than the beginning of the 2014-2015 academic year, which was the beginning of her sixth tenure-earning year. The CoL Faculty Handbook, section I.E.7., stated: "Submission of materials by the candidate in support of his/her application for promotion and/or tenure must coincide with the University's Schedule for Promotion and Tenure as generated annually from the Provost's Office." The "2014/2015 Tenure and Promotion Schedule" ("University Tenure Schedule") generated by the University stated that the deadline for applications for tenure and promotion was September 12, 2014 (with no hour of time stated).

34. During the 2014-2015 academic year the RPT Committee consisted of the following tenured associate and full professors (the tenured faculty):

   i.    Randall S. Abate (a White man),

   ii.   Robert H. Abrams (a White man),

iii.   Deleso A. Alford Washington (a Black woman),

iv.   Nicola ("Nicky") A. Boothe-Perry (a Black woman),

v.   Patricia ("Pat") Broussard (a Black woman),

vi.   Jeffrey ("Jeff") M. Brown (a Black man),

vii.   Joan R.M. Bullock (a Black woman),

viii.   Ann Marie B. Cavazos (a Black woman),

ix.   Markita D. Cooper (a Black woman),

x.   John Duncan (a Black man),

xi.   Jonathan W. Fineman (a White man),

xii.   Joseph Grant (a Black man),

xiii.   Ronald C. Griffin (a Black man),

xiv.   William ("Bill") D. Henslee (a White man),

xv.   Darryll K. Jones (a Black man),

xvi.   Lundy R. Langston (a Black woman),

xvii.   Jeremy Levitt (a Black man) who was on sabbatical leave, but may have participated in RPT Committee activities and communications,

xviii.   Shiv Persaud (an Indian/West Indian man),

xix.   Rhonda M. Reaves (a Black woman),

xx.   Omar Saleem (a Black man),

xxi.   Jennifer M. Smith (a Black woman), and

xxii.   Phyllis C. Taite (a Black woman).

35.   Aggregated by race, the members of the 2014-2015 RPT Committee were as follows: ten (10) Black women, seven (7) Black men, four (4) White men, and one (1)

Indian/West Indian man. All the female members of the RPT Committee were Black women. There was no Hispanic/Latina/o (man or woman) in the RPT Committee.

36. Professor Reyes was the first Hispanic/Latina/o hired in the tenure track and the first and only thus far to apply for tenure.

37. Dean LeRoy Pernell appointed Professor John Duncan as Chair of the 2014-2015 RPT Committee. Professor Duncan was supposed to guide Professor Reyes through the tenure process. However, he turned the process into an adversarial process even before she applied. He did not provide information and told Professor Reyes that she should contact Professor Phyllis Taite with questions. When Professor Reyes contacted Professor Taite with questions, Professor Taite responded that she would forward her questions to Professor Duncan. Professor Reyes was getting the run around about what she needed to do, including to where and to whom she needed to submit her tenure application, and the time to prepare her materials was running.

38. Unbeknown to Professor Reyes, Professor Phyllis Taite sent a memorandum to Dean Pernell, dated August 15, 2014, alleging that Professor Reyes was "harass[ing]" her after an email exchange between Professor Reyes and Professor Taite about a faculty meeting, on August 13, 2014, when then Associate Dean Darryll Jones set up a student situation and used it to bully Professor Reyes, including at the meeting. Professor Taite joined with then Associate Dean Jones against Professor Reyes during that meeting and in the email exchange that she used to set up her false allegations against Professor Reyes. In her August 15, 2014 memorandum to Dean Pernell, Professor Taite stated that she was concerned for her safety, afraid of what Professor Reyes may do to her, and trying to avoid being around Professor Reyes. She also

blamed Professor Reyes for stress that allegedly affected her health, including her blood pressure and ability to sleep. Nothing Professor Reyes stated in the email exchange warranted such accusations. However, this became the narrative behind the scenes and Professor Reyes did not even know about it.

39. Professor Taite was herself preparing her application for promotion to full professor at the same time that Professor Reyes was preparing her application for tenure. Professor Taite did not have to accept the designation as the point person to answer Professor Reyes's questions about her tenure application, but Professor Taite's designation gave her access to harm Professor Reyes shortly before the deadline to apply for tenure.

40. Neither Professor Taite nor Dean Pernell ever informed Professor Reyes about Professor Taite's August 15, 2014 memorandum. Professor Taite did not recuse herself from participation in Professor Reyes's tenure process. Instead, she participated in the ploys to deny Professor Reyes tenure, including the false and unsubstantiated allegation of five-minute late submission.

41. On September 12, 2014, Professor Reyes submitted her application and portfolio materials in full compliance with the deadline set forth in the University Tenure Schedule. She delivered her application and portfolio materials in accordance with instructions given to her by Professor John Duncan. Professor Reyes put together a very strong application by all objective standards. She fulfilled and exceeded the standards that were provided to her upon hiring. Dean Pernell had rated her performance as excellent in all categories of her annual evaluations. The annual RPT Committee reviews had all rated her performance in teaching, scholarship, and service

13

to be very good to excellent. She had received class peer observations rating her teaching from very good to excellent. Students had consistently rated her as an effective, highly competent teacher. The overwhelming majority of comments in student evaluations were extremely positive about her teaching. A few students complained about Professor Reyes's rigorous teaching style, but no one ever raised concerns about this during her annual evaluations.

42. Pursuant to the University Tenure Schedule, the deadline for the RPT Committee to submit its recommendation to Dean Pernell was October 10, 2014.

43. In mid-October 2014, Professor Reyes became concerned because she had not heard anything about the status of her application. She also noticed that members of the RPT Committee were avoiding her. She reached out to Dean Pernell via email to request the status of her application and he responded that they should meet.

44. On October 29, 2014, Professor Reyes met with Dean Pernell, in his office, and he informed her that he was unable to begin his review of her application because the RPT Committee had not sent him her application and portfolio materials or its letter of recommendation. The deadline for Dean Pernell to submit his recommendation was November 14, 2014.

45. Dean Pernell told Professor Reyes that he could not review her application and materials if the RPT Committee did not first fulfill its duty to engage in the initial review process and provide a letter of recommendation to him. Therefore, the failure of the RPT Committee to perform its duty to (a) process Professor Reyes's application and supporting materials, including arranging for external and internal reviews of her

scholarship, and (b) prepare a letter of recommendation by the stated deadline derailed Professor Reyes's entire tenure process.

46. If the RPT Committee did not process Professor Reyes's application for tenure, there would be no review by the College of Law Dean, University Tenure and Promotion ("T&P") Committee, Provost, President, and Board of Trustees. The failure of the RPT Committee to fulfill its duty to process Professor Reyes's application and issue a recommendation would foreclose a review of Professor Reyes's application for tenure altogether. The University Faculty Handbook, section II.J.(5)(a), stated: "By the end of six years of continuous full-time, or equivalent part-time service in a tenure-earning position in the University, a Faculty employee shall be nominated for tenure or given notice that further employment will not be offered, in the affected position with reason(s) why the employee was not nominated for tenure."

47. The majority clique that hijacked Professor Reyes's tenure process was driven by unlawfully discriminatory racial and racial/sex animus against Professor Reyes. They recruited allies and followers. They silenced the dissenters, who were also prohibited from communicating with Professor Reyes about what was happening in the secret, closed RPT Committee meetings, including about the decisions that were being made to derail her tenure process and reach a recommendation that tenure should be denied.

48. In their efforts to deny Professor Reyes tenure, the majority clique repeatedly violated the regulations that governed the tenure review process.  They also violated the regulations that set forth the standards that should be applied when reviewing an application for tenure, including by denying Professor Reyes fairness and due process.

49. The majority clique engaged in many ploys, including the following:

15

i.   Made a five-minute false allegation of violation of a non-deadline that turned Professor Reyes's tenure process into an adversarial, controversial, and difficult process, which served to discredit Professor Reyes at the RPT Committee level and higher levels of review.

ii.   Stopped Professor Reyes's tenure process in violation of the rules and ignoring Professor Reyes's repeated assertion that she delivered her materials by 5:00 PM. The actual deadline for submission was an entire day (until 11:59 PM). The RPT Committee refused to tell Professor Reyes what the allegation was (the 5:05 PM allegation) and what evidence they alleged, despite her repeated requests for this crucial information.

iii.   Denied Professor Reyes the opportunity to refute their unsubstantiated allegation. They made it extremely difficult to set up a meeting and then, once a date and place were finally agreed upon (September 29, 2014) with Chair John Duncan, Professor Lundy Langston, and Professor Joseph ("Joe") Grant, they cancelled the meeting at the last minute without any explanation to Professor Reyes as to the reason for the cancellation.  Subsequently, they misrepresented to the other members of the RPT Committee, the FAMU Division of Audit and Compliance ("DAC") investigator, the Dean, the Interim Provost, the President, the General Counsel, and/or other University officials that Professor Reyes did not want to clarify, without telling them that they were the ones who canceled the meeting and continued to keep Professor Reyes in the dark about what was happening in her tenure process.

iv.   Kept Professor Reyes isolated and marginalized during the entire tenure process (over two semesters when the process was only supposed to be one semester). Chair John Duncan refused to provide Professor Reyes with the information she was entitled to receive. He also instructed other Committee members not to speak with her; thereby silencing them and alienating Professor Reyes from colleagues who would vote on her tenure.

v.   Argued for "confidentiality" of the process to keep everything secret while they violated the claimed "confidentiality" by going outside the process (to all decision-makers at the University level) with their unsubstantiated allegation that Professor Reyes was lying about the time of delivery of her materials and also falsely claiming that she refused to clarify. In their statements, they never stated the alleged time (5:05 PM); they just kept saying that Professor Reyes submitted late or after the deadline. They also spread the falsehood to Black law professors beyond the FAMU College of Law.

vi.   Disenfranchised two White men from voting on Professor Reyes's tenure application: Professors Randall ("Randy") Abate and Robert ("Rob") Abrams.

vii.   Caused Professor Reyes to be subjected to a FAMU Division of Audit and Compliance ("DAC") investigation, in fall 2014, that she only learned about when she received notice of her interview, three days before the interview, at a time when she was busy teaching an extra heavy course load. Upon information and belief, Professor Deleso Alford Washington, a Black female faculty member who was a member of the RPT Committee by the time Professor Reyes applied for tenure, submitted her tenure application materials well after 5:00 PM but she was not accused and investigated as Professor Reyes was.

50. When the RPT Committee refused to process Professor Reyes's application for tenure, she hired an attorney who sent a letter to then Interim Provost Rodner Wright on October 22, 2014 and a follow-up letter to then General Counsel Avery McKnight on October 30, 2014. Those letters explained the irreparable injury Professor Reyes would suffer from the ongoing discrimination if the RPT Committee did not process her application. Professor Reyes's attorney advocated that it was not in good faith to recruit Professor Reyes under the guise that her application for tenure would be reviewed in her sixth year and then deny tenure without review. After Professor Reyes's attorney sent letters opposing the race, gender, and national origin discrimination, Interim Provost Wright retaliated against Professor Reyes by subjecting her to an official Division of Audit and Compliance ("DAC") investigation over the unsubstantiated, alleged five-minute late submission of a 5:00 PM non-deadline, which Professor Reyes insisted that she met.

51. Three members of the RPT Committee were interviewed during the DAC investigation: John Duncan, Joe Grant, and Phyllis Taite. Their interviews were audio recorded. In those interviews, they attempted to corroborate the alleged late submission; however, none of them were present when Professor Reyes submitted her application.

52. Then Associate Dean, Professor, and RPT Committee member Joan Bullock, the one who made the initial false allegation of late submission, did not submit herself to an interview. Instead, she provided a self-serving written statement in which she claimed that she stopped by Professor Reyes's office, early in the afternoon on the day when she was supposed to submit her materials, and Professor Reyes was still working on her application. In her written statement, Associate Dean Bullock gratuitously and falsely alleged that Professor Reyes "grunted" at her. Although Associate Dean Bullock was present in the law school building, she did not make herself available to receive Professor Reyes's materials. Instead, she assigned the most junior program assistant, Evett Collins, someone under her supervision, to receive Professor Reyes's application and supporting materials (3 large binders and 25 small binders as required).

53. Associate Dean Bullock and Professor Duncan persuaded Ms. Collins, the program assistant who was designated to receive the materials, to go along with their allegation of late submission. They got her to say that Professor Reyes submitted her materials five (5) minutes after 5:00 PM (not the published deadline). They also tried to get Professor Reyes's program assistant, Celia Westbrook , who was also present when Professor Reyes submitted her application, to go along with their ploy. However, Ms. Westbrook refused and told the truth during the DAC investigation. Thereafter, Associate Dean Bullock, her supervisor, retaliated against her with the lowest evaluation Ms. Westbrook had ever received.

54. Ms. Westbrook complained to the DAC that she was subjected to retaliation after she was promised that she would not suffer retaliation if she told the truth during the DAC investigation of the timeliness of Professor Reyes's application for tenure. After

Ms. Westbrook's repeated requests for an investigation of the retaliation against her by then Associate Dean/Professor Joan Bullock, the DAC conducted an investigation and reviewed the evaluations provided by three of the faculty members whom Ms. Westbrook assisted. All three (Professor Randy Abate, Professor Pat Broussard, and Professor Reyes) provided individual evaluations with very high scores; therefore, Associate Dean Bullock had no basis to give Ms. Westbrook the low scores she assigned.

55. According to records of the DAC investigation of Ms. Westbrook's complaint of retaliation, when the DAC investigator interviewed Professor Patricia Broussard, Professor Broussard stated that she gave Ms. Westbrook high scores in her evaluation; however, she also stated that she wanted to give Ms. Westbrook lower scores but was afraid that Ms. Westbrook may file a complaint against her. At the point when Professor Broussard was interviewed, Ms. Westbrook had never complained about her evaluation.

56. The FAMU Division of Audit and Compliance ("DAC") found that Ms. Westbrook's complaint of retaliation by Associate Dean Bullock was corroborated by the evidence, including because Associate Dean Bullock decreased Ms. Westbrook's evaluation points and increased the evaluation points of Ms. Collins, the program assistant that provided the unsubstantiated five-minute allegation.

57.  Ms. Westbrook, a woman of Brazilian, Latin American origin, resigned from the FAMU College of Law a couple of weeks before the 2022-2023 academic year began. Ms. Westbrook worked in the FAMU College of Law for twelve (12) years and witnessed the ongoing discrimination, harassment, hostilities, and workplace mobbing that

Professor Reyes endured during over a decade when Ms. Westbrook was assigned as Professor Reyes's program assistant. Ms. Westbrook was also targeted.

58.  Three (3) professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant) rushed to review Professor Reyes's evidence and professional responsibility classes right at the beginning of fall 2014; they knew, by that point, that there was a late submission ploy underway to stop processing Professor Reyes's application for tenure. Stopping the tenure process meant that the four (4) evaluations by these three (3) professors were the only peer teaching evaluations available for Professor Reyes's fall 2014 classes. RPT Committee Chair John Duncan refused to give Professor Reyes the four (4) peer teaching evaluations from Professors Broussard, Cavazos, and Grant. This was another violation of the process. Professor Reyes was also left in the dark about the false and negative comments those three (3) professors stated in those four (4) evaluations; therefore, she did not have a chance to refute what they stated.

59. The individual professors (Pat Broussard, Ann Marie Cavazos, and Joe Grant), the teaching subcommittee, and the RPT Committee violated the mandate in the CoL Faculty Handbook that required that class observers meet with the professor to provide feedback. None of the three (3) professors (Broussard, Cavazos, and Grant) met with Professor Reyes.

60. The RPT Committee also considered and gave credit to unsubstantiated allegations made by Professor Patricia Broussard during the RPT Committee meeting and in her peer teaching evaluation about what students allegedly told her.

61. Professor Broussard did not disclose to the RPT Committee that she told students in Professor Reyes's fall 2014 evidence course to complain about Professor

Reyes to then Associate Dean Darryll Jones, who then instructed them to file written complaints against Professor Reyes.

62. In a repeated and ongoing pattern of discriminatory and hostile conduct toward Professor Reyes, Professor Patricia Broussard negatively interfered with Professor Reyes's relationships with students and empowered students to question Professor Reyes's teaching methodology and disrespect her. Professor Broussard informed students that Professor Reyes was applying for tenure, something that Professor Reyes had not shared with students.

63. After Professor Pat Broussard sent students to complain to then Associate Dean Darryll Jones about Professor Reyes, four (4) students, out of seventy-four (74) students in her fall 2014 evidence course, submitted written complaints, at the beginning of fall 2014. Neither Professor Broussard nor Associate Dean Jones ever discussed the students' allegations with Professor Reyes.

64. As with the false and unsubstantiated allegation of five-minute late submission, the RPT Committee denied Professor Reyes an opportunity to respond to the ploy to use the four (4) student complaints in her tenure process. Professor Reyes learned about this ploy after a student warned her, on February 11, 2015, the date when the teaching subcommittee disclosed the four (4) complaints to the entire RPT Committee. According to the student, J.S., the ringleader of the four (4) complaints was encouraging students to complain about Professor Reyes and telling them that there was a meeting that day "to get her fired." The student said that the ringleader was openly saying this in Professor Broussard's class. The ringleader was close to Professor Broussard and Professor Jennifer Smith. Professor Reyes did not know when the RPT Committee was

meeting but students knew when and why they were meeting; this was evidence of the violations of the "confidentiality" of the process.

65.  The teaching subcommittee, under the leadership of Professor Nicola ("Nicky") Boothe-Perry, a member of the majority clique, presented information about the four (4) student complaints to the RPT Committee at the last minute. The members of the RPT Committee who were blindsided with this new material did not have a meaningful opportunity to argue that it was a violation of the process to consider this type of student complaints. Professor Boothe-Perry did not notify Professor Reyes that the student complaints would be added to her tenure file, which was a violation of due process. When Professor Reyes learned of the ploy, she urged the RPT Committee to consider the potential repercussions for the four (4) law students whose frivolous complaints and allegations were going to become part of the record.

66. During its deliberations, the RPT Committee did not attach and did not consider a memorandum Professor Reyes provided to the RPT Committee on February 24, 2015 (with Exhibits), in response to the four (4) student complaints. The negative comments in those four (4) complaints were highlighted in the teaching assessment of Professor Reyes's tenure report. However, the majority clique refused a suggestion by some Committee members that, if those four (4) complaints were going to be added and considered, the total student evaluations from fall 2014 should be added and considered. Those evaluations were not yet available when Professor Reyes applied in fall 2014 but were available in spring 2015 by the point the four (4) complaints were added to her tenure file (in violation of the rules).

67.  RPT Committee Chair John Duncan selected the members and chairs of three (3) subcommittees to review Professor Reyes's teaching, scholarship, and service. On repeated occasions Professor Reyes requested information about the composition of the subcommittees, but Chair Duncan refused to provide this information, just like he refused to provide Professor Reyes the information she was entitled to receive immediately before and during the tenure process. She finally received the list of RPT subcommittees in investigation records provided to her by the FAMU Division of Audit and Compliance ("DAC"). The chairs of the subcommittees were: Nicola Boothe-Perry (teaching), Bill Henslee (scholarship), and Shiv Persaud (service). None of the chairs of the subcommittees ever requested to meet with Professor Reyes. Chair Duncan selected chairs and members of subcommittees who went along with the ploys (by action or inaction). Upon information and belief, the following full professors were excluded from Professor Reyes's tenure subcommittees: Professor Randall Abate, Professor Robert Abrams, Professor Ron Griffin, Professor Rhonda Reaves, and Professor Omar Saleem. However, they were still members of the entire RPT Committee. The subcommittees wrote the teaching, scholarship, and service sections of the RPT Report.

68. Professor Nicky Boothe-Perry, the chair of the teaching subcommittee, was supposed to visit Professor Reyes's Professional Responsibility class in fall 2014, but she never did. She also never responded to Professor Reyes's email in which she asked her if she was going to visit her class in fall 2014. Professor Boothe-Perry did not visit Professor Reyes's class in spring 2015. Professor Boothe-Perry did not give Professor Reyes copies of the class observation forms that were provided to her during

the tenure process (fall 2014 and spring 2015). Professor Boothe-Perry never communicated with Professor Reyes to give her feedback about her peer teaching evaluations during the tenure process. The teaching subcommittee waited until the last minute (February 11, 2015) to slip in the information about the four (4) student complaints in its report. At that point, the RPT Committee was told that a vote had to be taken on February 25, 2015 and the final report had to be assembled and provided to Dean Pernell by February 27, 2015.

69.  The scholarship subcommittee was chaired by Professor William ("Bill") Henslee, someone who had never gone through a tenure process because he was granted tenure upon being hired, as a "founding faculty" associate professor, by inaugural Dean Percy Luney, who knew him personally. Upon information and belief, Professor Henslee wrote (or guided) the scholarship report that dismissed the merit of two of Professor Reyes's law review articles and ignored one of her other articles in clear violation of the rules, which required that all articles Professor Reyes submitted should be considered in the scholarship assessment.

70.  Some years before Professor Reyes applied for tenure, Professor Henslee told Professor Reyes that he was denied promotion to full professor because he is a White man. He told her that he was going to sue if they denied him again. However, during Professor Reyes's tenure process, Professor Henslee gained semi-insider status by participating in the ploys against Professor Reyes with the majority clique.

71.  In yet another violation of the tenure process, Professor Lundy Langston, the woman who silenced Professor Ronald Griffin (by filing a complaint against him) when he argued against the race discrimination during Professor Reyes's tenure process in

fall 2014, took charge of the outside reviewer selection process with her co-chair, Professor Deleso Alford Washington. After Professor Reyes received excellent external reviews of her scholarship from law professors in top-ranked law schools, Professor Langston, at the last minute, slipped in a negative external review by a Black female law professor, from a lower ranked law school, whose area of expertise is critical race theory. Professor Randy Abate stated, in a memorandum to Dean LeRoy Pernell, that the external reviewer was not vetted through the Outside Reviewer Selection Subcommittee process. That external reviewer provided the only negative external review of Professor Reyes's scholarship.

72. The majority clique that took control of the tenure process, inappropriately placed great emphasis on the highly critical external review by the critical race scholar, someone who did not disclose in her external review that she and her friend, a self-described Afro-Latina law professor, both attacked Professor Reyes personally when they were all participants in the *Defining Multiracialism and its Impact on the Law* panel during the 2014 Southeastern Association of Law Schools Annual Conference. This was during the summer before Professor Reyes applied for tenure. The two professors mocked Professor Reyes for proposing that Hispanic/Latino has become a race and should be considered for inclusion in the racial categories of the next U.S. Census (the 2020 Census). Immediately after the panel, Professor Reyes approached the critical race theory scholar to introduce herself; the professor responded in a rude and dismissive manner. She told Professor Reyes, in what Professor Reyes perceived as a threatening tone, "you should tell LeRoy Pernell, your dean, that I said hello. He and I

go a long way back." During the tenure process, Professor Reyes did not know that this professor had become part of the internal ploys.

73.  There were additional ploys as part of Professor Reyes's tenure process. The ploys stated in this complaint are only a representative sample of the ongoing, severe and pervasive hostilities and indignities Professor Reyes has faced for years. On April 24, 2015, Professor Reyes submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, sex, and retaliation to FAMU's Office of Equal Opportunity Programs ("EOP") against members of the 2014-2015 RPT Committee who discriminated against her, harassed her, and made the tenure process as hostile as possible. The majority clique did not want a non-Black Latina from Hispanic origin to join the group of tenured professors.

74.  FAMU's EOP Director, Carrie M. Gavin, did a sham investigation of Professor Reyes's Charge and dismissed it. Professor Reyes documented the flaws in Ms. Gavin's sham investigation in a memorandum dated September 8, 2015, which Professor Reyes submitted to then President Elmira Mangum requesting review of the decision. On September 14, 2015, the then FAMU General Counsel, Avery McKnight, responded that there was no appellate procedure to review the EOP investigation.

75.  At the end of the RPT Committee review, the majority clique and their allies recommended denial of tenure to Professor Reyes. Dean LeRoy Pernell, after conducting an independent evaluation of the application and reviewing dissenting reports that advocated for tenure, recommended that Professor Reyes be granted tenure. He concluded that the majority in the RPT Committee did not provide a rational basis for its conclusion (recommendation). He also found that the RPT Report and

Recommendation issued by the RPT Committee did not set forth a rationale that supported the conclusion (recommendation).

76. The University T&P Committee, with Professor Broussard as the representative of the College of Law and Dr. Michael Abazinge as Chair, followed the lead of the RPT Committee.

77. Provost Marcella David, an experienced, accomplished law professor who had recently joined FAMU as provost, knew how to review an application for tenure by a law professor and did an independent review of Professor Reyes's application. Provost David and President Elmira Mangum recommended that Professor Reyes receive tenure. Professor Reyes's tenure was approved on June 10, 2015.

### The Racial Animus against non-Black Latinas in the FAMU College of Law

78. Comments about race, color, and national origin have been prevalent in Professor Reyes's experiences at FAMU. There has also been a race-sex/gender aspect to the ongoing discrimination. There is a history of discrimination against Hispanics-Latinas in the College of Law. Carmenelisa Perez-Kudzma, a Hispanic-Latina legal writing instructor, complained that she was being discriminated against by a Black woman, the then director of the legal research and writing program; her contract was terminated. Professor Reyes observed how Wanda Aviles, a Hispanic-Latina executive assistant who worked in the Dean's Suite, went through similar discrimination and hostile work environment as Professor Reyes although for a shorter period of time because she resigned due to the hostilities. Ms. Aviles described to Professor Reyes how a group of Black women targeted her when she was the only non-Black woman in the Dean's Suite. She also described how another Latina staff member adopted a Black

27

identity and was accepted by the majority clique. Ms. Aviles also described how Associate Dean Darryll Jones and Associate Dean Reginald Green joined in efforts to sabotage Ms. Aviles to gain favor with the Black women. Associate Dean Jones also raised his voice at Ms. Aviles in what she considered an abusive tone. Associate Dean Markita Cooper did not step in to help Ms. Aviles. Dean Pernell did not respond to Ms. Aviles's requests for a meeting with him.

79. Associate Dean Jones has also been abusive toward Professor Reyes for years. By targeting Professor Reyes he has bonded with the Black women who harass her. Associate Dean Jones has constantly rejected Professor Reyes's Hispanic/Latina/o race self-identification. According to him, she is White Latina.

80. After Professor Reyes accepted the offer to join the FAMU Law faculty, during a visit to look for housing she stopped by the law school and was introduced by a staff member to Professor Rhoda Cato, a more senior faculty member, a Black woman. Professor Cato's first comment to Professor Reyes was: "So you are the wise, Latina diva they hired." Professor Reyes was hired around the time of Justice Sonia Sotomayor's confirmation hearing, when Justice Sotomayor was attacked and chastised for her comment that a wise Latina judge may reach a different result than a wise judge of a different background and experience. Professor John Duncan's first comment to Professor Reyes when she joined the faculty was: "We are going to have fun with you." Professor Reyes found the comments inappropriate and odd but did not say anything.

81. Professor Patricia Broussard, during Professor Reyes's first weeks on the job, kept referring to Professor Reyes's Latina identity as the basis for her hiring. She seemed focused on and bothered by Professor Reyes's Hispanic/Latina identity.

Professor Reyes finally responded that she was qualified for the job beyond her Hispanic/Latina identity. Professor Broussard also told Professor Reyes that her daughter dated a man from Latin America, but emphasized that he was Black.

82. Professor Lundy Langston told Professor Reyes that the reason why the Black female professors were hostile toward her was because of her hair. She explained that her straight hair and light complexion means she is White. Professor Langston also told Professor Reyes that she identifies with her Dominican (someone from the Dominican Republic) hairdresser because they have the same hair texture and, as such, they share a racial connection. Professor Reyes does not have the same hair texture as Professor Langston and had no idea that her hair and skin color were being scrutinized.

83. The comments about race, color, and national origin distinctions continued year after year. It has taken Professor Reyes years working at FAMU to understand how "code language" is used by some Black faculty members. For example, some Black professors, primarily some of the ones who constantly targeted Professor Reyes, often responded to Professor Reyes's suggestions during faculty meetings with the phrase "this is a Black school." Eventually, Professor Reyes realized that this comment was meant to silence her and to signal to other faculty members that Professor Reyes should not comment because she is not Black.

84. There were also comments about a caste system depending on the national origin of immigrants. Black immigrants and immigrants from countries that are deemed Black are preferred. There is also a preference for dark skin color if someone is not Black. Related to this, Professor Reyes also learned that some Black faculty members divide Latinas/os between "Black Latino" and "White Latino." Some Latina/o students

shared with Professor Reyes that Professor Jeremy Levitt, during class, shamed Latina/o students into picking between the Black and White races after they initially self-identified as Hispanic/Latina/o. Hispanic/Latina/o students also shared with Professor Reyes that this questioning feeds racial conflict within the student body.

### Professor Reyes Endures Retaliation When She Opposes Race Discrimination against Hispanic/Latina/o Students

85. Administrators have not addressed the race-based discrimination against Hispanic/Latina/o students even though it has been brought to their attention by students. As early as October 31, 2008, G.F., a Hispanic student, filed a complaint based on race and national origin discrimination with FAMU's EOP Office against Professor Jeremy Levitt. On December 19, 2008, EOP Director Carrie Gavin sent a letter to the student advising him that she recommended that the complaint be dismissed in its entirety. On December 19, 2008, the student responded to Ms. Gavin stating: "I am amazed that the complaint is dismissed given the amount of persons and information provided to your office. I am also surprised a visit to our school never took place. I had previously shared my concerns regarding a less than thorough investigation. I still share this sentiment."

86. On May 13, 2021, HALSA Board members met with Dean Deidré Keller to raise some of the discrimination issues they face because they are Hispanics/Latinas/os/x. They also told her that they want Professor Reyes to be treated the same as other tenured professors. As of the date of this amended pleading, Dean Keller has not followed up with the HALSA Board or Professor Reyes about the negative experiences that were discussed during that presentation over two years ago.

87. In fall 2021, HALSA was not invited to join a domestic violence and breast cancer event organized by students in Professor Lundy Langston's domestic violence workshop in conjunction with the Black Law Students Association ("BLSA") and the Women's Law Caucus ("WLC"). Professor Jennifer Smith is BLSA's faculty advisor and Professor Patricia Broussard is WLC's faculty advisor. Professor Langston sent an email to the faculty announcing the event. Professor Reyes replied that she supported the event but thought it was a missed opportunity not to have invited HALSA because statistics showed that domestic violence against women rose during the Covid pandemic shutdown and breast cancer is the most common form of cancer among Latinas. Professor Langston got defensive and mischaracterized Professor Reyes's email as an attack on the work of the Black female students who organized the event. Unbeknown to Professor Reyes, Professor Langston copied two Black female students in the email to the faculty. After that, HALSA Board members reported to Professor Reyes that they were being questioned by Black female students about Professor Reyes's email in a very confrontational manner. Professor Reyes advised the HALSA Board members to send students to talk with her but none reached out to her.

88. In spring 2022, HALSA was excluded from co-hosting with BLSA a Lunch and Learn Zoom session with the Miami-Dade Public Defender's Office, which extended the invitation to both organizations. When Professor Reyes complained about the exclusion, Director Gary Harrington said it was because HALSA was not eligible due to a vacancy in the HALSA Board. There was no rule about this. Dean Keller went along with the exclusion of HALSA.

89. During a meeting with faculty on April 27, 2022, Dean Keller and her administrative team presented data, charts, and analysis on bar passage for Black graduates/students. Professor Reyes asked whether the same data was available for Hispanic/Latina/o/x graduates. Dean Keller responded that the data was available but they did not analyze it. Professor Reyes requested that a similar analysis be conducted for Hispanic/Latina/o/x graduates. As of the date of this pleading, that analysis has not been provided to the faculty.

90. On October 20, 2022, Professor Jennifer Smith harassed W.M., a student in Professor Reyes's fall 2022 evidence course. Professor Smith was not supposed to be in the classroom at the time the student entered to get ready for Professor Reyes's class. The student filed a complaint against Professor Smith and the FAMU Office of Compliance and Ethics ("OCE") issued a report finding that Professor Smith retaliated against the student, including by filing a complaint against her for the purpose of having the student report the complaint on her bar application. Professor Smith described the student as "one of reyes' students (Hispanic blonde)," "Aggressive rude." Professor Patricia Broussard participated as a witness on behalf of Professor Smith in the investigation with allegations about what she allegedly heard students say about W.M. in bathroom stalls. The OCE did not allow Professor Reyes to participate as a witness in the investigation on behalf of the student even though Professor Reyes had relevant information, including what students told her immediately after the incident happened, right before her evidence class and the harassment by Professor Smith. Professor Smith used the investigation as an opportunity to make heinous, defamatory allegations about Professor Reyes.

91. The fact that Professor Reyes opposes discrimination on behalf of students who are or are perceived to be Hispanic/Latina/o/x students and HALSA, as HALSA's faculty advisor, has made her a target of additional retaliation.

### The Majority Clique Pitted "Black Latina" vs. "White Latina"

92. A year after Professor Reyes was hired as a tenure-track assistant professor, the majority clique pushed for a legal writing instructor, a Latina who self-identified as Black, to be elevated to the tenure track faculty. Some professors and students reported that they did not know that the professor was Latina. Professor Reyes did not know she was Latina. Professor N.N. had changed her name and was primarily using the African name she adopted. When Professor N.N. applied to become a tenure track faculty member, she distributed documents to the faculty explaining that she changed her name to denote her African ancestry and moved from College Park to Pine Hills to be in a Black neighborhood. She emphasized her Black racial identity during the hiring process.

93. Professor Reyes greeted Professor N.N. when she was about to give her "job talk" to the faculty. Professor Levitt interrupted and physically got between Professor Reyes and Professor N.N. After that, Professor N.N. and Professor Reyes spoke briefly when they were alone one evening in the faculty suite. Professor Reyes perceived that Professor N.N. felt she had to stay away from Professor Reyes in order to gain favor with the majority clique. The more some professors, including Pat Broussard and Ann Marie Cavazos attacked Professor Reyes, the more they supported Professor N.N. They even wrote a workbook with her. This is how some Black faculty members divide Latinas/os.

94. During a faculty meeting, Professor Jeremy Levitt made it a point to correct the FAMU 2012 Self-Study, which the faculty was preparing to present to the ABA, to describe Professor N.N. as "Black Latina" and not as "Latina." Professor N.N. was present at the meeting but said nothing. During the meeting, Professor Reyes asked whether the ABA had a separate category for "Black Latino." Professor Darryll Jones looked at Professor Reyes with disdain and asked her what kind of Latina she is. Professor Reyes responded that she self-identifies just as Latina, but Professor Jones asked her again what kind. Professor Reyes responded that she would need some type of DNA test to tell him more. Professor Jones, Professor Levitt, and other members of the majority clique want Hispanics/Latinas/os/x to choose between a Black and White racial identity thereby disappearing the group racially. And, their preference is for Black Latinas/os.

95. Professor Levitt reignited the issue of Black Latina versus White Latina again on October 23, 2019 when he viciously attacked Professor Reyes in a racial and gender attack that was worse than his prior racial attacks against Professor Reyes. As part of his abusive emails, he falsely accused Professor Reyes of rejecting Professor N.N.'s "self-designation as Black and Latina." He characterized Professor Reyes as a "White Latina" with "white privilege," and attempted to once against pit her against Professor N.N., a "Black Latina" who was no longer working in the law school. The attack was particularly heinous because Professor Levitt falsely accused Professor Reyes of attacking Professor N.N.'s racial self-identification. This was character assassination in a political climate where those types of allegations can derail Professor Reyes's career. Professor Levitt copied the entire faculty in his abusive and defamatory email.

96. Professor N.N. is no longer in the FAMU College of Law. Professor Reyes was alienated from Professor N.N., another Latina professor, due to the race division that was fueled by the majority clique. This forced racial division was not good for Professor Reyes or Professor N.N.

### Racial Animosity and Discriminatory Treatment against Professor Reyes as "White Latina"

97. Professor Reyes has been subjected to the constant message that Black professors who discriminate against her perceive her as a White Latina and place that label on her to denote that she is not Black in the Black-White binary of race that they promote. During the DAC investigation, then Associate Dean and Professor Joan Bullock said that Professor Reyes is "White appearing." On April 8, 2020, Professor Jennifer Smith called Professor Reyes a "White Latina" during a presentation when Professor Reyes once again stressed that she self-identifies as Latina without any additional qualifier.

98. Another constant message Professor Reyes gets is that Black ancestry is superior, that Blacks have a superior right to life in the United States than Latinos, and that she is supposed to accept inferior status, including by accepting the discrimination, disparate treatment, and hostilities without complaining. For example, some years ago, Professor Jennifer Smith made a comment during a forum when Professor Smith was a panelist, as she saw Professor Reyes enter with students, that "Asians and Latinos are unintended beneficiaries of the Civil Rights Movement." Professor Reyes responded to the comment by briefly explaining that Latinos participated in the Civil Rights Movement, even if they were not in the South, and Chinese fought against the Chinese Exclusion Acts and racist treatment.

**Black Women Retaliated against Colleagues who tried to Defend Professor Reyes from Race Discrimination**

99. The racial hostility toward Professor Reyes became evident in the closed RPT Committee meetings when the Committee was reviewing Professor Reyes's application for tenure. Professor Ronald Griffin and Professor Randall ("Randy") Abate called out the race discrimination against Professor Reyes. Professor Griffin protested against it during a Committee meeting and Professor Abate documented it in a memorandum he sent to Dean LeRoy Pernell after the RPT Committee, led by the majority clique, recommended that Professor Reyes be denied tenure.

100.     In retaliation against Professor Griffin for opposing the discrimination, on October 1, 2014, Professor Lundy Langston sent an e-mail to then Dean Pernell with copies to his executive assistant, Pamela Leonard, and then Associate Dean Jones complaining about "reprehensible conduct" allegedly exhibited by an "African American male professor," Ronald Griffin, against her during an RPT Committee meeting on October 1, 2014. This was around the time when the majority clique was insisting that Professor Reyes's tenure review should not proceed as a result of the unsubstantiated allegation of late submission.

101.     On October 24, 2014, Professor Langston sent another e-mail that she characterized as "an official complaint" against Professor Griffin "for his [alleged] conduct referring to [her] and other [Black] female colleagues . . . as being malicious, evil, racist, and vile" against Professor Reyes during an RPT Committee meeting on October 23, 2014. Professor Langston stated that Professor Griffin made his statements "while addressing the viewpoints expressed by African American women committee members." Professor Langston sent her complaint to Dean Pernell and copied the

36

University President, the Interim Provost, the Board of Trustees' attorney, the University EEO Officers, the General Counsel, Chair Duncan, Associate Dean Jones, and Pamela Leonard (one of the Black women who was hostile to executive assistant Wanda Aviles when they worked together in the Dean's Suite; Ms. Leonard was also hostile to Professor Reyes since the hiring process when she delayed processing Professor Reyes's moving paperwork).

102.    In her complaint, Professor Langston described, with much verbosity, a scenario of "African American women committee members" breaking down and "sobbing, loudly" after Professor Griffin allegedly made his comments. "Two other African American women" allegedly "walked out of the meeting." Professor Langston claimed that the words that Professor Griffin allegedly used were "actionable as slanderous." She went on to define each term and seemed to conclude that Black women cannot be racist because of the racism they themselves experience.

103.    Professor Langston used her complaint against Professor Griffin to silence Professor Griffin's opposition to the discrimination and taint Professor Reyes's tenure process by potentially creating additional racial animus against her. Professor Langston, in violation of the FAMU EOC process, submitted her complaint about what she alleged happened in Professor Reyes's tenure meetings to decision-makers that were supposed to review and make recommendations on Professor Reyes's application for tenure at subsequent levels of review. Rather than limit herself to submitting her complaint to the University Equal Opportunity Programs Officer, which is the procedure specifically prescribed in the University Regulation, she sent her complaint to Dean Pernell, an African-American man, and copied the President, an African-American

37

woman, the Interim Provost, an African-American man, the Board's attorney, another African-American woman, the Associate Dean for Academic Affairs, an African-American man; the Chair of the RPT Committee, an African-American man, and Dean Pernell's executive assistant, an African-American woman. By including Ms. Leonard, Professor Langston riled up even the Black female staff, the majority of staff members in the law school.

104.     Professor Langston did not stop there. She and some of the other Black female faculty members complained behind the scenes about Professor Reyes and claimed that they were afraid of her. There were email exchanges with EOP Director Carrie Gavin and Human Resources liaison Adrienne Snyder raising all kinds of rumors about Professor Reyes being "dangerous."

105.     Professor Langston effectively silenced Professor Griffin from defending Professor Reyes against future racist attacks. In fact, since then, Professor Griffin distanced himself from Professor Reyes. This is how the retaliation served to alienate from Professor Reyes a colleague with whom Professor Reyes had enjoyed positive interactions.

106.     A junior Black female faculty member, C.H., was also retaliated against for exercising individual, independent thinking and not going along with ploys to harm Professor Reyes. After Professor C.H. was deemed "friendly" to Professor Reyes, the Black women in the majority clique turned against her. Professor Jennifer Smith even questioned Professor C.H.'s "blackness" during a faculty meeting when then Dean Felecia Epps, a Black woman, rushed to stand between Professor Smith and Professor

C.H. in a motion that seemed an effort to stop a physical altercation. Professor Reyes was present when this happened.

**The "Dangerous" White Latina Narrative and Blaming Professor Reyes for Actions she did not even know About When they Allegedly Happened**

107.   Even alleged "visions" have been used to promote the narrative that Professor Reyes is "dangerous." On November 4, 2014, then IT/Security Director Shashi Persaud reported to FAMU Police Officer Kelvin Hunter via email:

> "On Wednesday 10/29/14 at approximately 11:45AM, a law school professor, Jennifer Smith, arrived at the office. Professor Smith told program assistant Evett Collins, that she had a vision that another professor (Maritza Reyes) was going to harm Ms. Collins. Ms. Collins asked Professor Smith how she was going to be harmed and Smith pointed at her face with her hand in the shape of a gun. Professor Smith pretended she was firing the gun, then walked away. Ms. Collins felt significantly threatened by this and was in a state of panic. She reported the incident to law school security."

108.   Director Persaud never told Professor Reyes about Professor Jennifer Smith's violent vision about her or any other complaints against her. She found out when she obtained records of investigations. Those records show the deep racial hatred against Professor Reyes and how turning Professor Reyes into a "dangerous White Latina" conjures up race-based group frenzy, including workplace mobbing.

109.   FAMU's General Counsel Denise Wallace, a Black woman, has also misrepresented Professor Reyes's conduct, including on August 20, 2020, in an email to President Larry Robinson, Provost Maurice Edington, Dean Deidre Keller, and Associate Counsel Shira Thomas, intimating that Professor Reyes contacted the Office of the General Counsel in another university to ask about faculty meetings and sunshine laws when it was not Professor Reyes. This was around the time when FAMU and Dean

Keller were sued by a law student after Dean Keller closed the faculty meetings to students immediately after she became dean.

**Black Men Also Targeted Professor Reyes**

110.   In addition to dealing with hostilities from Black women, Professor Reyes has also been subjected to abusive conduct from Black men. For example, Professor Reyes only communicates with Professor Levitt in group emails and she is only around him during faculty meetings because he was highly abusive toward her since she joined the faculty in 2009. When Professor Reyes spoke about Professor Levitt's abusive conduct with Associate Dean Markita Cooper, she told Professor Reyes that she was also dealing with his harassment but, if Professor Reyes told anyone, she would deny it. Basically, Associate Dean Cooper said that she would lie. Therefore, Professor Reyes realized that she could not count on her to help. Professor Reyes had to fend for herself in an abusive workplace where she was more vulnerable than most.

111.   On May 9, 2019, Professor Levitt sent an individual email to Professor Reyes. This was soon after he ridiculed Professor Reyes at a faculty meeting on May 8, 2019, when, upon Professor Reyes's request for credit for her professional contributions, Professor Levitt responded that he was going to give her "a star and smelly sticker or happy face." Professor Levitt's subsequent email was an excuse to start conflict with Professor Reyes, claim offense, accuse her of racism, and insult her because of her race. On May 10, 2019, Professor Levitt accused Professor Reyes of "anti/Black Caucasian critiques of progressive Black men." In that email exchange, he also called Professor Reyes a "white Latin or Hispanic," and termed her response to his attack "[her] defensive and white privileged victim-based response." On May 13, 2019,

40

Professor Reyes demanded that Professor Levitt stop sending her emails and copied then Interim General Counsel Shira Thomas. Professor Reyes stated in pertinent part:

> Jeremy,
>
> You have crossed the line into harassment. I am copying attorney Shira Thomas, FAMU's Interim Vice President and General Counsel, so she can add this record to all the records in the Office of the General Counsel about FAMU Law and what happens here. I **am not** filing a Regulation 10.103 complaint because I have no confidence in the FAMU Office of Equal Opportunity Programs. They and the FAMU Office of the General Counsel have been aware of the hostile work environment in the law school for years. Unfortunately, like the avoidance of dealing with the hazing problem until it became public, the institution has, thus far, ignored the workplace environment problem in the law school. I hope that the selection of a new dean serves to address this cancer that has been killing the law school and harming human beings who find ourselves in a position of vulnerability.

112.     On May 14, 2019, Professor Reyes also put Provost Maurice Edington on notice of Professor Levitt's latest attack. She also notified then Interim Dean Nicky Boothe-Perry, Interim Associate Dean Phyllis Taite, and Associate Dean Reginald Green (Professor Levitt's friend since they were 1L students in law school). Professor Reyes reminded the three of them that they were present when Professor Levitt ridiculed her during the faculty meeting and they, as administrators, said nothing. In her email to Provost Edington and Interim General Counsel Thomas, Professor Reyes stated:

> The e-mail below from Jeremy Levitt confirms the latest setup. Jeremy Levitt bullied me at the faculty meeting (on 5/8/19) when we met to discuss the finalists for the dean position. Then, he followed up by e-mailing me. He escalated the situation and, after I defended myself and copied attorney Shira Thomas, he leveled a heinous and false accusation against me by stating that I am "attacking [him] and others on the basis of race and or gender." This is a blatant lie. It is also hypocritical and self-serving, especially after Jeremy Levitt called me a "white Latin or Hispanic" with "white privilege." This is how he and others view me in this workplace.

Professor Levitt is accusing me to silence me. I will not remain silent.

\*\*\*

The fact that this situation is happening in an HBCU law school with a publicized mission of social justice is troubling and demoralizing. How would people outside judge what is happening here? This is beyond embarrassing. It is abusive. The University should hire a reputable law firm to conduct an independent investigation of the workplace environment and propose a plan of action to address the mayhem.

113.    On May 15, 2019, Carrie Gavin, FAMU's EOP Director, sent an email to

Professor Reyes asking her if she wanted to file a harassment complaint. Professor

Reyes responded in pertinent part:

Based on my knowledge of how the FAMU Office of Equal Opportunity Programs (EOP) has conducted prior investigations of complaints by law professors and other employees, including me, I currently have no intention of filing a Regulation 10.103 complaint. You should remember what happened when then law professor Barbara Bernier filed her internal complaint against then Associate Dean Jeremy Levitt. The way the EOP conducted its investigation, reached a conclusion, and wrote it up provided cover for what Jeremy Levitt was doing. He got away with it and continues to get away with it, with full knowledge by actors at all levels of the institution. The law school and the ones under attack suffered the negative consequences, which some of us as still enduring. The State of Florida paid for the costs of the entire mess and is still paying.

With all due respect, I am not going to spend yet another summer, without pay, dealing with another non-productive, non-objective, sham internal investigation. FAMU is on notice of the hostile work environment and the actions against me. If additional circumstances arise, I may re-assess the need to file a complaint after consultation with legal counsel. In such case, the goal will be to get objective and independent review of my claims.

I understand that the only assistance you are offering is documenting that you told me to file a Regulation 10.103 complaint. I suggest that you go beyond that and finally advise the Provost and the President to hire a reputable law firm to conduct an independent, credible investigation of the hostile work environment in the law school.

114.    After Professor Reyes demanded that Professor Levitt stop sending her

emails, he joined in a group email to the faculty wherein Professor Phyllis Taite

dismissed Professor Reyes's comment and said that the "majority" was in agreement. Professor Reyes has heard the same "majority" comment for years and has come to understand that it is meant to constantly remind her that she is not part of the majority. In response to Professor Taite, Professor Reyes acknowledged her minority status. Professor Levitt then took this opportunity to reply to all faculty attacking Professor Reyes and questioning her race and gender identity.

115.    In summary, Professor Levitt, in his e-mail correspondence dated October 23, 2019, 2:56 PM:

a) began by insulting Professor Reyes and self-servingly claiming that there were no "EO concerns" raised by his harassment, which Professor Reyes qualified as abusive conduct;

b) applied some type of litmus test to question Professor Reyes's racial identity;

c) used a reference to former colleague N.[N.], a self-described Black Latina who was pitted against Professor Reyes, to set up a false race-based accusation against Professor Reyes;

d) ascribed to Professor the thinking of a Spanish conquistador (Pedro de Alvarado) who was a torturer and mass murderer of indigenous people;

e) falsely alleged that Professor Reyes admitted not understanding the diversity of Black people;

f) determined that Professor Reyes does not have the knowledge and experience Professor Reyes claims about "race, ethnicity, color, gender and religion in the US" because, according to Professor Levitt, Professor Reyes's experience is not morally equivalent to his;

g) labeled Professor Reyes a descendant of the "enslavers" of "[his] people;" and

h) criticized the definition of Latino that Professor Reyes used in an article in 2008 in the Harvard Law School student newspaper.

116.       Professor Reyes waited three weeks to see if any faculty member or administrator who was copied in Professor Levitt's email responded in her defense or at least asked her how she was feeling after such a vicious and public attack. No one reached out to her. Professor Reyes determined that she must respond; otherwise, her

43

silence may be deemed an admission of Professor Levitt's false allegations. In today's political climate, the types of race-based accusations Professor Levitt made about Professor Reyes foster hatred and animosity against the non-Black person. They are especially detrimental in professional settings and are used to destroy professional careers.

117.    Professor Reyes prepared a memorandum, dated November 13, 2019, which she submitted to the following: College of Law Faculty, President Larry Robinson, Provost Maurice Edington, General Counsel D. Denise Wallace, and EOP Director Carrie Gavin. In said memorandum, before responding to each of Professor Levitt's vicious racialized attacks, Professor Reyes stated:

I must respond to Levitt's dangerous and abusive allegations (See Composite Exhibit "A"). He made unsupported accusations and broad misrepresentations about me and what I have stated with the clear intent of harassing me, damaging my reputation, and promoting additional racial animus against me. Therefore, I cannot afford to leave his false allegations unchallenged. This is by no means an academic exchange. This is my response/defense to Levitt's discrimination and harassment, which institutional actors have been aware of. Again, I became his target as soon as I began working here.

***

The e-mail exchange that led to this memorandum response is a perfect example of how I have yet again been attacked by a member of this law school's faculty, and need to defend myself because, otherwise, the false allegations may be deemed admissions. The lies are spread all over the law school and beyond. This has happened before; therefore, I must respond, preferably in e-mails to all faculty, to try to avoid misrepresentations of what I said or did.

***

Can you imagine what would happen if I (a Latina) wrote to Levitt (a Black man) the hateful things he writes to me? To put Levitt's attacks against me in context, in his "*Fuck your Breath*" law review article, Levitt stated that hate "means to intensely dislike, harbor extreme hostility, or antipathy toward [another] 'usually deriving from fear, anger, or sense of injury.'" To me, Levitt's e-mails are full of

this hate. What is even more dangerous is that Levitt is using this institution to spread hate and a hate-filled rhetoric against people whom he perceives as not being "the same [as] or even similar" to him – people he places "on different sides of the enslavement and slavery index" [Levitt's words].

118.    Professor Levitt has not attacked any other faculty member with the racist and gendered attacks he has directed at Professor Reyes in plain view of many people, including deans and associate deans. President Larry Robinson and Provost Maurice Edington have been on notice. Professor Levitt has also attacked Professor Reyes in combination of race and gender - "White Latina." Professor Darryll Jones has also joined in attacking Professor Reyes in emails and in meetings. And, Associate Dean Reginald Green, their friend and ally, has also participated in ploys to sabotage Professor Reyes.

119.     Black female faculty members who themselves complained that they suffered gender discrimination from Black men on the faculty, including Professor Joan Bullock, Professor Lundy Langston, Professor Jennifer Smith, Professor Patricia Broussard, Professor Ann Marie Cavazos, Professor Nicky Boothe-Perry, and Professor Phyllis Taite joined with Black men in attacking Professor Reyes for years. In this way, attacking Professor Reyes became a source of Black racial solidarity. Other faculty and staff members follow the lead of the majority clique. That is how workplace mobbing works.

120.    For years, Professor Reyes has advanced that racial hostility causes divisions that should not happen in a law school with the noble mission of the FAMU College of Law. Even as she has faced ongoing discrimination and hostilities, Professor Reyes has worked to bring students of all race, ethnic, and cultural backgrounds

together for a common purpose of serving as catalysts for positive change. The diverse students in the law school are the reason why Professor Reyes has remained. She has helped many students and alumni. In turn, many students and alumni of diverse backgrounds have sought her mentoring and showed appreciation for her teaching and service. Some Black female students have been the most supportive, including because some share Professor Reyes's Christian faith. Many students and alumni have provided moral support and prayers along the years when Professor Reyes has been dealing with the ongoing discrimination, harassment, and hostile work environment, including workplace mobbing.

### The Discrimination, Harassment, Hostile Work Environment, and Retaliation Continued and Escalated After Professor Reyes Received the Tenure She Earned

121.    EOP Director Carrie Gavin's sham investigation of Professor Reyes's EOP Charge during the tenure process, including Director Gavin taking members of the majority clique at their word (even with one-sentence general denials), emboldened them in their ploys against Professor Reyes.

122.    For example, in her EOP Charge, Professor Reyes detailed several documented violations by Professor Broussard. Professor Broussard's response to the Charge consisted of one sentence: "I categorically deny all allegations of Ms. Reyes's Complaint." This was sufficient for EOP Director Gavin to conclude that Professor Reyes's Charge as to Professor Broussard's conduct was unsubstantiated. She did the same thing for all other wrongdoers.

### Professor Reyes Was Targeted Even When She was Visiting at UF Law

123.    The retaliation against Professor Reyes continued even when she was visiting at the University of Florida Levin College of Law ("UF Law") in fall 2015. When

46

Professor Reyes accepted the invitation to visit UF Law for one semester (right after her tenure ordeal), she remained in the FAMU payroll system. FAMU negotiated with UF Law for a rate they charged to cover Professor Reyes's FAMU salary and benefits. The rate they charged UF Law was higher than what they paid Professor Reyes. Therefore, FAMU received a windfall (over $60,000) which became a line item in the FAMU College of Law's budget. However, for all intents and purposes, Professor Reyes remained a FAMU employee.

124.     In fall 2015, Professor Darryll Jones, who was then Interim Dean, invited the new UF Law Dean to meet with the FAMU Law faculty in Orlando. However, he did not invite Professor Reyes. Professor Reyes learned about the invitation when the UF Law Dean told her, which placed Professor Reyes in an uncomfortable position. To Professor Reyes's recollection, this was the only time a dean from another law school in Florida was invited to visit with the faculty of the FAMU College of Law.

125.     That same semester (fall 2015), FAMU College of Law's Black Law Students Association ("BLSA") hosted UF Law's BLSA. A BLSA member told Professor Reyes that some FAMU College of Law BLSA members were gossiping with UF Law BLSA members about Professor Reyes. Professor Jennifer Smith was the faculty advisor of  the FAMU College of Law BLSA.

126.     Professor Reyes has been serving as faculty advisor of the Hispanic American Law Student Association ("HALSA") for many years. Professor Reyes planned to continue to advise HALSA during fall 2015. She reviewed the Student Handbook rules and confirmed that she could remain as faculty advisor, including because she was still a full-time employee in the FAMU system. UF Law arranged her

class schedule such that she could travel to Orlando to attend HALSA functions. She paid for parking at FAMU College of Law because she planned to attend HALSA events. Professor Reyes worked with HALSA's president to re-certify the organization through FAMU's bureaucratic process. She fulfilled all her duties as faculty advisor for the semester, including attending activities for Hispanic Heritage Month. She put a lot of time and effort into driving from Gainesville to Orlando to attend orientation for HALSA and all major events. She also spent lots of time communicating by phone and email with HALSA's president. UF Law arranged video conferencing so Professor Reyes could meet with HALSA's Board.

127.     Toward the end of the fall 2015 semester, Associate Dean Reginald Green, with the approval of Interim Dean Darryll Jones, instructed members of the HALSA Board to remove Professor Reyes as faculty advisor. Then Associate Dean Joan Bullock was also involved in the ploy. The hostile removal was effected in violation of the University Student Handbook, which required consultation with the faculty advisor prior to removal. Associate Dean Reginald Green, Interim Dean Darryll Jones, and Associate Dean Joan Bullock did not contact Professor Reyes.

128.     The president of HALSA reported to Professor Reyes that she was threatened with HALSA losing funding if Professor Reyes was not replaced. Associate Dean Green instructed then FAMU College of Law Student Affairs Director Fritzlaine Powell not to respond to Professor Reyes's request for information. One of Professor Reyes's ongoing harassers, Professor Patricia Broussard, replaced Professor Reyes as HALSA's faculty advisor without even contacting Professor Reyes. The hostile way in which the hostile removal was orchestrated was meant to humiliate Professor Reyes

48

and ostracize her from HALSA members, the majority of whom were Hispanic students. The institutional actors who participated in the hostile removal caused chaos, confusion, and division within HALSA and nearly decimated the organization.

129.    HALSA members reached out to Professor Reyes to find out what was happening. They reported that they were being called into a meeting to elect Professor Broussard as faculty advisor. However, the meeting and vote were being scheduled and conducted in violation of the provisions in the HALSA Constitution. Professor Reyes felt she had a duty to inform HALSA members to be careful and not violate HALSA's internal documents. She sent a couple of emails to HALSA members explaining what she knew about the situation and advising them not to violate HALSA's Constitution. Everything Professor Reyes stated in her emails to HALSA was true and stated in good faith for the benefit and protection of HALSA and its members. For the sake of HALSA, to avoid having the organization be further targeted in efforts to harm Professor Reyes, Professor Reyes did not challenge the removal as HALSA's faculty advisor.

130.    In further harassment of and retaliation against Professor Reyes, on November 25, 2015, the day before Thanksgiving, Professor Broussard submitted a false, malicious, and frivolous EOP Charge to the FAMU EOP against Professor Reyes. Professor Broussard alleged retaliation and Title IX stalking. She used the emails Professor Reyes sent to HALSA as the basis for her Charge. Professor Broussard also referenced a video of a faculty meeting and falsely alleged that Professor Reyes "attempted to push her way into [her] space." She also claimed that Associate Dean Green "was so upset by [the video.]"

131.     Associate Dean Green denied that he said what Professor Broussard alleged in her EOP Charge and stated that he did not watch the video.

132.     The video actually showed Professor Broussard blocking Professor Reyes from participation in the counting of votes during a meeting when a White male candidate was being considered for a clinic position. The video also showed that two Black female law professors were much closer to Professor Broussard than Professor Reyes and even made physical contact with Professor Broussard. Professor Broussard did not accuse them of attempting to push their way into her space. The video also showed Professor Cavazos questioning why Professor Reyes was counting the votes. Professor Reyes responded that she also had a right to participate in the counting like Black female professors.

133.     Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith sent emails with copy to all faculty insulting Professor Broussard. Upon information and belief, Professor Broussard did not file an EOP Charge against Professor Jennifer Smith after Professor Smith called her a "snake" and a "weasel" in emails that were filed in Professor Smith's federal case against FAMU. Upon information and belief, Professor Broussard has only filed an EOP Charge against Professor Reyes. In addition to slanderous accusations against Professor Reyes, Professor Broussard claimed that she was afraid of Professor Reyes and tried to stay away from her when the opposite was true.

134.     Professor Reyes responded to Professor Broussard's EOP Charge line by line. Professor Reyes noted that Professor Broussard's own actions belied her claims of fear and staying away from Professor Reyes. Professor Broussard

participated voluntarily in the hostile replacement as HALSA's faculty advisor. She was not afraid. She constantly looked for ways to harm Professor Reyes including via student situations and student organizations. Professor Reyes's comprehensive response to Professor Broussard's Charge demonstrated the falsity of Professor Broussard's conclusory and defamatory allegations. Professor Reyes requested that the EOP recommend that Professor Broussard be disciplined in accordance with FAMU Regulation 10.103(6)(d) for knowingly filing a false complaint of retaliation and Title IX stalking and for providing false testimony in the form of false facts alleged in her Charge. Professor Broussard was not disciplined and this further emboldened her to continue to harass Professor Reyes and make false allegations against her.

### The Hostilities against Professor Reyes Became Physical

135.     The hostilities against Professor Reyes have even become physical.

### The "Bump" Incident - Erica Polite
### February 9, 2015

136.     In spring 2015, as Professor Reyes was being tortured in the tenure process (for a second semester), a member of the IT staff, Erica Polite, who had been bringing lunch to Professor Broussard in her office that semester, bumped Professor Reyes on her shoulder as Professor Reyes was walking by her. Ms. Polite had the space available to move to her right and avoid the physical contact. Professor Reyes was literally against a wall and did her best to get against the wall to avoid Ms. Polite.

137.     Three years before that spring 2015 incident, Ms. Polite, a Black woman, screamed at Professor Reyes on the phone, about an IT issue. Professor Reyes reported that incident to Ms. Polite's supervisor, IT/Security Director Shashi Persaud, and avoided Ms. Polite since then. Professor Reyes could not avoid the bump.

Professor Reyes reported the bump incident to Director Persaud whose office door was open, right by where the incident happened. He claimed he did not see anything; however, Professor Reyes noticed that there was a surveillance camera and asked to see the surveillance video.

138.     The incident was reported to Associate Dean Reginald Green and Dean LeRoy Pernell; neither of them ever followed up with Professor Reyes. Instead, they escalated the situation by referring it to the FAMU Police in Tallahassee without even consulting with Professor Reyes. This was leaked all over the building and turned against Professor Reyes. Professor Reyes, the perceived "White Latina" was falsely portrayed as the person who reported the incident to the FAMU police against a Black woman.

139.     During her thirteen (13) years teaching in the FAMU College of Law Professor Reyes has never reported any of the many incidents she has experienced as a result of her employment in the law school to a police department (FAMU or otherwise), although she has considered it. Thus far, Professor Reyes has erred on the side of trying to resolve matters internally, unfortunately, to her detriment.

140.     Right after Professor Reyes reported the incident with Ms. Polite to Ms. Polite's supervisor (IT/Security Director Persaud), Professors Patricia Broussard, Rhoda Cato, and Phyllis Taite made a point of exaggerating their efforts to stay far from Professor Reyes as they passed her in the hallways.

**The Blood on the Office Door's Doorframe Incident**
**February 8, 2018**
**&**
**The Removal of the Christian Cross from the Office's Door Handle**

141.     On February 8, 2018, Professor Reyes was talking and walking with a student.  When they reached her office, Professor Reyes noticed a stain on the doorframe of her office door. It looked like blood to her, but she did not say this because the student was next to her. The student offered to clean the stain, but Professor Reyes told her that the office cleaning staff would take care of it. Professor Reyes's program assistant, Celia Westbrook, and Professor Rhonda Reaves also saw it. Professor Reaves, as she often did when Professor Reyes was targeted, dismissed it as if nothing happened. The cleaning crew later notified Professor Reyes that they had to report it to their supervisor because it appeared to be blood when they cleaned it. They took pictures. Professor Reyes informed Dean Pernell but he never contacted her about it.

142.     Professor Reyes shared about the incident with her mother and her mother gave her a Christian cross and asked her to put it on her office door handle. Professor Reyes did as her mother told her. Unfortunately, the cross was taken down from the door handle and thrown on the floor several times. The program assistants found the cross on the floor. The cleaning crew also found the cross on the floor and took pictures of the cross on the floor. Professor Reyes took down the cross and placed it on the inside of her office.

### Another Bump Incident – Professor Patricia Broussard
### Fall 2018

143.     At the beginning of fall 2018, Professor Broussard bumped Professor Reyes from behind as Professor Reyes was walking back from taking the group faculty pictures. Professor Broussard acted as if it was by accident and Professor Reyes did not say anything. Professor Reyes suspected that Professor Broussard, just like Erica Polite, wanted a reaction from Professor Reyes. For years, the majority clique and their

allies have been trying to get a reaction or outburst from Professor Reyes to support the false narrative they have disseminated about her. Professor Reyes has always maintained her composure and professionalism despite the many incidents in the hostile work environment.

### The Elevator Incident - Professors Patricia Broussard and Ann Marie Cavazos
### May 6, 2019

144.    On May 6, 2019, Professor Reyes entered the law school and headed toward the first floor elevators (two side by side) in the first floor lobby to get to the faculty suites in the third floor. As she was nearing the elevator, Professor Reyes saw Professor Joe Grant passing by with a student. Professors Broussard and Cavazos were walking together farther behind them. They were coming from the opposite direction from which Professor Reyes was approaching the elevators. Professor Reyes rushed to get in one of the elevators and pushed the button so the door would close but the door did not close. To her shock, Professors Broussard and Cavazos entered the elevator. Professor Reyes quickly exited the elevator.

145.    Professor Reyes then headed toward the other side of the building to use the elevator in the library. When the elevator door opened, Professors Broussard and Cavazos were standing in front of the door of the elevator with a Black female staff member, Claudine Beale, who has also engaged in hostile actions against Professor Reyes. Professor Reyes exited that elevator and headed away from them. Later, when Professor Reyes reviewed the surveillance video, she saw that, as they were laughing, they were signaling toward the direction to which Professor Reyes headed when she exited the elevator.

146.      The surveillance video of the first encounter by the elevator in the lobby showed Professor Broussard running toward the elevators to push the button and not allow Professor Reyes, who was already in the elevator pushing the button to close the door, to go up. The video also showed how Professor Cavazos looked out by the elevator door as she followed Professor Broussard into the elevator which Professor Reyes quickly exited after they entered.

147.      Professors Broussard and Cavazos are two of the Black female law professors who have been claiming, behind the scenes, at all levels of the University and beyond, that they are afraid of Professor Reyes and seek to avoid her. The surveillance video of the elevator incident demonstrated the falsity of their alleged fear. The video showed that they ran after Professor Reyes to be alone with her in the elevator. The video also showed that Professor Reyes did her best to avoid being alone with them for fear that they may harm her or falsely accuse her of doing something to them.

### By the Elevator Incident – Professor Jennifer Smith
### January 13, 2022

148.      On January 13, 2022, as Professor Reyes was headed toward her evening evidence course, from the third floor faculty offices' door, Professor Jennifer Smith exited the elevator ahead of where Professor was walking. Rather than continue walking, Professor Smith pulled to the side, waited for Professor Reyes to pass, mumbled something to Professor Reyes, and walked behind her so as to intimidate her. There is also a surveillance video of this incident.

### The Student Organizations Event Incident  - Professor Patricia Broussard
### March 28, 2022

149.    In spring 2022, Professor Broussard once again found a way to make a law school experience hostile for Professor Reyes, in front of students who had no idea of the ways in which Professor Broussard has harassed Professor Reyes for years. Professor Reyes was scheduled to serve as one of several panelists in a panel organized by several student organizations, including HALSA. A student representative of the Women's Law Caucus ("WLC") invited HALSA, at the last minute, to join in a diversity and inclusion grant application to the Florida Bar Young Lawyers Division with other student organizations that were invited before HALSA was invited.

150.    The WLC student representative noted in the invitation that WLC became aware of complaints that HALSA was being excluded from joint events. This was after Professor Reyes raised the issue of HALSA's exclusion from the domestic violence event organized in conjunction with Professor Langston's domestic violence course, in which the WLC joined with BLSA. This is the situation that the WLC student representative referenced as the reason for inviting HALSA to the joint diversity and inclusion event.

151.    Professor Reyes was glad that her raising the issue opened an opportunity for inclusion, for the benefit of all students. Professor Reyes advised the HALSA president and Board to accept the invitation even if it was last minute. Because it was at the last minute, HALSA was the only student organization that was noted on the application as pending approval by its Board, which was not fair to HALSA. Nonetheless, HALSA accepted the invitation and designated the HALSA vice president as the student representative for the planning committee of the joint event.

152.     Each student organization selected a panelist to represent the organization. HALSA designated Professor Reyes. The Caribbean Law Students Association designated Professor Kim Crag-Chaderton, the organization's faculty advisor. Other student organizations designated attorneys. Because Professor Broussard is the WLC's faculty advisor, Professor Reyes did her best to ascertain whether Professor Broussard was going to serve as moderator or panelist without directly asking students about it. Professor Reyes asked the HALSA student representative in the planning committee to ask for the name of the moderator. The HALSA student representative informed Professor Reyes that the WLC was not releasing the name.

153.     On Wednesday, March 23, 2022, the WLC student representative sent an email to all panelists with the questions for the panel. The list of email recipients did not include Professor Broussard. On Friday, March 25, 2022, Professor Reyes replied to the student's email and stated:

> Thank you for your email and for the questions. I look forward to contributing and participating in a diverse and inclusive event for the benefit of all students.
>
> I have not heard from the moderator of the panel. Who is it?
>
> Please send us the structure of the panel. Do we each say opening and closing remarks? How long do we each get for that? How long do we each get to respond to each question, etc.
>
> As for our bios, are those going to be read? If so, does someone from the student organization that submitted our name get to read it (for purposes of diversity & inclusion)?
>
> The panel is on Monday, so I would like to receive this information today, Friday, if possible.

154.     On Friday, March 25, 2022, the WLC student representative responded that the moderator would be Courtney Jones, a Black female attorney who works in the

FAMU College of Law's Office of Career Planning and Development. The student also provided the itinerary, which stated: "6:15 - 6:30 PM - Introduction of event and panelists by Moderator."

155.     On Monday, March 28, 2022, at 6:10 PM, Professor Reyes arrived in the classroom where the diversity and inclusion event was being held. When she opened the door, she saw all the panelists already seated and, to her shock, Professor Broussard was standing at the podium reading the bios of the panelists. Rather than leave the seat farthest from the podium empty for Professor Reyes, the only empty seat in the panel table was right next to the podium, right below from where Professor Broussard was standing. Moreover, to get to the seat, Professor Reyes had to walk behind all the seats where the other panelists were already seated.

156.     Professor Broussard started the panel early with full knowledge that Professor Reyes was not yet present. Professor Broussard made a comment about Professor Reyes being late, which prompted Professor Reyes to explain, by reference to the printout of the email she received, that she was actually early. When Professor Broussard read Professor Reyes's bio, she shortened it. She also said that she was going to deviate from the questions that were provided and asked her own questions.

157.     During the panel, Professor Broussard stood over Professor Reyes and mocked Professor Reyes about wearing a mask and not wanting to be videotaped. When Professor Reyes started to get up to participate in the panel group picture, Professor Broussard poked Professor Reyes on her left shoulder-arm with her finger and glasses and questioned why Professor Reyes was going to be in the picture if she

did not want to be on video. Professor Reyes had to explain the obvious, that video is not the same as a picture and she could take off her mask briefly to take a picture.

158.     Professor Reyes did her best to maintain her composure and not allow Professor Broussard to intimidate her with attorneys from the community, alumni, and students present. Most of the students and alumni were current and former members of the WLC. A few of them had been disrespectful to Professor Reyes in her evidence course (in different semesters). This has been a consistent circumstance for years; a few students who are close to Professor Broussard and her allies are rude and disrespectful toward Professor Reyes. One of those disrespectful students, including via email (in fall 2021), was the WLC Black female student representative who gave Professor Reyes the itinerary information and did not inform her of the change of moderator or start time for the panel. During the event, Professor Reyes felt uncomfortable and tense. Immediately after the event, Professor Reyes felt sick.

**The Review for Promotion to Full Professor Became a Continuation of the Discriminatory Review for Tenure and the Ongoing Hostile Work Environment**

159.     The effective date of Professor Reyes's promotion to associate professor was August 6, 2012. Her tenure was approved on June 10, 2015. Professor Reyes planned to submit her application for promotion to full professor as soon as she qualified under the University rule which required that she serve five (5) years in rank as associate professor. That meant she was qualified to apply in 2017.

160.     In 2017, FAMU adopted the Interfolio electronic application system which required that the Office of the Provost provide the information to access the system. Professor Rhonda Reaves was chair of the RPT Committee during the 2017-2018 academic year. Professor Reyes asked Professor Reaves for the Interfolio access

information on several occasions and Professor Reaves responded that she did not receive it. Professor Reyes was disappointed that Professor Reaves was not more proactive about getting the information in her role as chair of the RPT Committee. Professor Reaves knew that a promotion was the only way for Professor Reyes to get a raise, which she had not received since her last promotion in 2012. Rather than demand that Professor Reaves ascertain and provide the Interfolio access information, Professor Reyes did not raise the issue again and gave up on applying that year, which meant foregoing a 15% pay raise.

161.    Professor Reyes once again began asking the Office of the Provost for the Interfolio information the next year, in summer 2018. That year, Professor Rob Abrams was appointed chair of the RPT Committee. Professor Reyes finally received the Interfolio case access information at the last minute in fall 2018 and applied by the published deadline. She became the first professor from the College of Law to apply for promotion via the new online Interfolio platform. She had to figure out the system on her own.

162.    All ten (10) tenured, full professors who participated in the review of Professor Reyes's application for promotion to full professor were also members of the RPT Committee that reviewed Professor Reyes's application for tenure. They were:

 i.    Rob Abrams, a White man

 ii.   Nicky Boothe-Perry, a Black woman

 iii.  Pat Broussard, a Black woman

 iv.   Ann Marie Cavazos, a Black woman

 v.    Ron Griffin, a Black man

    vi.    Bill Henslee, a White man

    vii.    Darryll Jones, a Black man

    viii.    Rhonda Reaves, a Black woman

    ix.    Jennifer Smith, a Black woman, and

    x.    Phyllis Taite, a Black woman.

163.    They were all involved, in one way or another, in the discriminatory, harassing, and retaliatory tenure process Professor Reyes endured during the 2014-2015 academic year. They were all included in the internal EOP charge Professor Reyes submitted during her tenure process for discrimination based on race, color, national origin, sex, and retaliation. None of them provided responses explaining any of their wrongful actions or omissions during the EOP investigation.

164.    Professors Boothe-Perry, Broussard, Cavazos, Henslee, Jones, and Taite actively participated in the many ploys to derail Professor Reyes's tenure process. They escalated their hostilities and retaliation against Professor Reyes after she received tenure, including when some of them served in administrative roles. They bonded over workplace mobbing Professor Reyes. Professor Henslee, a White man, gained superficial acceptance within the majority clique by joining in workplace mobbing Professor Reyes.

165.    In her response to Professor Reyes's EOP complaint against the RPT Committee, Professor Jennifer Smith claimed that she did not participate in Professor Reyes's tenure process. However, on October 29, 2014, Professor Smith sent Ms. Evett Collins into a panic attack when she told her about her "vision" that Professor Reyes was going to harm Ms. Collins. Ms. Collins was the program assistant who went along

with the 5:05 PM false allegation of late submission of Professor Reyes's tenure application. Therefore, Professor Smith was involved in efforts to harm Professor Reyes during her tenure process.

166.     Director Shashi Persaud never warned Professor Reyes that Professor Jennifer Smith told Ms. Collins that she had a "vision" about Professor Reyes harming her. After Professor Reyes received tenure, Professor Smith escalated hostilities and retaliation against her, including by involving students.

167.     Dean Epps appointed Professor Jennifer Smith to chair the Student Disciplinary Committee and also appointed Professor Reyes to be a member of the committee. Right at the beginning of the spring 2017 semester, students told Professor Reyes that Professor Smith went to Professor Reyes's class right as the semester started and told students to visit her if they wanted to talk about student grievances (against other students). A student also told Professor Reyes that, once she went to Professor Smith's office, she realized that all Professor Smith wanted to do was to gossip about Professor Reyes.

168.     After the first meeting of the Student Disciplinary Committee, on January 13, 2017, Professor Reyes responded to a group email that Professor Jennifer Smith sent to the Committee and stated: "I understand that you have been meeting with students, including my Civil Procedure students, and informing them that it is about the Student Disciplinary Committee. What is that about?" Professor Smith responded: "I have not. I do not report to you. Do not email me with no facts." On January 13, 2017, Professor Reyes responded:

Professor Smith,

I was asking the question because it pertains to the Committee's work. Please keep it civil in these e-mails. There are staff members and also students in this Committee.

Best,

Prof. Reyes

169.     On January 13, 2017, Professor Smith responded (with copy to Professor Shiv Persaud, Professor Jonathan Fineman, Associate Dean Reginald Green, and Student Affairs Director Gary Harrington):

You have been reprimanded already for your email behavior to others. You acted inappropriately in the mtg on the 11th (only one who refused to adhere to the chair), so I am appointing a parliamentarian if I cannot have you transferred to another committee. JS

170.     Professor Reyes realized that Professor Jennifer Smith was spreading false rumors that Professor Reyes was "reprimanded" because she obviously found out about Dean Felecia Epps's October 18, 2016 letter of "counseling," which was the result of frivolous and malicious complaints by Professor Patricia Broussard, Professor Ann Marie Cavazos, and Emeritus Professor Nayaran Persaud (the father of IT/Security Director Shashi Persaud and Professor Shiv Persaud). The three complained after Professor Reyes exercised her First Amendment rights and participated in email exchanges with faculty at the University level during a time when FAMU President Elmira Mangum was being bullied by some members of the FAMU Board of Trustees and faculty, including retired Dr. Nayaran Persaud. Everything Professor Reyes stated in her emails consisted of true facts and substantiated opinions. However, Dean Epps did not give Professor Reyes an opportunity to respond to the allegations because she initially refused to tell her who submitted the complaints and also gave her a last-minute

opportunity to respond when she had already decided that she was going to issue a letter of "counseling" to Professor Reyes. A letter of "counseling" is not considered disciplinary action under the FAMU Regulation; therefore, Professor Reyes could not appeal the "counseling." Dean Epps took the side of the Black women who discriminated against and harassed Professor Reyes.

171.     Professor Reyes also realized that Professor Jennifer Smith's false allegation in reference to her conduct toward her, as chair of the Student Disciplinary Committee, was patterned after the language Dean Epps used in her March 3, 2016 memorandum about the incident when Professor Reyes did not return the document (evidence of abuse) to Professor Henslee, the then Chair of the RPT Committee, when he blindsided Professor Reyes during her first RPT Committee once she returned to the law school as a tenured faculty member. In said document, Professor Henslee assigned Professor Jeremy Levitt as Professor Reyes's mentor without consulting with Professor Reyes and with full knowledge of Professor Levitt's harassing conduct. When Professor Reyes protested the assignment during the meeting, Professor Henslee told her to take it up with the Provost. However, when she was leaving the meeting, he demanded that she return the one-page document with the mentor assignments. Professor Reyes refused and explained to Professor Henslee that she needed the document to take it up with the Provost as he instructed her to do. Professor Reyes felt accosted by Professor Henslee and reported the incident to Dean Epps who concluded that there was no wrongdoing, including about the mentor assignment, but warned Professor Reyes to give in to requests from the Chair.

172.      Professor Reyes noticed that Professor Smith and Dean Epps seemed very close. Professor Reyes confirmed how close when Dean Epps removed Professor Reyes from the Student Disciplinary Committee after Professor Smith sent a one word email to Professor Reyes, on January 13, 2017, stating: "DELETE." Dean Epps sided with Professor Smith and notified Professor Reyes, on January 17, 2017, that she was removing her from the Student Disciplinary Committee, which sent a message to professors, staff, and students in the Committee and throughout the law school that Professor Smith got away with bullying and discriminating against Professor Reyes.

173.      Professor Reyes reported Professor Jennifer Smith's abusive emails, including the "DELETE" email to Dean Epps and requested that Professor Smith be disciplined. Upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith for misusing the FAMU email to harass Professor Reyes. Upon information and belief, Dean Epps did not issue Professor Smith a letter of counseling when Dean Epps was copied in emails in which Professor Smith engaged in vicious abuse of Professor C.H., a junior faculty member who joined the tenure track faculty in fall 2014. Upon information and belief, Dean Epps did not issue a letter of counseling to Professor Smith after Professor Smith questioned Professor C.H.'s Black identity in a meeting in the presence of Dean Epps and many faculty members.

174.      Professors Boothe-Perry, Broussard, Cavazos, and Taite gave evidence against Professor Griffin in the *Langston v. Griffin E*OP complaint which Professor Langston submitted after Professor Griffin called these Black female law professors "malicious, evil, racist, and vile" when they derailed Professor Reyes's tenure process. After Professor Reyes received tenure, these Black female professors escalated their

hostilities against Professor Reyes, including by raising false allegations about her conduct.

175.     Three (3) of the ten (10) members of the RPT Committee (Professors Rob Abrams, Ron Griffin, and to a lesser extent Rhonda Reaves) became targets of hostility when they were deemed supportive of Professor Reyes's application for tenure. During the review of Professor Reyes's 2018 application for promotion to full professor they went along to get along with the discrimination and retaliation. That is how workplace mobbing works. They also knew they did not have the votes to overcome the will of the majority clique.

176.     The RPT Committee applied a quantitative standard for scholarship that did not appear anywhere in the CoL Faculty Handbook or in the interpretive memorandum provided to Professor Reyes (the "Nunn Memo") when she was hired. The Committee's application of a standard that did not exist in the CoL Faculty Handbook or the University Faculty Handbook was basically the same tactic as when the majority clique in the RPT Committee invented and used made-up standards to evaluate Professor Reyes's application for tenure and conclude that she did not meet the standards.

177.     The CoL Faculty Handbook did not state a quantitative standard for promotion; the "Nunn Memo" confirmed this. The Nunn Memo provided the only quantitative standard provided to Professor Reyes: (a) one "scholarly manuscript" that has been accepted for publication for promotion to associate professor; and (b) for promotion to full professor, "at least two additional scholarly works over that required for

promotion to associate professor." Professor Reyes met and exceeded this quantitative standard. She also met and exceeded the qualitative standard.

178.     The RPT Committee members who participated in the review and vote on Professor Reyes's 2018 application for promotion to full professor carried the discriminatory animus from the tenure process and their escalation or hostilities into the promotion process. They also used the promotion process to further retaliate against Professor Reyes after she continued to oppose the discrimination, harassment, hostile work environment, including workplace mobbing, and retaliation. By refusing to review Professor Reyes's application in accordance with the standards that were provided to her upon hire, they built on the same unlawfully, racially discriminatory animus and hostile work environment that drove violations of the rules and misapplication of the standards during Professor Reyes's tenure. In this way, they turned her promotion review into a continuation of her tenure process. The two became a continuous discriminatory, hostile, retaliatory process.

179.     The RPT Committee attached reports from Professor Reyes's prior application for promotion to associate professor (in Fall 2011) and for tenure (in Fall 2014). However, in violation of the express provision in the Faculty Handbook, they did not attach any of the external reviews of her scholarship conducted during those evaluations. They also refused to review her scholarship anew. This is how they set up their recommendation that she be denied promotion because she did not meet the scholarship standard, without reviewing her scholarship record.

180.     The RPT Committee's discriminatory actions tainted the entire process at all levels with discriminatory animus. All actors at higher levels of review, namely Interim

Dean LeRoy Pernell, the T&P Committee led by Dr. Michael Abazinge with Professor Patricia Broussard as the College of Law representative (same as during the tenure process), Provost Maurice Edington, and President Larry Robinson went along with the misapplication of the scholarship standard and decision of the RPT Committee. They did not conduct independent reviews. They rubber-stamped the RPT Committee's recommendation thereby condoning and participating in the discrimination, harassment, hostile work environment, and retaliation.

**Provost Edington and President Robinson Participated in the Discrimination and Hostilities**

181.   President Larry Robinson and Provost Maurice Edington had been made aware of the race discrimination and hostile work environment against Professor Reyes even before she applied for promotion to full professor, including since on or before March 2, 2017, when Professor Reyes reached out to President Robinson via email asking for help. They, both Black men, went along with the Black majority clique. They participated in the ongoing hostile work environment against Professor Reyes, including by rubber-stamping the discriminatory RPT Committee recommendation, making it difficult for Professor Reyes to get the promotion decision, and foreclosing appeal of the decision.

182.   According to the Provost's published schedule, the President was supposed to provide the decision to Professor Reyes in June 2019. When Professor Reyes had not received the decision by the beginning of July, she requested it. On July 17, 2019, Provost Edington responded to one of Professor Reyes's e-mails and stated: "You will be provided notification of the outcome of your application for promotion within the next week." A week after that email, Professor Reyes followed up because no

decision was provided within a week of Provost Edington's response. On August 5, 2019, Professor Reyes once again requested the decision from President Robinson and Provost Edington; this time, she copied Trustee Belvin Perry in the e-mail. That same day, August 5, 2019, Provost Edington responded and alleged that a letter was sent to Professor Reyes via regular mail on July 25, 2019. However, he never even bothered to confirm whether Professor Reyes received the letter and did not provide the letter to Professor Reyes via e-mail despite her several e-mails asking for the decision. This was additional hostility.

183.   Provost Edington falsely claimed that the letter was sent to Professor Reyes's mailing address, which FAMU had on file since Professor Reyes began working at FAMU in 2009. However, the letter was sent to a wrong address in Tallahassee and it was returned by the U.S. Postal Service to FAMU "Return to Sender – Not Deliverable as Addressed." Professor Reyes never resided in Tallahassee.

184.   Professor Reyes sent Provost Edington an e-mail on July 23, 2019, once again requesting the decision; however, Provost Edington did not respond until she followed up again on August 5, 2019. The letter from Provost Edington was dated July 24, 2019, but it was not provided to Professor Reyes until August 5, 2019 via email. He waited to provide the letter until the first day of the semester; this was an additional act of hostility. He finally gave Professor Reyes the negative decision on the first day of classes rather than during the summer when she was not teaching. He waited until Professor Reyes was starting to teach the heaviest teaching load of any professor in the law school (two large, required, first-year and second-year courses for a total of seven (7) credits).

69

185.    After Professor Reyes finally receive notice of the denial of her application for promotion, President Robinson and Provost Edington made it impossible for Professor Reyes to appeal the denial. They involved Associate Provost Genyne Boston (a Black woman) and General Counsel Denise Wallace (a Black woman), who engaged Professor Reyes in a back-and-forth of e-mails about the information, only to finally deny her the information and sabotage her appeal.

186.    On January 22, 2020, Provost Edington ostracized Professor Reyes in front of the faculty during a faculty meeting in the law school. Provost Edington disagreed with Professor Reyes's reiteration of something he said and turned to the faculty and asked them whether they sided with his version or Professor Reyes's. No one responded because no one was going to take Professor Reyes's side against the Provost. It was one more hostile way to send a message to the faculty that such types of hostility should be directed at Professor Reyes. Provost Edington undermined her in front of faculty and staff. After the incident, Provost Edington told Professor Reyes that it was not "personal." She responded that it felt very personal to her, including because of his institutional power as provost and as a Black man in an HBCU. However, Professor Reyes offered an olive branch and asked Provost Edington if he would finally agree to meet with her to come up with a plan to address the discrimination and hostilities, including the denial of her promotion. Provost Edington oddly responded by asking Professor Reyes if she would agree to meet and she responded, "Of course, this is what I have been asking for, to try to resolve matters amicably and put an end to the hostilities."

187.     On January 22, 2020, Professor Reyes followed up via email asking Provost Edington when he was available and offering to audio- and even video-record the meeting to avoid "that's not what I said" issues. Provost Edington did not respond to Professor Reyes's request to schedule a meeting. Professor Reyes realized that it was one more sham tactic.

188.     The denial of promotion meant that Professor Reyes did not get a long, overdue 15% raise. She also did not get other benefits, such as an office with a window.

189.     Professor Reyes must work harder than most full professors, including because she must deal with ongoing hostilities, including denial of information and resources she needs to do her job. In addition to the duties associated with being an excellent law professor, Professor Reyes must spend precious time defending against the constant attacks, writing memoranda about incidents, and documenting what she says and does in emails in order to be able to defend against potential allegations.

190.     Upon information and belief, Professor Reyes has been the target of more investigations than any other employee in the FAMU College of Law. Professor Reyes has always responded to every investigation with the truth, with professionalism, and with integrity. She has spent precious personal time responding to the malicious prosecutions to which she has been subjected.

### New Deans Participated in the Systemic Discrimination, Harassment, Hostile Work Environment and Retaliation against Professor Reyes

191.      As new deans (interim and permanent) have been appointed by President Robinson and Provost Edington, they have joined in the discrimination, harassment, hostile work environment and retaliation against Professor Reyes. President Robinson and Provost Edington have condoned the hostile work environment against Professor

71

Reyes. They have received notice for years of what a majority clique have done to Professor Reyes. Again, the phenomenon of workplace mobbing explains why so many people have participated in the harm against Professor Reyes, individually and collectively.

192.    Angela Felecia Epps was recruited and hired when Professor Reyes was visiting at UF Law. Professor Epps started her tenure as dean at the same time Professor Reyes returned from UF Law in spring 2016. Professor Reyes reached out to Dean Epps via email to welcome her to the law school. She also invited her to meet for coffee or lunch, a professional courtesy in many law schools when a new dean joins the faculty. However, Dean Epps responded that she would only meet in the law school building. There is no cafeteria in the law school; therefore, sharing a meal was not an option.

193.    When Dean Epps showed up in Professor Reyes's office, at the beginning of the spring 2016 semester, Professor Reyes decided to ask for her help. She tried to tell her about what had just happened in her tenure process and the recent frivolous charge by Professor Broussard. Professor Reyes tried to explain the discrimination and hostile work environment she was experiencing. Dean Epps responded that she did not want to hear history and that Professor Broussard had a right to file a charge. Dean Epps did not even try to empathize with Professor Reyes. She told her, "you got tenure and that's that." After Professor Reyes opposed the discrimination and hostile work environment, Dean Epps retaliated against her.

194.    The hostile way Dean Epps acted toward Professor Reyes upon meeting her, led Professor Reyes to think that she had been talking to some of the faculty

members who target Professor Reyes – the majority clique. When Professor Reyes tried to explain the hostile work environment she was facing, Dean Epps sided with the Black women who targeted Professor Reyes. She showed them sex/racial solidarity by going after Professor Reyes.

195.     Dean Epps never informed Professor Reyes that, on January 8, 2016, Director Persaud raised his "active concern" about Professor Reyes due to complaints made to him the prior year by Professor Lundy Langston, Professor Patricia Broussard, Professor Deleso Alford Washington, Professor Phyllis Taite, and staff members Erica Polite and Pamela Leonard, all Black women. He sent his email to newly appointed Dean Epps during her first week as dean. In his email, he stated: "I think you should be aware that I have fielded quite a few written and verbal complaints about Professor Reyes. Because of this, I have made my concerns known to the appropriate personnel on main campus in the past. This is just a heads up, thanks for your time."

196.     Dean Epps refused to help Professor Reyes. Instead, based on false complaints by Professor Pat Broussard and Professor Ann Marie Cavazos, Dean Epps issued a letter of "counseling" to Professor Reyes without due process. By terming it a letter of "counseling" and not a letter of "reprimand," she avoided giving Professor Reyes the due process required in the FAMU Regulations. However, in violation of said regulations, she placed the letter in Professor Reyes's file.

197.     When Professor Reyes submitted a Regulation 10.206 complaint about Dean Epps issuing and placing the letter of "counseling" in her personnel file to President Robinson, he refused to process it in clear violation of the FAMU Regulations. When Professor Reyes reported his refusal to abide by FAMU's Regulation to the

Division of Audit and Compliance, they also refused to investigate. Dean Epps continued to retaliate against Professor Reyes. Dean Epps only lasted as dean for about sixteen (16) months. During this time, she actively soiled Professor Reyes's record.

198.     Then, in April 2019, Nicky Boothe-Perry became Interim Dean and named her friend Phyllis Taite as Interim Associate Dean. They continued retaliating and escalating hostilities against Professor Reyes, including by targeting two students (a Latina and an Indian woman) whose independent research Professor Reyes supervised. They refused to process Professor Reyes's upper-level writing certification of the students' independent research papers, which the students needed to graduate. Interim Dean Boothe-Perry and Interim Associate Dean Taite used the setup to falsely accuse Professor Reyes of not doing her job in reference to the certification, in a public faculty meeting on January 29, 2020, when faculty and students were present. They also told the students not to communicate with Professor Reyes thereby marginalizing her. The students were afraid that they would not be able to graduate.

199.     Professor Reyes documented to Provost Edington that Interim Dean Boothe-Perry and Interim Associate Dean Taite were violating the Student Handbook provision that applied to the students and falsely accusing her. However, the damage was done. During the Boothe-Perry-Taite Interim Administration, Professor Reyes stopped supervising additional independent writing projects to avoid students getting harmed when Professor Reyes was targeted.

200.     On May 13, 2020, Interim Associate Dean Taite falsely accused Professor Reyes of withholding grades and threatened to put a memo in Professor Reyes's

evaluation file. On May 15, 2020, Professor Reyes reached out to Provost Edington about the false accusations, but he never responded.

201.     Professor Reyes actively participated in the dean search process of the current dean, Deidré Keller. She also encouraged Professor Markita Cooper to serve as Associate Dean of Academic Affairs once again. She suggested to Dean Keller that Associate Dean Cooper was the most qualified faculty member to become associate dean because she already knew the job and would support her.

202.     Dean Keller and Associate Dean Cooper also joined in the retaliation, hostile work environment, and workplace mobbing against Professor Reyes. Once again, Professor Reyes became the litmus test to show racial solidarity with the Black faculty members who target Professor Reyes, especially the Black women. Even before Dean Keller officially started working in the FAMU College of Law, she joined with then Interim Dean Nicky Boothe-Perry in an op-ed in the *Orlando Sentinel*, in summer 2020, when they both proclaimed their shared identity as Black women and mothers of Black boys in reference to the murder of George Floyd.

203.     As she was getting ready to start her tenure as dean, Dean Keller scheduled phone calls with faculty and, after those phone calls, she distanced herself from Professor Reyes.

204.     Dean Keller and Associate Dean Markita Cooper have also retaliated against Professor Reyes after she filed her EEOC charge. On October 20,2020, Professor Reyes told Dean Keller that she had filed an EEOC charge due to the ongoing discrimination and hostile work environment. Thereafter, both Dean Keller and Associate Dean Cooper retaliated against Professor Reyes, including by not providing

information that Professor Reyes should receive like where she was in the wait list of faculty waiting for a window office (reserved for full professors). They made Professor Reyes ask over and over again. Finally, during summer 2023, Associate Dean Reginald Green assigned Professor Reyes to a faculty office that is isolated from the program assistants, far from the printer, and across from and near the noisy mechanical rooms and the bathroom. Dean Keller participated in the hostile decision and has thus far refused to re-consider the decision in light of health and safety concerns that Professor Reyes raised to her. It is a pattern of conduct meant to humiliate, marginalize, and distress Professor Reyes.

205.     On February 24, 2021, Dean Keller and Associate Dean Cooper held a Zoom meeting with students and permitted two Black students to make disparaging comments about Professor Reyes when the students were arguing that they wanted a Black female visiting law professor (a friend of Professors Patricia Broussard and Jennifer Smith) to remain in the law school beyond the agreed upon term of her visit. The students wanted to know why she was not scheduled to teach the evening evidence course that Professor Reyes was teaching. The students who complained were not students who were taking the evidence course. Dean Keller and Associate Dean Cooper did nothing to address the disparaging comments the two students made about Professor Reyes.

206.     Immediately after the first Zoom meeting ended, Professor Reyes posted in the chat of the next Zoom meeting (a town hall), when some of the same students were still present, that law students should not engage in such conduct. Professor Reyes also posted that she may need to deal with the disparaging comments in due

time as in making them a teaching moment about professionalism. Dean Keller posted in the chat that she would discuss the situation with Professor Reyes. Thereafter, she asked to meet with Professor Reyes via Zoom but did not tell Professor Reyes that Associate Dean Cooper would also be present in the meeting.

207.     When the three met, Dean Keller proceeded to "counsel" Professor Reyes that some students could consider what Professor Reyes wrote as a "threat." However, Dean Keller did not receive any complaints from students about Professor Reyes. In fact, two Black female students emailed Dean Keller, with copy to Professor Reyes, complaining about Dean Keller's conduct of permitting the disparaging comments against Professor Reyes.

208.     After Professor Reyes met with Dean Keller, someone submitted an anonymous complaint to the Division of Audit and Compliance (DAC) against Professor Reyes with vicious, false allegations and referenced the "threat" that Dean Keller referenced. The DAC forwarded the complaint to the FAMU EOP and Sylvia Barge sent the one-page anonymous complaint to Professor Reyes. Professor Reyes prepared a 15-page memo and 62 exhibits to respond to the malicious and false allegations.

209.     On May 13, 2021, Ms. Barge notified Professor Reyes via email, with copy to EOP Director Carrie Gavin, that the anonymous complaint was closed. However, there was now a written report of the investigation stating that Dean Keller met with Professor Reyes and "counseled" her. The report stated that Dean Keller acknowledged that no students complained to her. The DAC did not receive any complaints from students. However, Dean Keller took it upon herself to view a threat where there was none thereby creating a reason to "counsel" Professor Reyes for no valid reason.

During the meeting with Professor Reyes, Dean Keller made serious allegations about what Professor Reyes may do to students without any proof that Professor Reyes has ever done any such thing. During that meeting, Dean Keller informed Professor Reyes that a faculty full of only Black professors meets the definition of diversity because Black people are from diverse countries and backgrounds. Professor Reyes responded that said rationale could apply to all race groups, but that is not what Dean Keller advocated in the predominantly white majority institution where she worked before.

210.    The anonymous complaint was one more instance when Professor Reyes was forced to document with evidence her innocence but the accuser(s) was not required to provide evidence in support of the accusations. The accuser did not even provide his/her/their name. The anonymous complaint, the processing of the complaint, the written report, and Dean Keller's reference to "counseling" all served to further soil Professor Reyes's professional/academic record.

211.    On May 11, 2022, Dean Keller gave Professor Reyes the lowest annual evaluation she has ever received (average), including by not giving her credit for her extensive service work, when the electronic faculty activities report that Dean Keller provided did not indicate that there were word count limits and more questions than appeared on the screen. When Professor Reyes was unable to include all the information in the spaces in the electronic form, she copied and pasted the questions into a Word document, answered them, and submitted them to Dean Keller in a PDF document (as she had submitted annual faculty activity reports to prior deans). Professor Reyes did not find out, until May 11, 2022, the day of her evaluation meeting, which Dean Keller insisted must be in person in the Dean's conference room (rather

than via Zoom as Professor Reyes requested), that there were more questions than the ones that appeared on the screen.

212.     During that hostile evaluation meeting, Dean Keller did not tell Professor Reyes, until the end of the meeting, that she would state in the evaluation form that she could not assess Professor Reyes's service because she did not provide the information. This was a two-year evaluation (2020-2021 and 2021-2022) which was a violation of the one-year evaluation procedure stated in the University Faculty Handbook. In an arbitrary and capricious manner, Dean Keller retaliated against Professor Reyes by not giving her credit for the merit of her two-year service work when Dean Keller was well aware of Professor Reyes's extensive service work, including as Chair of the 2020-2021 Faculty Recruitment Committee, all the Committees to which Dean Keller assigned her, and her service as HALSA's faculty advisor. Professor Reyes requested that Dean Keller provide the missing questions and allow her to submit the information. As of the date of filing of this amended pleading, Dean Keller and Associate Dean Cooper have not provided the additional questions to Professor Reyes.

213.     On May 13, 2022, Professor Reyes reached out to Provost Edington and requested that he intervene and instruct Dean Keller to provide the questions, allow Professor Reyes to provide the information, and re-assess her based on the merit of her work. Professor Reyes explained to Provost Edington that this was the first year that faculty received the electronic form, that there were glitches with the form (as documented in emails from the Dean's Suite including from Dean Keller), and that Professor Reyes's request was reasonable in light of the circumstances.

214.     On May 16, 2022, Provost Edington responded: "I will review this matter and follow up with you accordingly." On July 22, 2022, when Professor Reyes was still in unpaid status during the summer, she sent another email to Provost Edington following up on her request for assistance. On July 26, 2022, Provost Edington responded that he would follow up with her by the end of the week. On July 29, 2022, he responded that he discussed the matter with Dean Keller and decided that "[Dean Keller] is not obligated to conduct an additional evaluation of you. You are free to provide responses to the branch questions for inclusion in your file." On that same day, Professor Reyes replied to Provost Edington correcting several factual inaccuracies he stated about the electronic form and the process. Professor Reyes's last comment on the matter was: "Please let me know when Dean Keller will finally provide all the questions, so I can provide the responses I should have been permitted to provide." Professor Reyes did not receive the courtesy of a response or the missing questions; therefore, she was denied the opportunity to respond and at least include those responses in her file.

215.     Dean Keller has made it unbearable for Professor Reyes to do her job. To start, right as she became dean, she appointed Professor Reyes Chair of the 2020-2021 Faculty Recruitment Committee, during the Covid pandemic, and then sabotaged the work Professor Reyes needed to do by not providing the information she needed. She also allowed Director Adrienne Snyder, a Black woman, someone who was supposed to perform the Human Resources function and was involved behind the scenes in defamation and group hysteria about Professor Reyes (in emails) without ever telling Professor Reyes, to make getting information Professor Reyes needed for

the hiring process very difficult including by not responding to emails. When Professor Reyes asked to meet with her via Zoom, Ms. Snyder refused and said they would have to wait until her supervisor, Associate Dean Reginald Green, could attend the meeting. Associate Dean Green did not make himself readily available. Professor Reyes needed to get the hiring process started and no one was providing the resources she needed to do so. To add insult to injury, Dean Keller told Professor Reyes that she was not allowed to meet with Associate Dean Green or Ms. Snyder and that all questions should be submitted to Dean Keller. Dean Keller joined in discriminating against Professor Reyes and furthering the hostile work environment. Thereafter, Dean Keller promoted Ms. Snyder to Chief of Staff.

216.    When Professor Reyes complained about not getting the information she needed to start the recruitment process, Dean Keller asked her if she wanted to quit as chair of the committee. Professor Reyes responded that she would not quit and did not appreciate that Dean Keller seemed to be setting her up for failure. Professor Reyes knew that this could be used against her in an evaluation, including a post-tenure review.

217.    Professor Reyes worked seven days a week to do all her assigned duties in addition to the work required to do the recruitment process without assistance she should have received from Director Snyder and Associate Dean Green. Professor Reyes structured a professional hiring and recruitment process from scratch. It was the most successful hiring process since Professor Reyes has been a member of the faculty (over a decade). Professor Reyes organized and led the recruitment efforts in 50 public Zoom meetings and nine public full-day Zoom interviews all in compliance with

Florida's Sunshine Law. Three faculty members were hired: a Latina legal research and writing instructor (the first Latina alumni hired for a full-time teaching position); a doctrinal constitutional law professor (a Black man who immediately received majority status and joined in hostility against Professor Reyes); and a clinic director/professor (a White man who received tenure upon appointment after Professor Reyes helped him to prepare materials sufficient to support approval of tenure).

**The Majority Clique Voted a Highly Qualified White Woman Unqualified – Similar to How They Voted to Deny Professor Reyes Tenure and Promotion**

218.     Professor Reyes, as Chair of the 2020-2021 Faculty Recruitment Committee, presented the candidates to the faculty during a faculty meeting on February 17, 2021. For the doctrinal position, there were three finalists who were already tenured professors: a Black man, a White man, and a White woman. The Committee found them all to be highly qualified. Some faculty attended their full day interviews but some did not. Because all three were tenured, only tenured faculty (the RPT Committee) could vote on the first question – whether they were qualified for the position.

219.     During the meeting, the majority clique managed to foreclose consideration of the White woman who was highly qualified for a doctrinal position. She was a tenured law professor with outstanding credentials and experience. Her resume showed that her interests and work, since she was in law school, aligned with the mission of the FAMU College of Law. She had the best scholarship record of the three finalists in addition to impressive work experience, including prestigious federal district court and appellate clerkships. As a tenured associate professor, she had a better scholarship record and credentials than most tenured full professors in the FAMU

College of Law. She was eager to teach in an HBCU law school because of her commitment to social justice. The Faculty Recruitment Committee ranked her in the top two candidates with the Black male professor who was eventually hired.

220.    The White man did not progress to a vote. Then, the majority clique was ready to vote on the White woman without even discussing her credentials. The following faculty members (all members of the RPT Committee) voted that the White woman was not qualified: Pat Broussard, Ann Marie Cavazos, Ron Griffin, Yolanda Jones, Lundy Langston, Jeremy Levitt, Jennifer Smith, and Phyllis Taite. The Black man received a unanimous vote as he should have because the Committee had already found him to be qualified for the position, same as the White woman. However, by finding the White woman not qualified for the position, the majority clique ensured that only the Black man was considered for hiring. Therefore, the faculty did not get to proceed to a vote on ranking the candidates because only one was found to be qualified by the majority clique. Dean Keller was present when this happened and did not say anything.

221.    The obvious racial aspect of the vote reminded Professor Reyes of her own tenure and promotion votes by the majority clique. After the vote, Professor Reyes, as Chair of the Faculty Recruitment Committee, had to call the White female candidate and tell her that she was no longer under consideration because she was not found to be qualified. This was humiliating for a candidate with her credentials. Professor Reyes remembered the ways in which the majority clique diminished her qualifications in efforts to humiliate her and get rid of her like they got rid of the highly qualified White female candidate. The law professor cried when she heard the news and Professor

Reyes empathized with her and also cried after the phone call ended. It was one more racial traumatic experience during Professor Reyes's time at FAMU College of Law. Professor Reyes remains the only non-Black tenured woman in the FAMU College of Law.

222.     Something similar almost happened with the White male candidate for the clinic position. He was also highly qualified. However, he was not tenured and had never been in a tenure track position. The CoL Faculty Handbook permitted granting tenure upon appointment if the candidate met the standards. Professor Reyes, as Chair, worked with the candidate to put together a strong record for tenure upon appointment. He made it through the qualification question, but the next review happened in the closed RPT Committee meetings. There, the issue of "White man privilege" was raised by Black members of the RPT Committee. Professor Reyes responded that race should not become the issue; the issue was whether he met the standards and should be granted tenure upon appointment. A factor that helped him was that a Black female candidate withdrew from consideration and the other Black female candidate did not show much interest in the position. Therefore, he was the only remaining candidate.

223.     In 2021-2022, another White male candidate was being considered for tenure upon hire; he had tenure in another law school that was no longer in existence. Black female faculty members in the RPT Committee argued that he should not be eligible for tenure because the law school where he got tenure was no longer in existence. However, these were the same faculty members who favored granting tenure to a Black female candidate the year before when the law school where she received tenure was no longer in existence. The White male candidate had a much stronger

teaching, scholarship, and service record, including from years when he taught as a visiting professor in the FAMU College of Law. Professor Reyes once again had to defend her position that he was qualified for tenure upon appointment as a lateral hire and, for her, race was not a factor in the decision.

### The Discrimination, Hostile Work Environment, and Retaliation against Professor Reyes are Systemic

224.     After Professor Reyes filed her EEOC charge, the retaliation from President Robinson, Provost Edington, Dean Keller, Associate Dean Cooper and other faculty members has made Professor Reyes realize that the targeting is systemic. The emails about what seem like insignificant issues are many. It is the frequency, severity, humiliating, and recurring nature of what they do. They denied Professor Reyes an accommodation to teach from home during the pandemic when she provided a doctor's letter stating that she was the sole caretaker of her elderly mother and would put her at risk of contracting Covid if Professor Reyes were to teach in person.

225.     Dean Keller and Associate Dean Cooper had some discretion to decide which 50% of the faculty returned to teach in person. They made Professor Reyes teach in person. Then, Professor Reyes got sick and needed to be on bed rest with her leg up during the last week of the fall 2021 semester. She requested permission to teach those last three classes synchronously via Zoom. Dean Keller and Associate Dean Cooper said no, same as President Robinson and Provost Edington. What made their tactic even more hostile was that they insisted that Professor Reyes apply for an ADA accommodation when she kept telling them that she was not disabled. Then, when she applied, her request was denied. It was all a waste of time and additional work and stress. Professor Reyes did not get to rest. She had more work as a result of all the

back-and-forth of emails and the work she had to prepare to make up for class time instead of teach synchronously.

226.     Dean Keller has even refused to list Harvard University, the school from which Professor Reyes earned her highest law degree, in the Academic Regalia section of the College of Law Hooding Program. When Professor Reyes reached out to President Robinson about it, two years ago, he forwarded the matter to the Office of the General Counsel even though it was a clear academic affairs decision. FAMU's own academic regalia form asks faculty for their highest degree; this is the practice in academia. It is one more tactic to retaliate against Professor Reyes even at the expense of the best interest of the FAMU College of Law which would benefit from having Harvard University listed in the faculty academic regalia section of the program.

227.     It has become evident to Professor Reyes that the retaliation plan is to (1) keep her busy defending against ongoing hostilities and indignities, in addition to all the work, which reduces her time for scholarship; (2) make it as hostile as possible so she leaves "voluntarily" or gets sick and is unable to keep up with the job; (3) set her up for "good cause" dismissal, despite her tenure; and (4) ruin her chances of getting other jobs by soiling her professional record (including with false accusations, formal investigations, and by "blacklisting" her). This means that Professor Reyes is even more vulnerable after tenure and after she filed the EEOC charge. The ongoing incidents are meant to intimidate, ridicule, insult, ostracize, marginalize, and drive Professor Reyes out of the FAMU College of Law, after ruining her academic career.

228.     Through the years Professor Reyes, through records requests, has obtained surveillance videos showing some of the hostilities. The FAMU email system

has all the emails Professor Reyes has sent and received. Many of those emails are evidence of the hostilities, discrimination, harassment, hostile work environment and retaliation she has endured. Many of those emails also demonstrate the many times she has reached out to President Robinson and Provost Edington asking for help. She has even asked them to consider how what they have done and permitted to be done to her would look if it were being done to a Black woman in a predominantly white institution. They do not seem to care.

229.     As the 90-day deadline to file this lawsuit was approaching, Professor Reyes was still wrestling with the decision whether to sue FAMU. She did not make the final decision until the first week back to classes (August 15 – 19, 2022) in fall 2022 after she was verbally attacked by Professor Jeffery Brown, a Black man, on August 18, 2022. Some years ago, Professor Brown referred to Professor Reyes as a "fucking thing," during a committee meeting when then Associate Dean Darryll Jones, Professor Cavazos, and Professor Reaves were present. No one came to Professor Reyes's defense. In fact, Associate Dean Darryll Jones said Professor Brown's epithet was "inappropriate but understandable." Professor Brown also provided cover for Professor Jeremy Levitt when he attacked Professor Reyes during her first semester at the FAMU College of Law.

230.     On August 18, 2022, Professor Reyes provided notice of Professor Brown's verbal attack to Provost Edington, Dean Keller, Associate Dean Cooper and the faculty. They did not reach out to Professor Reyes about the matter. To Professor Reyes, this was definitive confirmation that the ongoing discrimination, harassment, workplace mobbing, and hostile work environment will continue unabated. No one within

FAMU will do anything to address the situation. After years of putting up with abuse in her workplace, Professor Reyes decided that she must file this lawsuit.

231.     Professor Reyes has been uplifted by students and alumni of diverse race, ethnic, and cultural backgrounds during the fourteen (14) years she has taught in the FAMU College of Law. Professor Reyes has remained in the FAMU College of Law because she cares about the law school and students. However, she can no longer tolerate the abuse. This is why she is filing this lawsuit and hopes that students and alumni will understand that it is her right, as a human being, to do what she can to protect herself from further harm.

**COUNT I**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Race**

232.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

233.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

234.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

235.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from race discrimination.

236.     Defendant discriminated against Plaintiff based on her race, Hispanic/Latina, by failing to promote her to full professor when she applied in 2018.

237.     Plaintiff is a member of a protected class.

238.     Plaintiff was qualified for the position of full professor when she applied in 2018.

239.     Plaintiff applied for full professor in 2018 and was denied the promotion and the 15% pay raise and other benefits associated with the promotion.

240.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

241.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT II**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Color**

242.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

243.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

244.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

245.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from color discrimination.

246.     Defendant discriminated against Plaintiff based on her color, light skin Hispanic/Latina, by failing to promote her to full professor when she applied in 2018.

247.     Plaintiff is a member of a protected class.

248.     Plaintiff was qualified for the position of full professor when she applied in 2018.

249.     Plaintiff applied for full professor in 2018 and was denied the promotion and the 15% pay raise and other benefits associated with the promotion.

250.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

251.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT III**
**Discrimination in the Terms and Conditions of Employment in**
**Violation of Title VII – Sex and Sex-Race**

252.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

253.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

254.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

255.     Defendant acted with deliberate indifference toward its obligation to provide a workplace free from gender and/or gender-race discrimination.

256.     Defendant discriminated against Plaintiff based on her sex and/or sex-race, female/Hispanic/Latina, by failing to promoter her to full professor when she applied in 2018.

257.     Plaintiff is a member of a protected class.

90

258.     Plaintiff was qualified for the position of full professor when she applied in 2018.

259.     Plaintiff applied for full professor in 2018 and was denied the promotion.

260.     Non-members of Plaintiff's protected class were treated more favorably and were promoted to full professor.

261.     Plaintiff suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT IV**
**Hostile Work Environment in Violation Title VII – Race**

262.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

263.     Plaintiff belongs to a protected group.

264.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her race.

265.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

266.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of race.

267.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her race, Hispanic/Latina. Such conduct was unwelcome.

268.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

269.     Plaintiff perceived the environment to be abusive or hostile.

270.     A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

271.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

272.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT V
### Hostile Work Environment in Violation Title VII – Color

273.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

274.     Plaintiff belongs to a protected group.

275.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her color.

276.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

277.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of color.

278.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her color, light skin Hispanic/Latina. Such conduct was unwelcome.

279.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

280.     Plaintiff perceived the environment to be abusive or hostile.

92

281.     A reasonable light skin Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

282.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

283.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

**COUNT VI**
**Hostile Work Environment in Violation Title VII – Sex and Sex-Race**

284.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

285.     Plaintiff belongs to a protected group.

286.     Defendant, by and through its employees, acted under color of law with respect to creating, maintaining, and/or condoning a hostile work environment for Plaintiff based on her gender and/or gender-race.

287.     These actions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

288.     Defendant acted with deliberate indifference toward its obligation to not subject employees to a hostile work environment on the basis of sex and/or sex-race and/or for retaliatory reasons.

289.     Plaintiff was subjected to insulting, humiliating and/or discriminatory conduct related to her gender and/or gender-race, female/Hispanic/Latina. Such conduct was unwelcome.

290.     The discriminatory and hostile acts described herein were severe and/or pervasive and altered Plaintiff's conditions of her employment making it more difficult for her to do her job, take pride in her work, and to desire to stay in her position.

291.     Plaintiff perceived the environment to be abusive or hostile.

292.     A reasonable Hispanic/Latina in her circumstances would consider the environment to be abusive or hostile.

293.     Defendant is directly and/or vicariously liable for the hostile environment created, maintained and/or condoned by its administrators, supervisors, and employees to whom it delegated the power to take tangible employment actions against Plaintiff.

294.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional distress.

## COUNT VII
## Retaliation in Violation of Title VII

295.     This claim is pled in the alternative.

296.     Plaintiff realleges paragraphs 1 through 231 as fully set forth therein.

297.     Plaintiff belongs to a protected group.

298.     Defendant, by and through its employees, acted under color of law with respect to the employment related decisions such as the promotion decision outlined herein.

299.     Those decisions were made and/or ratified by the Dean of the College of Law, the Provost, and the President.

300.     Defendant acted with deliberate indifference toward its obligation to not subject employees who engage in protected activity to adverse action.

301.     On October 22, 2014 and October 30, 2014, Plaintiff formally opposed and complained about unequal treatment, discrimination and bias when her attorney sent letters to then Interim Provost Rodner Wright and General Counsel Avery McKnight. On April 27, 2015, Plaintiff once again formally opposed and complained about unequal treatment, discrimination and bias when she submitted a Charge of Discrimination/Harassment on the basis of race, color, national origin, gender, and retaliation to Defendant's Office of Equal Opportunity Programs (EOP). However, Plaintiff had raised concerns informally before then and has continued to raise concerns about employment related decisions she suspected, in good faith, were discriminatory because of race, color, national origin, and/or sex. Plaintiff filed a Charge of Discrimination with the EEOC on May 29, 2020. Plaintiff continued to oppose the discrimination and hostile work environment in communications to Dean Felecia Epps, Interim Dean Nicky Boothe-Perry, and Dean Deidre Keller. They all retaliated against Professor Reyes.

302.     In response to raising these concerns, Plaintiff has been subjected to a pattern of retaliatory conduct, including ongoing harassment that is severe and/or pervasive and has altered the terms and conditions of her employment.

303.     Plaintiff has suffered and has damages such as lost compensation and benefits and emotional harm.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following:

a.  Back pay, in amounts to be determined at trial;

b.  Compensatory and consequential damages;

95

   c.  Front pay;

   d.  Injunctive and/or declaratory relief;

   e.  Prospective relief;

   f.  Pre-judgment and post-judgment interest at the highest lawful rate;

   g.  Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and

   h.  Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 9th day of October, 2023.

/s/ Maritza Reyes

P.O. Box 5102
Winter Park, FL 32793
mreyesclaim@gmail.com
305-308-8200

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 9, 2023, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send notice to Defendant's attorneys.

/s/ Maritza Reyes
Plaintiff, Pro Se